**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT HOSSFELD, individually and on | ) | |
| behalf of a class of all persons and entities | ) | Case No. 1:20-cv-07091 |
| similarly situated, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Hon. Judge Joan B. Gottschall |
| | ) | Hon. Mag. Judge Sunil R. Harjani |
| ALLSTATE INSURANCE COMPANY, | ) | |
| Defendant. | ) | |

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

**Page**

I.  BACKGROUND .................................................................................................2

    A.  The TCPA ..............................................................................................2

    B.  Facts ......................................................................................................4

        1.  Allstate's Internal Do-Not-Call Policy .....................................4

        2.  Allstate's Internal Do-Not-Call List .........................................4

        3.  Plaintiff's Experience ................................................................5

II.  LEGAL STANDARD ........................................................................................6

III.  ARGUMENT .....................................................................................................7

    A.  The Classes Are Clearly and Objectively Defined. ...............................7

    B.  All Rule 23(a) Requirements Are Satisfied. ..........................................8

        1.  Both Classes Are Sufficiently Numerous. .................................8

        2.  Common Questions of Law or Fact Exist. .................................9

        3.  Plaintiff's Claims Are Typical. ................................................10

        4.  Plaintiff Will Adequately Represent the Classes. ...................10

    C.  Rule 23(b)(2) Is Satisfied. ..................................................................11

        1.  Plaintiff Is Likely to Prevail on the Merits. ............................12

            a.  Allstate Is Liable Because the Telemarketers Did What Allstate Told Them to Do. ...............................................15

            b.  Telemarketers Making Calls Pursuant to Allstate's Polices Were Its Agents. ..................................................15

            c.  Allstate Cloaked Agents and Telemarketers with the Appearance of Agency. ...........................................17

            d.  Allstate Ratified the Calling Challenged in this Case. ...................19

2. Absent Injunctive Relief, Allstate Will Continue to Accept Business Derived from Illegal Telemarketing. ........................................................20

3. The Court Should Order a Nominal Bond or No Bond. ...........................21

4. Absent an Injunction, Plaintiff and the Classes Will Be Irreparably Harmed....................................................................................................21

5. Money Damages Are Not an Adequate Remedy. .....................................22

6. The Balance of Harms Favors the Proposed Injunction. ..........................23

7. A Preliminary Injunction Is in the Public Interest. ..................................23

D. Rule 23(b)(3) Is Satisfied. ........................................................................24

1. Common Questions of Law or Fact Predominate.....................................24

2. A Class Action Is the Superior Means for Resolving the Class' Claims...26

IV. CONCLUSION.........................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997)................................................................................24, 26

*Bilek v. Fed. Ins. Co.*,
8 F.4th 581 (7th Cir. 2021) ..............................................................................15

*Braver v. NorthStar Alarm Services, LLC*,
2019 WL 3208651 (W.D.Okla., Jul. 16, 2019).................................................20

*Butler v. Sears, Roebuck & Co.*,
702 F.3d 359 (7th Cir. 2012) ...........................................................................25

*Butler v. Sears, Roebuck & Co.*,
727 F.3d 796 (7th Cir. 2013) ...........................................................................25

*Cadence Design Sys., Inc. v. Avant! Corp.*,
125 F.3d 824 (9th Cir. 1997) ...........................................................................23

*Chapman v. Wagener Equities Inc.*,
747 F.3d 489 (7th Cir. 2014) .............................................................................8

*City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*,
867 F.3d 434 (3d Cir. 2017)...............................................................................7

*Coca-Cola Co. v. Purdy*,
382 F.3d 774 (8th Cir. 2004) ...........................................................................24

*D.U. v. Rhoades*,
825 F.3d 331 (7th Cir. 2016) ...........................................................................12

*Deposit Guar. Nat. Bank v. Roper*,
445 U.S. 326 (1980).........................................................................................27

*Fed. Pants, Inc. v. Stocking*,
762 F.2d 561 (7th Cir. 1985) ...........................................................................16

*FTC v. Lifewatch Inc.*,
176 F. Supp. 3d 757 (N.D. Ill. 2016) ...............................................................20

*G.M. Sign, Inc. v. Finish Thompson, Inc.*,
2009 WL 2581324 (N.D. Ill. Aug. 20, 2009) ..................................................10

*Gadelhak v. AT&T Serv., Inc.*,
    950 F.3d 458 (7th Cir. 2020) ............................................................................... 7

*Gebka v. Allstate Ins. Co.*,
    2021 WL 4951520 (N.D.Ill. Oct. 25, 2021) ........................................................ 7

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*,
    458 U.S. 375 (1982) ........................................................................................... 15

*Gomez v. St. Vincent Health, Inc.*,
    649 F.3d 583 (7th Cir. 2011) ............................................................................. 10

*Hatch v. Sunbelt Commc'ns & Mktg.*,
    282 F. Supp. 2d 976 (D. Minn. 2002) ................................................................ 12

*Hatch v. Sunbelt Commc'ns. & Mktg.*,
    282 F.Supp.2d 976 (D. Minn. 2002) .................................................................. 23

*Heather K. v. City of Mallard*,
    887 F. Supp. 1249 (N.D. Iowa 1995) ................................................................. 24

*Henderson v. United Student Aid Funds, Inc.*,
    918 F.3d 1068 (9th Cir. 2019) ........................................................................... 19

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) ............................................................................... 27

*Iowa Utilities Bd. v. FCC*,
    109 F.3d 418 (8th Cir.  1996) ............................................................................ 21

*Ira Holtzman, C.P.A., & Assocs. v. Turza*,
    728  F.3d 682 (7th Cir. 2013) ......................................................................... 7, 25

*J2 Glob. Commc'ns, Inc. v. Blue Jay Inc.*,
    2009 WL 4572726 (N.D. Cal. Dec. 1, 2009) ..................................................... 12

*Keim v. ADF Midatlantic, LLC*,
    2015 WL 11713593 (S.D. Fla. 2015) ................................................................. 19

*Klein v. Commerce Energy, Inc.*,
    256 F. Supp. 3d 563 (W.D. Pa. 2017) ................................................................ 19

*Krakauer v. Dish Network, LLC*,
    311 F.R.D. 384 (M.D.N.C. 2015) ...................................................................... 25

*Kristensen v. Credit  Payment Servs.*,
    12 F. Supp. 3d 1292 (D. Nev. 2014) .................................................................. 25

*Lineback v. Spurlino Materials, LLC*,
  546 F.3d 491 (7th Cir. 2008) ...................................................................... 24

*Lynn v. Monarch Recovery Mgmt., Inc.*,
  2013 WL 1247815 (D. Md. Mar. 25, 2013) .................................................. 12

*Malcak v. Westchester Park Dist.*,
  754 F.2d 239 (7th Cir. 1985) ...................................................................... 18

*Manno v. Healthcare Revenue Recovery Grp.*,
  289 F.R.D. 674 (S.D. Fla. 2013) .................................................................. 27

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) ........................................................................ 7

*Meyer v. Portfolio Recovery Assocs., LLC*,
  707 F.3d 1036 (9th Cir. 2012) ............................................................... 12, 22

*Mims v. Arrow Fin. Servs., LLC*,
  132 S. Ct. 740 (2012) .................................................................................... 2

*Morris v. Novastar Mortg., Inc.*,
  2006 WL 2707349 (W.D. Mo. Sept. 19, 2006) ............................................ 18

*Mullins v. Direct Digital, LLC*,
  795 F.3d 654 (7th Cir. 2015) ................................................................... 7, 27

*Nolan v. Reliant Equity Inv'rs, LLC*,
  2009 WL 2461008 (N.D. W. Va. Aug. 10, 2009) ......................................... 26

*Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*,
  826 F.3d 1030 (8th Cir. 2016) ..................................................................... 21

*Salyers v. Metro. Life Ins. Co.*,
  871 F.3d 934 (9th Cir. 2017) ....................................................................... 18

*Sandusky Wellness Ctr., LLC v. Wagner Wellness, Inc.*,
  2014 WL 6750690 (N.D. Ohio Dec. 1, 2014) .............................................. 26

*Simmons v. Charter Commc'ns, Inc.*,
  222 F.Supp.3d 121 (D.Conn. 2016) ............................................................. 13

*Snyder v. Ocwen Loan Servicing, LLC*,
  258 F.Supp.3d 893 (N.D.Ill. 2017) ................................................... 2, 8, 10, 12

*Suchanek v. Sturm Foods, Inc.*,
  764 F.3d 750 (7th Cir. 2014) ....................................................................... 25

*Taylor Corp. v. Four Seasons Greetings, LLC*,
  315 F.3d 1039 (8th Cir. 2003) ................................................... 12

*Turnell v. CentiMark Corp.*,
  796 F.3d 656 (7th Cir. 2015) ..................................................... 24

*U.S. Commodity Futures Trading Comm'n v. Oystacher*,
  2016 WL 3693429 (N.D. Ill. July 12, 2016).............................. 12

*U.S. v. Bethlehem Steel Corp.*,
  38 F.3d 862 (7th Cir. 1994) ....................................................... 23

*United States  v. Dish Network, L.L.C.*,
  2016 WL 29244 (C.D. Ill. Jan. 4, 2016) .................................... 12

*United States v. Davison*,
  691 F. Supp. 2d 1033 (W.D. Mo. 2009) ............................... 12, 20

*United States v. Dish Network, LLC*,
  75 F.Supp.3d 942 (C.D.Ill. 2014) ................................................ 3

*United States v. Dish Network, LLC*,
  954 F.3d 970 (7th Cir. 2020) ............................... 3, 4, 14, 16

*United States v. Stover*,
  650 F.3d 1099 (8th Cir. 2011) ................................................... 12

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011)................................................................ 25

*Westefer v. Snyder*,
  2006 WL 2639972 (S.D. Ill. Sept. 12, 2006)................................ 8

## Statutes

47 U.S.C. § 227(c) ............................................................................ 3

47 U.S.C. § 227(c)(1)........................................................................ 2

47 U.S.C. § 227(c)(5)........................................................... 8, 11, 13, 22

Pub. L. No. 108-10, 117 Stat. 557 (2003)......................................... 3

TCPA, PL 102–243, 105 Stat 2394 (Dec. 20, 1991) ...................... 22

## Other Authorities

*1992 TCPA Order,*
    7 FCC Rcd. 8752 (1992) ........................................................................ 3

*2003 TCPA Order,*
    18 FCC Rcd. 14014 (2003) .............................................................. 3, 13

*Futrell v. E-Rate Prog.,*
    2017 WL 3621368 (E.D.Mo. Aug. 23, 2017) .................................... 16

*In re Dish,*
    28 FCC Rcd. 6574 (2013) ................................................................. 17

*In re TCPA,*
    18 FCC Rcd. 14014 (2003) .................................................................. 9

*In re TCPA,*
    20 FCC Rcd. 13664 (2005) .............................................................. 3, 13

*In re TCPA,*
    23 FCC Rcd. 559 (2008) .................................................................. 24

*Notice of Proposed Rulemaking, Ams. to the Telemarketing Sales Rule,*
    67 FR 4492 (Jan. 30, 2002) ................................................................. 3

Rest. (2d) of Torts § 877 ............................................................................ 15

Rest. (3d) of Agency § 1.01 ............................................................... 15, 16

Rest. (3d) of Agency § 2.03 ...................................................................... 18

Rest. (3d) of Agency § 4.01 ...................................................................... 19

Rest. (3d) of Agency § 4.03 ...................................................................... 19

Rest. (3d) of Agency § 7.04 ...................................................................... 15

S. Rep. 102-178, 1, 1991 U.S.C.C.A.N. 1968, 1969 (Oct. 8, 1991) ............... 22

## Rules

Fed.R.Civ.P. 23(b)(2) ............................................................................... 11

Fed.R.Civ.P. 23(a)(1) ................................................................................. 8

Fed.R.Civ.P. 23(a)(2) ................................................................................. 9

Fed.R.Civ.P. 23(a)(3) ............................................................................... 10

Fed.R.Civ.P. 23(b)(2) .................................................................................................. 1, 2

Fed.R.Civ.P. 23(b)(3) ................................................................................................ 1, 24

Fed.R.Civ.P. 23(g)(1) ..................................................................................................... 11

## **Regulations**

16 C.F.R. § 310 ............................................................................................................... 14

47 C.F.R. § 64.1100(h) ..................................................................................................... 9

47 C.F.R. § 64.1200(c)(2) ................................................................................................. 3

47 C.F.R. § 64.1200(d) ......................................................................................... 1, 13, 24

47 C.F.R. § 64.2305 ........................................................................................................... 9

## EXHIBIT LIST

Plaintiff is concurrently filing a motion for summary judgment. For consistency – and hopefully clarity – Plaintiff has coordinated exhibit letters and designations here with those referenced in his Statement of Material Fact. The only exhibit here that is not referenced in the Statement of Material Fact is Ex.W, the Declaration of Alexander H. Burke.

Items with an asterisk (*) have been filed provisionally under seal pursuant to Plaintiff's Motion for Leave to File Under Seal, Dkt. 144. Plaintiff is publicly filing redacted copies of such exhibits wherever possible.

A.      Allstate's DNC Policy

B.      1st Lim Deposition Transcript

C.      2d Lim Deposition Transcript*

D.      Basit Deposition Transcript

F.      Marovitch FRE 1006 Summary

       F.1      Allstate IDNC List Production Email

       F.2      Allstate IDNC List Excerpt*

       F.3      Transfer Kings IDNC List*

       F.4      Phone Number Matches of Allstate and Transfer Kings IDNC Lists*

       F.5      Combined Transfer Kings/Atlantic Allstate Call Transfer Records*

       F.6.     Calls Transferred Despite Phone Number on Allstate's IDNC List*

       F.7      Transfer Kings/Atlantic Post-Filing Allstate Call Transfers*

G.      Hossfeld Declaration

       G.1      HOSSFELD000052, Transcript of Call 1 (Callback)

       G.2      HOSSFELD000051, Transcript of Call 2 (Callback)

G.3     HOSSFELD000053, Transcript of Call 3*

G.4     HOSSFELD00005, Recording of Call 3*

G.5     HOSSFELD00001-2, Email from Jayne Joscelyne (Nov. 13, 2020)*

G.6     HOSSFELD000054, Transcript of Call 6. *

G.7     HOSSFELD000055, Transcript of Call 9. *

G.8     HOSSFELD000056, Transcript of Call 10. *

G.9     HOSSFELD000057, Transcript of Call 11. *

G.10    HOSSFELD00005, Transcript of Call 12. *

G.11    HOSSFELD00003-5, Quote for Insurance Received During Call 12. *

G.12    HOSSFELD000183-207, Quote for Insurance Received During Call 14.*

H.      Allstate's Discovery Responses

M.      Allstate Agency Standards August 10, 2020 (ALL0000257-284) *

N.      Group Exhibit of Reflecting Examples of Allstate Policy Changes*

O.      Non-Approved Vendors Notice Feb. 19, 2021 (ALL000036) *

P.      Non-Approved Vendors Notice Sept. 14, 2021 (ALLSTATE0117638) *

Q.      Rafford Deposition Transcript

S.      Allstate Records Retention Policy (ALL000042-43)*

T.      Warner Deposition Transcript*

U.      Wroblewski Deposition Transcript*

W.      Declaration of Alexander H. Burke

Aimed at controlling the "scourge of modern civilization" the Telephone Consumer Protection Act prohibits telemarketing to consumers who have requested not to receive calls. 47 C.F.R. § 64.1200(d). These provisions are known as the "internal do not call" or "company specific" do-not-call rules, and are referred to hereinafter as "IDNC." The IDNC regulations require all companies that make telemarketing calls, or that accept business derived from telemarketing calls, to establish and implement compliant IDNC policies and practices, and prohibits all telemarketing calls unless its requirements are met.

These regulations sweep in broad strokes, and prohibit *all* telemarketing calls by or on behalf of a company, unless there are proper policies, practices and procedures in place.

Allstate's formal, written IDNC policy, Ex. A[1], is defective because it impermissibly allows Allstate and third-party telemarketers to call phone numbers that are on Allstate's IDNC list, if the caller believes it has "express written invitation or consent." No such exception exists under the TCPA's IDNC regulations. Because of this improper policy, neither Allstate nor its telemarketers scrub phone numbers they believe they have "consent" to call against any IDNC list. Ex. B, 1st Lim Dep. at 44:3-8; Ex. C, 2d Lim Dep. at 96:3-7; Ex. D, Basit Dep. at 18:14-19. Allstate's IDNC policy thus *specifically authorizes* anyone making telemarketing calls on its behalf to call phone numbers that are on its IDNC list, in direct violation of the TCPA.

Such Plaintiff seeks certification of a Fed.R.Civ.P. 23(b)(3) damages class to redress past violations, as well as a Fed.R.Civ.P. 23(b)(2) injunctive relief class to prevent future violations. The Fed.R.Civ.P. 23(b)(3) class is defined as:

**Damages Class**: All residential telephone subscribers in the United States (i) to whom more than one call was made for the purpose of encouraging the purchase of

---

[1] Plaintiff is filing concurrently a motion for summary judgment, and will use the same exhibit labeling protocol herein as in the Statement of Material Facts. This motion will only attach those exhibits referenced herein.

1

Allstate goods or services (including to find a marketing "lead" for Allstate goods or services) in any 12-month period, (ii) to the telephone number of a residential subscriber, (iii) where that phone number had been added to Allstate's or any telemarketer calling for Allstate's internal do-not-call list at least 31 days prior, and (iv) where the DNC request happened no longer than five years before at least one call.

Plaintiff also requests that the Court certify the following injunctive class pursuant to

Fed.R.Civ.P. 23(b)(2):

> **Injunctive Class:** All residential telephone subscribers in the United States who requested – either directly to Allstate or through a person engaged in developing business for Allstate – not to receive Allstate telemarketing calls to such residential telephone number.

Plaintiff requests that the Court enjoin Allstate from accepting business derived from

telemarketing until it brings its IDNC policies, practices and procedures and into compliance,

and creates a complete Master IDNC List. Alternatively, the Court should find that the requisites

for an injunction are present, but abstain from entering a final injunction as Judge Kennelly did

in *Snyder v. Ocwen Loan Servicing, LLC*, 258 F.Supp.3d 893, 916 (N.D.Ill. 2017), so that the

parties may confer and try to agree as to an injunction's appropriate scope.

## I.    BACKGROUND

### A.    The TCPA

With bipartisan support, President George H.W. Bush signed the TCPA into law on

December 20, 1991, to address widespread public outrage over the proliferation of intrusive,

nuisance calling practices. *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012). Congress

directed the FCC to "initiate a rulemaking proceeding concerning the need to protect residential

telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they

object." 47 U.S.C. § 227(c)(1). After evaluating different approaches through public comment,

the FCC adopted the original version of the IDNC regulations, which banned initiating telephone

solicitations absent procedures to prevent calls to consumers who didn't want them. *See 1992 TCPA Order*, 7 FCC Rcd. 8752 at ¶¶ 7, 10-24 (1992) (citing 47 U.S.C. § 227(c)).

The 2003 Do-Not-Call Implementation Act directed the FCC to issue regulations strengthening the TCPA's privacy protections. Pub. L. No. 108-10, 117 Stat. 557 (2003); *see also 2003 TCPA Order*, 18 FCC Rcd. 14014 ¶ 15 (2003). The FCC thus implemented the National Do Not Call Registry and made other changes to the TCPA. *2003 TCPA Order*, 18 FCC Rcd. 14014 ¶ 28; 47 C.F.R. § 64.1200(c)(2). The biggest 2003 change to the internal do-not-call regulations was to apply them to any "telemarketing" calls, rather than "telephone solicitations." *2003 TCPA Order*, 18 FCC Rcd. 14014 ¶ 96 (citing "amended rule at 47 C.F.R. § 64.1200(d)"). This change abolished any "existing business relationship" ("EBR"), permission/invitation, or consent exemption for internal do-not-call claims. As the FCC observed at that time, "'established business relationship' … is not an exception to the company-specific do-not-call rules." *2003 TCPA Order*, 18 FCC Rcd. 14014 at fn. 351. The FCC reiterated this point in 2005:

> Once the consumer makes a company specific do-not-call request, whether to the company or third party, the company and its third party telemarketer may not call the consumer again on behalf of that company to make a telephone solicitation regardless of whether the consumer continues to do business with the company.

*In re TCPA*, 20 FCC Rcd. 13664, 13668 ¶ 7 (2005). This FCC order also makes clear that IDNC requests must be coordinated among sellers, agents and subagents. *Id*.; *accord U.S. v. Dish Network, LLC*, 954 F.3d 970, 976 (7th Cir. 2020).[2] In other words, sellers must compile a Master IDNC List so that (a) do-not-call requests made to a subvendor are result in that phone number

---

[2]     Although *Dish* concerned both the TCPA and the FTC's Telemarketing Sales Rule, this portion of the opinion only mentions the TSR. However, the FTC's internal do-not-call rules are "designed to track the approach in the FCC Rule" in the TCPA. *United States v. Dish Network, LLC*, 75 F.Supp.3d 942, 954 (C.D.Ill. 2014) (quoting *Notice of Proposed Rulemaking, Ams. to the Telemarketing Sales Rule*, 67 FR 4492, 4516 (January 30, 2002)).

being added to the Master IDNC list, and (b) those requests are honored by all the seller's other subvendors. 954 F.3d at 970.

**B.    Facts**

**1.    Allstate's Internal Do-Not-Call Policy**

Allstate's internal do-not-call policy permits telemarketing calls to persons who requested not to receive telemarketing calls, but who are believed to have provided consent to receive calls:

> Do not initiate a telephone call to phone numbers on the Allstate Do Not Call list for the purpose of encouraging the purchase of products or services, unless a consumer or customer on the Allstate Do Not Call list has made an inquiry about a product or service as evidenced by an express written invitation or consent to call the person and phone number.

Ex. A at ¶1. This policy applies to Allstate insurance agents, and Allstate requires that it be provided to and adhered to by third-party, non-contracted telemarketing vendors, too. Ex. B, 1st Lim Dep. at 74:5-11; Ex. C, 2d Lim Dep. at 48:2-49:8. In practice, this means that "if [a caller on behalf of Allstate has] express written invitation or consent to call you don't need to scrub against [Allstate's IDNC] scrubbing tool." Ex. B, 1st Lim Dep. at 44:3-8.

**2.    Allstate's Internal Do-Not-Call List**

Allstate maintains an internal do-not-call list, but the list is incomplete, cumbersome to use and unavailable to those who perhaps need it most: Non-Contracted Telemarketers. Ex. B, 1st Lim Dep. at 46:7-23. And although Allstate has the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Ex. S, Retention Policy at ALL00042-43; Ex. C, 2d Lim Dep. at 27:18-32:10, it does not investigate as to whether its IDNC list is complete and up-to-date or *even inquire* as to whether Non-Contracted Telemarketers are complying with its ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. B, 1st Lim Dep. at 55:4-8; Ex. C, 2d Lim Dep. at 54:11-57:17.

Instead of properly maintaining its IDNC list, Allstate blindly tasks others with updating

its IDNC list. However, that process makes doing so virtually impossible. Allstate's system will not permit Non-Contracted Telemarketers to scrub against, or add numbers to its IDNC list. Ex. B, 1st Lim Dep. at 46:7-23 (not permitted to scrub), 57:24-58:13 (not permitted to add numbers). Instead, Allstate agents are *required* to submit both phone numbers and names into the system. Ex. B, 1st Lim Dep. at 47:23-50:3.[3]

The effects of Allstate's illegal and improper IDNC policies is manifest when one considers their effect on Transfer Kings' calling. Had Allstate exercised its inspection and audit rights, Ex. S (retention policy), truly investigated the facts of this case or done even a cursory review of its IDNC list, it would have noticed that Allstate's IDNC list has 1,578,935 phone numbers on it, Ex. F, FRE 1006 Summary ¶ 4, whereas Transfer Kings' IDNC list has only 120,289 unique numbers on it. *Id.* ¶ 5. The two lists overlap by only 1,850 phone numbers, *Id.* ¶ 6, meaning Allstate's IDNC list is incomplete by more than 118,000 phone numbers and Transfer Kings' list is incomplete by some 1.4 million phone numbers.[4]

Because of both Allstate's improper consent exception and the fact that its IDNC list is incomplete, those 118,000 consumers are eligible for telemarketing calls by Allstate, its Contracted Telemarketers and any of the myriad Non-Contracted Telemarketers who – like Transfer Kings – develop business for Allstate, even though they should not be.

### 3. Plaintiff's Experience

---

[3] Once a consumer who requested no phone calls is added to Allstate's IDNC list, that person becomes eligible to receive Allstate marketing communications. Ex. B, 1st Lim Dep. at 99:10-23.

[4] Allstate also has a DNC Reversal policy that permits consumers who have previously requested not to receive telemarketing to change their minds. Ex. B, 1st Lim Dep. at 20:12-16. Such persons may send Allstate or an Allstate agent a signed, dated letter requesting such, and they will be removed from the IDNC list. *Id.* at 63:17-64:18; Ex E (ALL000716). Not surprisingly, requests to receive more telemarketing almost never happen. *Id.* at 63:17-64:18.

Plaintiff received at least fourteen telemarketing calls advertising Allstate goods and services since November 11, 2020, Ex. G, Hossfeld Declaration at ¶¶ 4-35, even though his phone number has been on Allstate's IDNC list since July 10, 2020. Ex. H (Interrogatory 1, pdf page 6). Allstate's policy of permitting calls to IDNC-listed telephone numbers is the primary reason Plaintiff received those calls, because Transfer Kings was following this policy. Ex. D, Basit Dep. at 81:21-82:4. A secondary reason Plaintiff received these calls is because Allstate does not maintain a Master IDNC List, Ex. D, Basit Dep at 25:6-12 (IDNC list not shared with Allstate), and because Allstate has set up impermissible and unreasonable roadblocks to non-contracted telemarketers scrubbing their call lists or otherwise complying. E.g. Basit Dep. at 78:19-79:1 (Transfer Kings asked for help complying with Allstate's IDNC policies, and was rejected).

Allstate has been recalcitrant such that Plaintiff *continues* to receive Allstate telemarketing calls during the pendency of this lawsuit. The lawsuit was filed on December 1, 2020, Dkt. 1, and Plaintiff received Allstate telemarketing calls on February 8, 2021, April 7, 2021, September 3, 2021, and September 22, 2021; Allstate issued Plaintiff quotes for insurance on the August 7, 2021, and September 22, 2021, calls. Ex. G, Hossfeld Dec. at ¶¶ 28-35; Exs. G.11 & G.12 (quotes). What is more, although Allstate knew that Transfer Kings was not scrubbing for IDNC and did not have access to Allstate's IDNC list, Allstate issued 4,169 quotes and wrote 136 policies arising directly from Transfer Kings' telemarketing calls made with the same policies and practices in place that this lawsuit challenges, *after this lawsuit was filed*. Ex. F, Data Summary at ¶ 13. The proposed classes should thus be certified, so that Plaintiff and those like him can recover damages from Allstate, and to wrench compliance from this unrepentant TCPA violator.

## II.   LEGAL STANDARD

In order to certify a class, a plaintiff must satisfy the requirements of Rule 23. First, a

proposed class must meet all the requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012). Next, the proposed class must qualify as a type described in Rule 23(b). "Class certification is normal in litigation under [the TCPA], because the main questions … are common to all recipients." *Ira Holtzman, C.P.A., & Assocs. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013). The proposed Classes meet the requirements of Rule 23(b)(2) and 23(b)(3), and they should be certified.

### III. ARGUMENT

#### A. The Classes Are Clearly and Objectively Defined.

The Seventh Circuit has rejected the notion that a Plaintiff must identify particular class members pre-certification; instead, a proposed class need only "be defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). Identification of individual class members is an administrative task reserved for notice and for disbursing money after judgment.

As in *Mullins*, both of Plaintiff's proposed Classes identify particular groups of subscribers in objective terms. The proposed class members were harmed – or are imminently threatened with harm – in the same way, because their privacy was or likely will be invaded in an identical manner. *Gebka v. Allstate Ins. Co.*, 2021 WL 4951520, at *2 (N.D.Ill. Oct. 25, 2021) (citing *Gadelhak v. AT&T Serv., Inc.*, 950 F.3d 458, 463 (7th Cir. 2020)). The Classes thus each represent "a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Mullins*, 795 F.3d at 660; *cf. City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 445 (3d Cir. 2017) (reversing certification denial in TCPA case).

And although we do not yet know the full scope of who is in each Class, determining such for notice and judgment purposes will be administratively feasible. In the event of class certification, Allstate will gather the disparate IDNC lists and calling data from all agents, and contracted and non-contracted vendors thereof. The IDNC lists will be compiled to create a Master IDNC List. Class member demographic information will be culled from records of calls that Allstate either already has (in the case of Contracted Telemarketers), or has the absolute contractual right and practical ability to obtain pursuant to Paragraph 19 of its Do Not Call policy, Ex. A, and ████████████████, Ex.S; Second Lim Dep. at 27:18-32:10.

Then the agents, contracted telemarketers, and non-contracted telemarketers' call data will be compared with the Master IDNC List to determine which calls were made to telephone numbers that were on a DNC list at the time of such call. Residential phone numbers that received more than one call advertising Allstate in a 12-month period after having been on an IDNC list for 31 days or more, from any combination of callers have a claim for damages pursuant to 47 U.S.C. § 227(c)(5). Subscribers for the phone numbers that are on the Master IDNC List are members of the injunctive class.

### B. All Rule 23(a) Requirements Are Satisfied. [5]

#### 1. Both Classes Are Sufficiently Numerous.

Under Fed.R.Civ.P. 23(a)(1)'s numerosity requirement, "a court can certify a class without first determining its exact size as long as it is reasonable to believe the class is large enough to make joinder impracticable." *Snyder*, 258 F. Supp. 3d at 903 (citing *Chapman v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014)). "[C]ourts have found the numerosity element satisfied where the putative class would number in the range of as few as ten to forty

---

[5]      Plaintiff is not moving to certify the ID Failure Class.

class members." *Westefer v. Snyder*, 2006 WL 2639972, at *2 (S.D. Ill. Sept. 12, 2006) (citing cases).

Here, Plaintiff has demonstrated that there are 33 residential subscribers[6] – including Plaintiff – who fall within the Rule 23(b)(3) class definition as to Transfer Kings calls *alone*: They received more than one Allstate marketing call within twelve months, when they had been on Allstate's do-not-call list for 31 days or more. Ex. F, Call Summary ¶ 12 & Ex. 6.

These numbers are just the "tip of the iceberg": Allstate's incomplete IDNC list and improper consent exception applied *company-wide*, to and/or implicated *all* contracted and non-contracted vendors making calls on behalf of Allstate, not just Transfer Kings. So, for example, there are certain to be phone numbers on other Non-Contracted Telemarketers' IDNC lists that are missing from both Allstate and Transfer Kings' lists, who Transfer Kings called. Thus, the true number of class members is certain to be in the tens or hundreds of thousands.

### 2. Common Questions of Law or Fact Exist.

Fed.R.Civ.P. 23(a)(2)'s commonality requirement for class certification requires that "there are questions of law or fact common to the class." This case challenges Allstate's IDNC policy and systematic telemarketing practices over the course of more than five years, going back

---

[6]     The TCPA provides a "rebuttable presumption" for claims raised under section 227, that phone numbers an individual has requested not to receive calls on are those of "residential subscribers," *In re TCPA*, 18 FCC Rcd. 14014, 14039, at ¶36 & fn 139 (2003), a presumption buttressed by the fact that the calls that are the subject of this case were made to sell consumer insurance policies to individuals. Ex.Q. Rafford Dep. at 16:14-17:5. Allstate has not presented any information that might rebut this presumption. To the extent that the Court finds this presumption insufficient, the TCPA sets objective standards for what constitutes a "residential" or "business" line. 47 C.F.R. § 64.2305(b), (d) (defining residential subscribers as any subscriber that is not a business) and 47 C.F.R. § 64.1100(h) (defining "subscriber" to be "the party identified in the account records of a common carrier as responsible for payment of the telephone bill."). If necessary, the parties can issue subpoenas to the cellular carriers to determine which phone numbers called were "residential subscribers" pursuant to 47 C.F.R. § 64.2305(b), (d) and 47 C.F.R. § 64.1100(h).

to December 1, 2016. Whether such policy and practice complies with the TCPA or not, is a common issue of law and fact susceptible of determination for the classes as a whole, thus satisfying commonality. *See G.M. Sign, Inc. v. Finish Thompson, Inc*., 2009 WL 2581324, at *4 (N.D. Ill. Aug. 20, 2009) (collecting cases); *Turza*, 728 F.3d at 684 (class certification is "normal" in TCPA cases). Other common issues include whether Allstate is liable for calls made by others on its behalf, and whether Allstate's violations were willful or knowing. These questions apply equally to all class members, and can be answered using common proof and uniform legal analysis. Commonality is thus satisfied.

### 3. Plaintiff's Claims Are Typical.

Fed.R.Civ.P. 23(a)(3) requires that the class representative have claims or defenses "typical of the claims or defenses of the class." "A plaintiff's claim is typical if it arises from the same event, practice, or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *Snyder*, 258 F. Supp. 3d at 904. Here, Plaintiff's claims and the claims of the Classes follow the same factual and legal theory challenging Allstate's written IDNC policy and IDNC list practices. Plaintiff is just like everyone else: everyone on the class was on Allstate's IDNC list but received Allstate telemarketing calls anyway, and are at risk of receiving calls in the future because of Allstate's improper IDNC policies, practices and procedures and incomplete IDNC list. Typicality is satisfied.

### 4. Plaintiff Will Adequately Represent the Classes.

In analyzing adequacy, the Court considers "the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011); Fed.R.Civ.P. 23(a)(4). There is no conflict between Plaintiff's interests and those of the Classes. Plaintiff has

10

demonstrated a desire and ability to protect class members' interests by investigating, filing, and vigorously prosecuting this case on their behalf. Ex. G, Hossfeld Decl. ¶ 3.

Counsel, too, are adequate. Fed.R.Civ.P. 23(g)(1). They have substantial experience in consumer protection and TCPA litigation, have investigated and identified the claims, have a firm handle on the facts and law in this action as demonstrated in this motion, and have dedicated the resources to represent the class. Ex. W, Burke Decl. ¶¶ 2-12. Adequacy is satisfied.

### C. Rule 23(b)(2) Is Satisfied.

A case may be certified as a class action under Rule 23(b)(2) where the "party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2). Allstate's policy of permitting telemarketing calls to phone numbers on IDNC lists and of failing to maintain a Master IDNC List adversely affect all persons who have asked not to receive calls from Allstate. The requested final injunctive relief, that Allstate correct the offending policy provisions and create and adhere to a Master IDNC List, will benefit the class as a whole by substantially lowering the chances of them receiving Allstate telemarketing calls in the future.

The TCPA specifically authorizes a plaintiff to seek "both" money damages and injunctive relief to stop violations of the Act and its corresponding regulations. 47 U.S.C. § 227(c)(5). There are two types of injunctions: a statutory injunction and a "traditional" injunction. "When an injunction is explicitly authorized by statute, proper discretion usually requires its issuance if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purpose..... The traditional criteria for permanent injunctive relief need not be discussed." *United States v. Stover*, 650 F.3d 1099, 1106 (8th Cir.

2011) (citations omitted). For a statutory injunction, Plaintiff must prove (1) the defendant has committed a statutory violation and (2) that there is a reasonable likelihood of future violations. *See U.S. Commodity Futures Trading Comm'n v. Oystacher*, 2016 WL 3693429, at *6 (N.D. Ill. July 12, 2016).[7] The factors for a traditional injunction are: "(1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant should a preliminary injunction be denied; (3) the balance between this harm and the harm that granting the injunction will cause to the other parties litigant; and (4) the public interest." *Taylor Corp. v. Four Seasons Greetings, LLC*, 315 F.3d 1039, 1041 (8th Cir. 2003).

The requirements for an injunction are present, regardless of which standard is applied.

### 1. Plaintiff Is Likely to Prevail on the Merits.

The party seeking statutory injunctive relief must first demonstrate that a statutory violation has occurred. *U.S. v. Davison*, 691 F. Supp. 2d 1033, 1039-40 (W.D. Mo. 2009); *U.S. v. Dish Network, L.L.C.*, 2016 WL 29244, at *1 (C.D. Ill. Jan. 4, 2016) (telemarketing context). Relatedly, for a traditional injunction the plaintiff must show a likelihood of success on the merits, which is a low threshold. *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016). "[T]he plaintiff's chances of prevailing need only be better than negligible." *Id.*

---

[7]      *See Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043-44 (9th Cir. 2012) (upholding preliminary injunction in TCPA class action); *Hatch v. Sunbelt Commc'ns & Mktg.*, 282 F. Supp. 2d 976, 979 (D. Minn. 2002) (traditional requirements need not be satisfied for TCPA injunctions); *J2 Glob. Commc'ns, Inc. v. Blue Jay Inc.*, 2009 WL 4572726, at *8 (N.D. Cal. Dec. 1, 2009) (irreparable harm need not be shown to obtain TCPA injunctive relief); *Lynn v. Monarch Recovery Mgmt., Inc.*, 2013 WL 1247815, at *7 (D. Md. Mar. 25, 2013), *on reconsideration in part*, 953 F. Supp. 2d 612 (D. Md. 2013), *and aff'd*, 586 F. App'x 103 (4th Cir. 2014), *as amended* (Oct. 17, 2014) ("[A] complainant [in a TCPA case] need not allege or prove irreparable harm when it invokes a statute that authorizes injunctive relief.  All that need be proved is a violation of the statute."), *but see Snyder*, 258 F. Supp. 3d 893 (N.D. Ill. 2017) (traditional injunction elements must be satisfied).

The TCPA requires that companies that accept business derived from telemarketing must institute procedures to prevent calls to persons who have asked not to be contacted. 47 C.F.R. § 64.1200(d).[8] In order to show a violation of 47 C.F.R. § 64.1200(d), a plaintiff must show that (a) the entity placing the calls failed to institute the proper procedures prior to the initiation of a telemarketing call to their residential phone, 47 C.F.R. § 64.1200(d); *Simmons v. Charter Commc'ns, Inc.*, 222 F.Supp.3d 121, 131 (D.Conn. 2016), and (b) that they received more than one call within a 12-month period, 47 U.S.C. § 227(c)(5).

Allstate failed to institute the proper procedures because, contrary to the TCPA, its IDNC policy permits telemarketing calls if the caller believes it has consent. The internal do-not-call rules do not contain reference to any "consent" or established business relationship ("EBR") defense. 47 C.F.R. § 64.1200(d); *Simmons*, 222 F.Supp.3d at 132. As explained *supra*, a consent exception existed in the TCPA's internal do-not-call regulations until the FCC abolished it in 2003. *2003 TCPA Order*, 18 FCC Rcd. 14014, ¶ 96 & fn. 351.

*In re TCPA*, 20 FCC Rcd. 13664, 13664-65 ¶ 1 (2005), makes clear that Allstate is required to maintain a "master" IDNC list:

> Once the consumer makes a company specific do-not-call request, whether to the company or third party, the company and its third party telemarketer may not call the consumer again on behalf of that company to make a telephone solicitation regardless of whether the consumer continues to do business with the company.

*Id.* at 13667-68, ¶ 7.2.[9] The Seventh Circuit reached the same conclusion when considering internal DNC in the context of both the TCPA and the FTC's Telemarketing Sales Rule, 16

---

[8]     The TCPA's internal do-not-call rules apply to both wireless numbers and residential landlines, which encompasses the consumer-targeted telemarketing here. *See* 47 C.F.R. § 64.1200(e).

[9]     Allstate shares its "existing business relationship" with its agents through a centralized scrubbing system, just as described in *In re TCPA*, 20 FCC Rcd. at 13664-65, and uses such EBR to defend TCPA do-not-call Registry claims arising from non-contracted vendor calls. Ex. B, 1st

C.F.R. § 310 *et seq.*, which generally mirror one another. *Dish*, 954 F.3d at 975. Allstate's IDNC list is missing about 118,000 numbers from Transfer Kings IDNC list, as well as untold other phone numbers from other non-contracted vendors who similarly did not coordinate with Allstate. And Allstate's IDNC list is missing Transfer Kings' phone numbers and certainly more given that it has never done any sort of investigation into whether its list is complete, Ex. B, First Lim Dep. at 65:3-22.

Plaintiff is a class member, and has a claim, because he received ten Allstate telemarketing calls on his residential cell phone in November 2020, and additional calls on February 8, 2021, April 7, 2021, September 3, 2021, and September 13, 2021, Ex. G, Hossfeld Declaration at ¶¶ 4-35, even though he had been on Allstate's IDNC since July 2020. Ex. H (Interrogatory 1, pdf page 6). Plaintiff received those calls as a result of Allstate's challenged IDNC consent policy and – to a lesser extent – incomplete IDNC list. Plaintiff's phone number was eligible to be called even though it was on Allstate's IDNC list, because Transfer Kings/Atlantic Telecom believed that he had opted in. Ex. D, Basit Dep. at 26:11-12; Ex.T, Warner Dep. at 48:18-49:12. Further, Plaintiff was on Allstate's IDNC list, but Allstate's unreasonably difficult process for scrubbing against its IDNC list (which denies "non-contracted" vendors access to the list or any mechanism for batch lead scrubbing) prohibited Basit from doing so.[10] *Id.* at 17:15-18.

Allstate should be held vicariously liable for calls made by Transfer Kings, other non-contracted and contracted vendors on its behalf, pursuant to its policies and practices. The Court

---

Lim Dep. at 274:4-14. Allstate should not be permitted to accept the benefits of that ruling without also accepting the burden of coordinating internal do-not-call lists.

[10]     *See also* Ex.T, Warner Dep. at 90:10-23 (Allstate ███████████████████ ███████████████████████████████ ).

14

looks to the Restatement (Third) of Agency when considering vicarious liability for TCPA

violations. *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021).

a.    <u>Allstate Is Liable Because the Telemarketers Did What Allstate<br>Told Them to Do</u>.

A "person who orders or induces an actor's tortious conduct is subject to liability for

harm resulting to a third person when the person 'knows or should know of circumstances that

would make the conduct tortious if it were his own.'" Rest. (3d) of Agency § 7.04, *cmt. b*. This

concept holds true "even when the relationship between two persons is ***not*** a relationship of

agency." Rest. (3d) of Agency § 7.04, *cmt. b* (emphasis added)*.* "When a person is subject to

liability as a consequence of this rule, it is immaterial whether the relationship between the

person and the actor is a relationship of agency" *Id*. (citing Rest. (2d) of Torts § 877, "Directing

or Permitting Conduct of Another," which also imposes liability under substantially identical

principles). Allstate's written IDNC policy expressly permitted calls to phone numbers that were

on the IDNC list, as long as there was consent. Ex. A. Allstate thus expressly authorized the calls

at issue in this case, and should be held liable for those calls.

b.    <u>Telemarketers Making Calls Pursuant to Allstate's Polices Were<br>Its Agents</u>.

"Agency" is "the fiduciary relationship that arises when one person (a 'principal')

manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf

and subject to the principal's control, and the agent manifests assent or otherwise consents so to

act." Rest. (3d) of Agency § 1.01. The agency inquiry largely boils down to whether the principal

exercises a sufficient level of control and authority over the agent such that the principal should

be held responsible for the agent's actions. *See, e.g.*, *Gen. Bldg. Contractors Ass'n, Inc. v.*

*Pennsylvania*, 458 U.S. 375, 393 (1982); *Fed. Pants, Inc. v. Stocking*, 762 F.2d 561, 564 (7th

15

Cir. 1985). In short, the principal's right "to control the agent's actions" is the "essential element of agency." Rest. (3d) of Agency § 1.01, cmt. f.

"Control is a concept that embraces a wide spectrum of meanings, but within any relationship of agency the principal initially states what the agent shall and shall not do, in specific or general terms." Rest. (3d) of Agency § 1.01, *cmt. f*. The ability to control can be evinced by "the capacity throughout the relationship to assess the agent's performance, provide instructions to the agent, and terminate the agency relationship by revoking the agent's authority." *Id.*; *cf. Futrell v. E-Rate Prog.*, 2017 WL 3621368, at *5 (E.D.Mo. Aug. 23, 2017).

*United States v. Dish Network, LLC* upheld the District Court's finding of agency based on the defendant's contract with its telemarketing agents, alone. *Dish Network* was an IDNC case where the defendant argued it couldn't be held liable because contracts with its telemarketers disclaimed agency and prohibited them from violating the law. 954 F.3d at 975. The Seventh Circuit found that two clauses in Dish's standard contract, which (1) required the telemarketers to comply with Dish's rules, and (2) allowed Dish to change the rules at any time, demonstrated the right to control sufficient for agency. *Id.* The Court also found it relevant that the telemarketers lacked their own inventory and were not merely resellers of Dish products. *Id.*

Here, not only does Allstate enjoy the *right* to control its agents' and their telemarketers' day-to-day activities, it *exercised* that right as to the telemarketing at issue. For example, Allstate designed and imposed its IDNC policy upon its insurance agents as well as their Non-Contracted Telemarketers, ███████████████████████████████████████████████████████
███████████████████████████████████████████████████. Ex. M & N (Agency Standards). Allstate similarly unilaterally imposed revised DNC policies five times since March 2016. Ex. A. ████████████████████████████████████████████



. Ex. O & P. This demonstrates – like in *Dish* –

Allstate's absolute right and sole discretion to tell agents and their vendors how to telemarket.

Allstate also controls the specific telemarketing ███████████████████████

███████████████████████████████████████████ . ████

████████████████████████████████████████

█████████████████████████ Ex. O & P.[11]

And just like in *Dish*, Allstate agents are ████████████████ . Ex. Q, Rafford Dep. at

15:11-21. They enter information directly into Allstate's computer quoting system, have no

inventory, and are not resellers of Allstate products and services. *Id.*; Ex. B, 1st Lim Dep. at

28:16-29:23, 39:2-23, 75:10-17 (discussing exclusive nature of agents' relationship and access to

Allstate's system, including quote, customer, and instructional information); *In re Dish*, 28 FCC

Rcd. 6574, 6592 (2013) (evidence that the seller "allows the outside sales entity access to

information and systems that normally would be within the seller's exclusive control" supports a

finding of vicarious liability, including "access to detailed information regarding the nature and

pricing of the seller's products and services or to the seller's customer information[;]" [l]likewise,

"[t]he ability by the outside sales entity to enter consumer information into the seller's sales or

customer systems, as well as the authority to use the seller's trade name, trademark and service

mark may also be relevant" to establishing an agency relationship).

All of the indicia of control that the Seventh Circuit in *Dish* found dispositive as to an

agency relationship, and most of the factors the FCC identified in its *2013 Order* are present.

          c.     <u>Allstate Cloaked Agents and Telemarketers with the Appearance of Agency</u>.

---

[11]     *See* <u>Ex. B,</u> Basit Dep. at 52:22-53:19 (testifying Transfer Kings continued to solicit business for Allstate throughout these proceedings, without instruction to the contrary).

"Apparent authority is the power held by an agent or any other actor to affect a principal's legal relations with a third party when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Morris v. Novastar Mortg., Inc.*, 2006 WL 2707349, at *6 (W.D. Mo. Sept. 19, 2006). Apparent authority "does not presuppose the present or prior existence of an agency relationship." Rest. (3d) of Agency § 2.03, *cmt. a*. "Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume or which he holds his agent out as possessing—it is such authority as a reasonably prudent man, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess." *Malcak v. Westchester Park Dist.*, 754 F.2d 239, 245 (7th Cir. 1985); *see Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 940 (9th Cir. 2017).

Allstate's do-not-call policy mandates that "the name of the person or business on whose behalf the call is being made, the purpose of the call, [and] the products or services that are the subject of the call" be stated during calls. Ex. A ¶ 2. This policy applies to *anyone* making calls to sell Allstate goods and services, including third-party non-contracted vendors. Ex. B, 1st Lim Dep. at 74:5-16. An ordinary, reasonable, person receiving a telephone call where the caller says they're Allstate, or calling to sell Allstate goods and services would believe that Allstate authorized the call, and such belief would be directly traceable to Allstate's policy. This policy directive "cloaked" third-party vendors and agents with the appearance that the calls were authorized by Allstate (of course, this was true, because the calls *were* authorized by Allstate), and thus – regardless of formal agency – had the effect of such, making Allstate liable. *Brown v. DirecTV, LLC*, 2021 WL 5755044, at *1 (C.D.Cal. Dec. 1, 2021).

18

d.    Allstate Ratified the Calling Challenged in this Case.

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Rest. (3d) of Agency § 4.01(1). This may occur through the knowing retention of the benefits of the act, or by "willful ignorance"— i.e., where the principal may not know the material facts, but has "ratified with awareness that such knowledge was lacking." Rest. (3d) of Agency § 4.01, at cmt. b; *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1075 (9th Cir. 2019). "Ratification may create a relationship of agency when none existed before[,]" Rest. (3d) of Agency § 4.03 cmt. a, and the "benefit" retained need not be monetary. *E.g., Keim v. ADF Midatlantic, LLC*, 2015 WL 11713593, at *8 (S.D. Fla. 2015); *Klein v. Commerce Energy, Inc.*, 256 F. Supp. 3d 563, 588 (W.D. Pa. 2017).

Perhaps the most compelling evidence of ratification here are that: (1) Allstate has not changed its internal do-not-call policies or practices as a result of this case, and (2) it permitted Transfer Kings and Atlantic to ██████████████████████████████████ ████████████████████████████████████████████████████████████ ██████. Ex. C, 2d Lim Dep. at 47:17-49:8, 58:13-60:19; Ex. D, Basit Dep. at 52:22-53:19.

Allstate's internal investigation as to this case, too, demonstrates that it knowingly "doubled down" on its improper IDNC consent policy, thus ratifying it. A few days after this case was filed, two separate Allstate investigators, ███████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████. Ex. T, Warner Dep. at 50:2-51:2. The investigators did not ask whether ████████████████████████

███████████████████████████████. Ex. T, Warner Dep. at 47:13-48:6, 91:2-17; Ex. U, Wroblewski Dep. at 24:11-19, 40:5-9. And despite ████████████████ ███████████████████████████████████████████████████████████ ALL00042-43; Ex. C, 2d Lim Dep. at 27:18-32:10, ████████████████████ ███████████████████████ Ex. T, Warner Dep. at 35:3-13, 36:11-37:20, 50:2-51:2; Ex. U, Wroblewski Dep. at 24:11-25:22.

Most importantly, Allstate issued 4,169 quotes and wrote 136 policies arising directly from Transfer Kings' telemarketing calls made with the same policies and practices in place that this lawsuit challenges, *after this lawsuit was filed*. Ex. F, Data Summary at ¶ 13.

In sum, Allstate still enforces – and certainly has not disavowed – its noncompliant IDNC consent exception policy, and still uses an IDNC list it knows to be incomplete because it neither (1) incorporates the IDNC lists of its agents' non-contracted telemarketing vendors, nor (2) coordinates a master IDNC list amongst all subvendors. These actions and omissions constitute ratification, *Braver v. NorthStar Alarm Services, LLC*, 2019 WL 3208651, at *13 (W.D.Okla., Jul. 16, 2019), and Allstate should be held liable for telemarketing calls that violated the TCPA because of this improper policy that it ratified.

### 2. Absent Injunctive Relief, Allstate Will Continue to Accept Business Derived from Illegal Telemarketing.

In an action for a statutory injunction, once a violation has been demonstrated, the moving party need only show that there is a reasonable likelihood of future. *Davison*, 691 F. Supp. 2d at 1039-40; *FTC v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 786 (N.D. Ill. 2016). The likelihood of future harm to consumers here is certain, because ████████████████ ████████████████████████ Ex. C, 2d Lim Dep. at 47:17-48:12. Indeed, because of Allstate's recalcitrance, Plaintiff continues to receive calls advertising Allstate. Ex.G, Hossfeld Decl. ¶¶

20

28-35. Allstate's refusal to come into compliance is even more egregious because ████████████ ████████████████████████████████████████████████ ████████████████████████████████. Ex. U, Rafford Dep. at 52:12-53:6.

### 3. The Court Should Order a Nominal Bond or No Bond.

Fed. R. Civ. P. 65(c) requires that a movant for a preliminary injunction give "security … in such sum as the court deems proper" before any preliminary injunction issues. "Courts in this circuit have almost always required a bond before issuing a preliminary injunction ... but exceptions have been made ... where the damages resulting from a wrongful issuance of an injunction have not been shown." *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (affirming lower court not ordering bond; "some courts have not required a bond, or have only required a minimal bond"). Moreover, Plaintiff works at an Amazom.com warehouse and cannot afford to pay a large bond. Ex. G Hossfeld Dec. ¶ 36. However, this is the rare case where a bond is unnecessary because the requested injunction is not preliminary; instead, it will be entered as part of the final judgment.

### 4. Absent an Injunction, Plaintiff and the Classes Will Be Irreparably Harmed.

"In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). Allstate's ongoing TCPA violations pose irreparable harm to Plaintiffs and proposed class members because the violations just "keep on coming" despite this lawsuit.

There is no evidence that Allstate has (1) remedied its defective policy permitting calls that are on its IDNC list if there is "consent," or (2) shored up its incomplete IDNC list. To the

contrary, all evidence shows that the challenged policy is still active and IDNC list still incomplete. Ex.G, Hossfeld Decl. ¶¶ 28-35; Ex. U, Rafford Dep. at 52:12-53:6.

*Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1044 (9th Cir. 2012), is instructive. After suggesting that a TCPA plaintiff probably does not need not show "irreparable harm," the Ninth Circuit declined to decide that issue. Instead, that Court found that the plaintiff and "other class members will suffer irreparable harm from [the debt collector's] continuing violations of the TCPA, which violate the class members' right to privacy, and because the district court found in its written order that [the debt collector] would continue to violate the TCPA if an injunction was not issued. *Id.* at 1044. Here, such ongoing violations are not a possibility, they have already happened.

### 5.     Money Damages Are Not an Adequate Remedy.

The TCPA authorizes money damages, an injunction or "both."  47 U.S.C. § 227(c)(5). This demonstrates an acknowledgment that compensating past wrongs through money damages will not necessarily prevent future illegal calls. Congress included injunctive relief as a remedy, recognizing that other remedial tools "that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer." TCPA, PL 102–243, 105 Stat 2394 (Dec. 20, 1991); *see also* "Background and Needs" section of Senate Report 102-178, finding as a justification for the law that "Consumers are especially frustrated because there appears to be no way to prevent these calls." S. Rep. 102-178, 1, 1991 U.S.C.C.A.N. 1968, 1969 (Oct. 8, 1991).

Allstate has made clear that the specter of money damages alone will not bring it into compliance, because it has refused to alter its policies and practices. Injunctive relief is therefore necessary to wrench it into compliance.

### 6.    The Balance of Harms Favors the Proposed Injunction.

Allstate's refusal to bring its system into compliance with the TCPA despite this lawsuit

and its capability to (1) ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████, Ex. Q, Rafford Dep. at 52:9-

53:6; Ex. B, 1st Lim Dep. at 106:2-16.

"Where the only hardship that the defendant will suffer is lost profits from an activity

which has been shown likely to [violate the law], such an argument in defense merits little

equitable consideration on an appeal from a preliminary injunction." *Cadence Design Sys., Inc.

v. Avant! Corp.*, 125 F.3d 824, 830 (9th Cir. 1997); *Hatch v. Sunbelt Commc'ns. & Mktg.*, 282

F.Supp.2d 976, 980 (D. Minn. 2002) ("no justification for why [Defendants] are entitled to profit

in the interim, unencumbered by competition that is now undoubtedly suppressed due to the

existence of a clear federal statute prohibiting their business practices.").

Further, "courts will not balance the equities […] where the defendant's conduct has

been willful." *See U.S. v. Bethlehem Steel Corp.*, 38 F.3d 862, 867-68 (7th Cir. 1994).  Here, it

is clear that Allstate continues to willfully violate the TCPA's IDNC rules for financial benefit. It

has not altered its policies or practices or shored up its IDNC list in the 18 months since this

action was filed. Thus, the Court need not balance the equities, but if it does, the equities favor

entering an injunction.

### 7.    A Preliminary Injunction Is in the Public Interest.

The public interest factor concerns "the effects, if any, that the grant or denial of the

preliminary injunction would have on nonparties." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015); *Heather K. v. City of Mallard*, 887 F. Supp. 1249, 1260 (N.D. Iowa 1995) (noting "public interest" factor "frequently invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious[,]" and finding "no difficulty" in identifying public interest in reference to purpose and intent of subject statute).

No third parties will be harmed by an injunction tailored to bring Allstate's IDNC policies, practices and procedures into compliance. To the contrary, TCPA violations like those the requested injunction is designed to prevent "threaten public safety and inappropriately shift costs to consumers*." In re TCPA*, 23 FCC Rcd. 559, 566 ¶ 14 (2008). An injunction is not overbroad if it "prohibits only those actions similar to the violations already committed." *Lineback v. Spurlino Materials, LLC,* 546 F.3d 491, 506 (7th Cir. 2008); *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 790 (8th Cir. 2004) (injunction should not be "broader than necessary to remedy the underlying wrong," but noting court's "discretion in fashioning injunctive relief"). Plaintiff's proposed injunction does just that: it is narrowly tailored to bring Allstate's telemarketing into compliance with 47 C.F.R. § 64.1200(d), and to stop telemarketing calls to folks who asked that they stop. It is in the public interest for these systematic violations of the TCPA arising from Allstate's IDNC policies and incomplete IDNC list to stop.

### D. Rule 23(b)(3) Is Satisfied.

Here, common questions predominate over individual issues, and the class action device is superior to other methods of adjudication. Fed.R.Civ.P. 23(b)(3).

### 1. Common Questions of Law or Fact Predominate.

Predominance is "readily met" in certain consumer cases. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). The touchstone for predominance analysis is efficiency.

*Butler v. Sears, Roebuck & Co.,* 702 F.3d 359, 362 (7th Cir. 2012) ("*Butler I*"), *vac'd on other grounds*, 133 S. Ct. 2768 (2013), *judgment reinstated*, 727 F.3d 796 (7th Cir. 2013) ("*Butler II*"). Predominance focuses on the most important issues in the case, only, because "a rule requiring 100% commonality would eviscerate consumer-fraud class actions." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 759 (7th Cir. 2014).[12] "[P]redominance is [not] determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance." *Butler II*, 727 F.3d at 801. "An issue 'central to the validity of each one of the claims' in a class action, if it can be resolved 'in one stroke,' can justify class treatment." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)).

The central issues here are legal ones: Do the TCPA's IDNC rules exempt calls made with consent, is Allstate required to compile a Master IDNC List, and should Allstate be liable for the actions of those who followed its policy directives? The answers to these questions are determinable based upon common evidence and law, and will determine Allstate's liability.

This uniformity of factual and legal issues arising from a common set of policies and practices is why courts routinely certify TCPA claims. *See Turza*, 728 F.3d at 684 (Seventh Circuit recognizing that class certification is normal in TCPA cases because the main questions are common to all recipients); *Krakauer v. Dish Network, LLC,* 311 F.R.D. 384, 394-95 (M.D.N.C. 2015) (holding vicarious liability issue predominated over individual questions in TCPA case); *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1307 (D. Nev. 2014)

---

[12]     Indeed, "[t]he entire notion of predominance implies that the plaintiffs' claims need not be identical, and, as the Supreme Court has noted, a class can meet this requirement 'even though other important matters will have to be tried separately.'" *Krakauer*, 925 F.3d at 658 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

(certifying nationwide class of individuals who received automated calls on their cellular telephones in violation of the TCPA and finding vicarious liability issues predominate because agency issues such as actual authority, ratification, and apparent authority "can be resolved on a class-wide basis"). These holdings are consistent with the Supreme Court's observation that the class certification requirements are "readily met" in consumer protection cases where, as here, common factual questions center upon the defendant's course of conduct. *Amchem*, 521 U.S. at 625. Accordingly, predominance is satisfied.

**2.    A Class Action Is the Superior Means for Resolving the Class' Claims.**

A class action is the superior method for adjudicating this controversy. The TCPA's modest statutory relief (maximum of $500 per violation) means individual claims are generally not economically viable. *Nolan v. Reliant Equity Inv'rs, LLC,* 2009 WL 2461008, at *6 (N.D. W. Va. Aug. 10, 2009) ("relatively small recovery" under federal statute made class action superior); *Sandusky Wellness Ctr., LLC v. Wagner Wellness, Inc.*, 2014 WL 6750690, at *6 (N.D. Ohio Dec. 1, 2014) ("This type of case weighs in favor of the class action as a superior device. Under the TCPA, the maximum recovery for each class member is $1,500, and it does not allow for fee shifting. Hence, individual class members are unlikely to litigate TCPA claims.").[13]

Through the class action procedure, the important issues of whether consent is a defense to IDNC claims, whether Allstate must establish a master IDNC list, and liability can be brought

---

[13]    *See also Caldera v. Am. Med. Collection Agency*, 320 F.R.D. 513, 519 (C.D. Cal. 2017) ("[T]he Supreme Court has specifically contemplated plaintiffs bringing TCPA cases as class actions."); *Siding & Insulation Co. v. Beachwood Hair Clinic, Inc.*, 279 F.R.D. 442, 446 (N.D. Ohio 2012) ("Individuals are therefore unlikely to bring suit against [the defendant], which makes a class action the superior mechanism for adjudicating this [TCPA] dispute."); *Green v. Serv. Master On Location Servs. Corp.*, 2009 WL 1810769, at *3 (N.D. Ill. June 22, 2009) ("[R]esolution of the issues [under the TCPA] on a classwide basis, rather than in thousands of individual lawsuits (which in fact may never be brought because of their relatively small individual value), would be an efficient use of both judicial and party resources.").

in one proceeding, preserving limited judicial resources, eliminating unnecessary duplication of document and data discovery and depositions, and avoiding potentially inconsistent outcomes. Certifying the class is the *only* way to "vindicat[e] the rights of individuals who otherwise might not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost." *Deposit Guar. Nat. Bank v. Roper*, 445 U.S. 326, 338 (1980).

Indeed, the Seventh Circuit has instructed that,

> [B]efore refusing to certify a class that meets the requirements of Rule 23(a), the district court should consider the alternatives as Rule 23(b)(3) instructs rather than denying certification because it may be challenging to identify particular class members. [A] district judge has discretion to (and we think normally should) wait and see how serious the problem may turn out to be after settlement or judgment, when much more may be known about available records, response rates, and other relevant factors. And if a problem is truly insoluble, the court may decertify the class at a later stage of the litigation.... Under this comparative framework, refusing to certify on manageability grounds alone should be the last resort.

*Mullins,* 795 F.3d at 664; *see also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (Sotomayor, J.) (refusing to certify a class "on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule").

This case does not present any of the manageability problems that might impact the superiority determination in other cases. Notice can be accomplished readily because Allstate has the ███████████████████████████████████████████████ necessary to send notice. Ex. S, Retention Policy at ALL00042-43; Ex. C, 2d Lim Dep. at 27:18-32:10. Thus, the proposed Classes meet the superiority requirements of Rule 23(b)(3). *Manno v. Healthcare Revenue Recovery Grp.*, 289 F.R.D. 674, 690 (S.D. Fla. 2013) ("[T]he large number of claims, along with the relatively small statutory damages, the desirability of adjudicating these claims consistently, and the probability that individual members would not have a great interest in controlling the prosecution of these claims, all indicate that [a] class action would be the

superior method of adjudicating the plaintiffs' claims under the … TCPA.").

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Robert Hossfeld respectfully requests that the Court: (1) certify the  proposed Classes; (2) appoint Plaintiff as class representative; (3) appoint his attorneys as class counsel; (4) order Allstate to obtain and produce records sufficient to identify the class members for purposes of effectuating direct mail and email notice under Fed.R.Civ.P. 23(c)(2)(B); (5) either:

(a) Enjoin Allstate from accepting business derived from telemarketing unless and until it:

(i) brings its IDNC policies and practices into compliance by at least modifying its written policy so that calls to phone numbers on its IDNC list are prohibited, and (i) compiles and makes available to all that telemarket on its behalf, a Master IDNC List comprised of all phone numbers of persons who have requested that Allstate or any Contracted or Non-Contracted vendor not call, or

(b) Find that the requisites for Fed.R.Civ.P. 23(b)(2) are met, and direct the parties to confer as to the proper scope of an injunction as in *Snyder v. Ocwen Loan Servicing, LLC*, 258 F.Supp.3d 893, 916 (N.D.Ill. 2017); and

(6) grant such other and further relief the Court deems reasonable and just.

Dated: May 19, 2022

Respectfully submitted,

ROBERT HOSSFELD, individually and on behalf of others similarly situated

By:  */s/ Alexander H. Burke*

Alexander H. Burke
Daniel J. Marovitch
**BURKE LAW OFFICES, LLC**
909 Davis St., Suite 500
Evanston, IL 60201
Telephone: (312) 729-5288
aburke@burkelawllc.com
dmarovitch@burkelawllc.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 19, 2022, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notification of such filing to all counsel

of record.

   */s/ Alexander H. Burke*