**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT HOSSFELD, individually and on behalf of a class of all persons and entities similarly situated, | ) ) ) | Case No. 1:20-cv-07091 |
| Plaintiff, | ) ) | |
| v. | ) ) | Hon. Judge Joan B. Gottschall |
| | ) | Hon. Mag. Judge Sunil R. Harjani |
| ALLSTATE INSURANCE COMPANY, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S OPPOSITION TO ALLSTATE'S**
**MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

I.     BACKGROUND ................................................................................................2

    A.    The TCPA ...........................................................................................2

    B.    Facts ...................................................................................................3

        1.    Allstate's Internal Do-Not-Call Policy Permits Calls to Numbers on its IDNC List................................................................................3

        2.    Allstate's Procedures Guarantee that an Incomplete Do Not Call List. ......4

        3.    Plaintiff's Experience.................................................................6

II.    LEGAL STANDARD..................................................................................9

III.   ARGUMENT ............................................................................................9

    A.    Allstate Violated the TCPA as to Plaintiff.........................................9

        1.    Plaintiff Received Fourteen Allstate Telemarketing Calls Within Ten Months. .......................................................................10

        2.    Allstate's IDNC Policy and Practices Were Deficient When Plaintiff Received Allstate's Calls, Rendering the Calls Impermissible. ................10

            a.    The TCPA Does Not Contain an IDNC "Consent" Exception......11

            b.    The TCPA Requires that Do Not Call Requests be Coordinated. .13

        3.    Allstate's Improper Policies and Practices were the Proximate Cause of the Illegal Calls to Plaintiff.....................................................15

    B.    Allstate Should be Held Liable for the Telemarketing Plaintiff Received. ...........17

        1.    Actual Authority. ....................................................................18

        2.    Formal Agency.......................................................................19

        3.    Apparent Authority .................................................................25

        4.    Ratification.............................................................................26

C.     Plaintiff Did Not "Consent." ............................................................................. 29

D.     Hossfeld Suffered Concrete Harm and Is in the TCPA's Zone of Interest. ........... 30

E.     Transfer Kings Never Adequately Identified Itself During Calls, and Allstate Ratified this Conduct. ......................................................................................... 33

VI.    CONCLUSION ................................................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allard v. SCI Direct, Inc.*,
2017 WL 2957883 (M.D. Tenn. July 10, 2017) ............................................ 12

*Am. States Ins. Co. v. Cap. Assocs. of Jackson Cnty., Inc.*,
392 F.3d 939 (7th Cir. 2004) ............................................................ 19

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................... 9

*Aranda v. Caribbean Cruise Line, Inc.*,
179 F. Supp. 3d 817 (N.D. Ill. 2016) .................................................... 24

*Bilek v. Fed. Ins. Co.*,
8 F.4th 581 (7th Cir. 2021) .............................................................. 18

*Bilek v. Nat'l Cong. of Emps., Inc.*,
470 F. Supp. 3d 857 (N.D. Ill. 2020) .................................................... 23

*Blow v. Bijora, Inc.*,
855 F.3d 793 (7th Cir. 2017) ............................................................ 30

*Braver v. NorthStar Alarm Servs., LLC*,
2019 WL 3208651 (W.D. Okla. July 16, 2019) ............................................ 22

*Brown v. DirecTV, LLC*,
2021 WL 5755044 (C.D.Cal. Dec. 1, 2021) ............................................... 26

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...................................................................... 9

*Charvat v. Allstate Corp.*,
29 F.Supp.3d 1147 (N.D.Ill. 2014) ...................................................... 30

*Cunningham v. Rapid Response Monitoring Servs.*,
251 F. Supp. 3d 1187 (M.D. Tenn. 2017) ................................................. 33

*FTC v. Lifewatch*,
176 F.Supp.3d 757 (N.D.Ill. 2016) ...................................................... 31

*Gadelhak v. AT&T Services, Inc.*,
950 F.3d 458 (7th Cir. 2020) ............................................................ 19

*Garcia v. Credit One Bank, N.A.*,
2020 WL 4431679 (D. Nev. July 31, 2020) ............................................................ 33

*Hand v. Beach Ent. KC, LLC*,
456 F.Supp.3d 1099 (W.D. Mo. 2020) .................................................................... 12

*Henderson v. United Student Aid Funds, Inc.*,
918 F.3d 1068 (9th Cir. 2019) ............................................................................... 26

*Hirsch v. USHealth Advisors, LLC*,
337 F.R.D. 118 (N.D. Tex. 2020) ........................................................................... 33

*Jackson v. Bank of New York*,
62 F. Supp. 3d 802 (N.D. Ill. 2014) ....................................................................... 21

*Keim v. ADF Midatlantic, LLC*,
2015 WL 11713593 (S.D. Fla. 2015) ...................................................................... 26

*Klein v. Commerce Energy, Inc.*,
256 F. Supp. 3d 563 (W.D. Pa. 2017) ..................................................................... 26

*Leyse v. Bank of Am., Nat'l Ass'n*,
2020 WL 1227410 (D.N.J. Mar. 13, 2020) ............................................................. 33

*Malcak v. Westchester Park Dist.*,
754 F.2d 239 (7th Cir. 1985) ................................................................................. 25

*Murray v. GMAC Mort. Corp.*,
434 F.3d 948 (7th Cir. 2006) ................................................................................. 31

*Scott v. Harris*,
550 U.S. 372 (2007) .................................................................................................. 9

*Smith v. Truman Rd. Dev., LLC*,
2020 WL 2044730 (W.D. Mo. Apr. 28, 2020) ........................................................ 12

*Stoops v. Wells Fargo Bank, N.A.*,
197 F. Supp. 3d 782 (W.D. Pa. 2016) ..................................................................... 33

*Toney v. Quality Res., Inc.*,
75 F. Supp. 3d 727 (N.D. Ill. 2014) ....................................................................... 21

*United States v. Dish Network L.L.C.*,
954 F.3d 970 (7th Cir. 2020) ...................................................................... 3, 14, 20

*Van Patten v. Vertical Fitness Grp., LLC*,
847 F.3d 1037 (9th Cir. 2017) ............................................................................... 19

*Wesley v. Snap Fin. LLC*,
339 F.R.D. 277 (D. Utah 2021) ............................................................... 33

## **Statutes**

47 U.S.C. § 227(c)(5) ................................................................... 1, 17, 18

## **Other Authorities**

47 C.F.R. § 64.1200(f)(9) ...................................................................... 30

Black's Law Dictionary (11th ed. 2019) ................................................. 18

*In re Dish Network, LLC*,
28 FCC Rcd. 6574 (2013) ............................................................... 18, 22

*In re TCPA*,
18 FCC Rcd. 14014 (2003) ................................................. 3, 12, 30, 32

*In re TCPA*,
20 FCC Rcd. 13664 (2005) ....................................................... 3, 10, 14

Rest. (2d) of Torts § 877 ....................................................................... 18

Rest. (3d) Agency § 3.15 ....................................................................... 22

Rest. (3d) of Agency § 1.01 ................................................................... 20

Rest. (3d) of Agency § 4.01(1) ........................................................ 26, 35

Rest. (3d) of Agency § 4.03 ................................................................... 26

Rest. (3d) of Agency § 7.04 ................................................................... 18

Rest. (3d) of Agency, § 4.01 ........................................................... 28, 29

## **Rules**

Fed. R. Civ. P. 56(a) .............................................................................. 9

## **Regulations**

16 C.F.R. § 310 ..................................................................................... 14

47 C.F.R. § 64.1200(d) .................................................................................... passim

47 C.F.R. § 64.1200(d)(2)....................................................................................... 2

47 C.F.R. § 64.1200(d)(3) ..................................................................... 2, 10, 12, 17

47 C.F.R. § 64.1200(d)(4)..................................................................................... 34

47 C.F.R. § 64.1200(d)(6)..................................................................................... 12

47 C.F.R. § 64.1200(f)(10) ................................................................................... 12

47 C.F.R. § 64.1200(f)(13) ................................................................................... 12

47 C.F.R. 64.1200(f)(15) ...................................................................................... 12

## **Record Citation Protocol**

- PSMF – "Plaintiff's Statement of Material Fact," which was originally filed with Plaintiff's summary judgment motion

- ASOF – "Allstate's Statement of Fact", which was originally filed with Allstate's summary judgment motion

- PRASOF – "Plaintiff's Response to Allstate's Statement of Fact", which are Plaintiff's responses to "Allstate's Statement of Fact"

- PAMF – "Plaintiff's Additional Material Facts", which follow Plaintiff's response to "Allstate's Statement of Fact"

The TCPA, 47 C.F.R. § 64.1200(d), prohibits a company from accepting business derived from telemarketing, unless it has instituted written policies, practices and procedures in place to prevent such calls to phone numbers of persons who have asked not to be called. Allstate's internal do-not-call ("IDNC") policy runs afoul of this regulation, because it permits Allstate and anyone telemarketing on its behalf to call phone numbers that are on Allstate's IDNC list if they believe they have "consent," "permission" or an "existing business relationship."

The TCPA provides a private right of action for persons like Plaintiff who receive two or more calls made by or on behalf of a company within a twelve-month period on their residential phone lines, while insufficient IDNC policies or procedures are in place. 47 U.S.C. § 227(c)(5). Plaintiff received fourteen telemarketing calls advertising Allstate goods and services on his residential cellular phone between November 2020 and September 2021, even though Plaintiff was on Allstate's IDNC list. These calls were expressly permitted by the consent exception in Allstate's written IDNC policy.

Allstate should be held liable for these calls pursuant to the Restatement (Third) of Agency. Through its policies and actions, Allstate controls the timing, recordkeeping and dialing instrumentality, as well as the scripting of all telemarketing calls by requiring that each call disclose "Allstate" as the seller of the products/services being peddled. It retains the unfettered right to change those policies at any time it pleases, to audit agents and their vendors' compliance with those policies, and to fire agents and/or their vendors on-the-spot if it perceives any deviation. What is more, the IDNC policy Allstate requires those who make calls on its behalf to follow runs inconsistent with the letter and spirit of the TCPA.

Although Allstate retains the *right* to audit its agents and their vendors' telemarketing conduct and to fire agents and their vendors for noncompliance with Allstate's telemarketing

policies, Allstate *almost never* employs those controls, instead electing to turn a blind eye while continuing to reap the benefits of such marketing. This is what happened with the telemarketing company that called Plaintiff: Although Allstate's TCPA investigators and outside counsel met with the telemarketer Transfer Kings, nobody ever asked Transfer Kings whether it had "scrubbed" Plaintiff's phone number against Allstate's IDNC list, and when Transfer Kings asked for assistance complying with Allstate's policies, Allstate refused. Nevertheless, Allstate continued accepting business derived from Transfer Kings telemarketing – thousands of quotes and dozens of new customers – for nearly a year before it issued a policy change prohibiting agents from using Transfer Kings (and only after the issue was raised by Plaintiff's counsel).

As such, Allstate's motion for summary judgment should be denied, and Plaintiff's motion for summary judgment, Dkt. 149, and motion for class certification and for an injunction prohibiting calls pursuant to Allstate's illegal IDNC policy, should be granted.

## I.    **BACKGROUND**

### A.    The TCPA

The TCPA prohibits "any" telemarketing to residential lines without first instituting procedures for maintaining a list of persons who have requested not to receive calls. 47 C.F.R. § 64.1200(d). IDNC procedures must satisfy specific "minimum standards," which are delineated in the regulation. For example, sellers like Allstate must have policies and procedures to ensure do not call requests are honored and that all persons dealing with telemarketing have been properly trained. 47 C.F.R. § 64.1200(d)(2), 64.1200(d)(3). Moreover, do-not-call requests must be coordinated among sellers and anyone making calls on their behalf, "otherwise any household

could receive endless calls peddling [the seller]'s service, as long as each came from a different [telemarketer]." *United States v. Dish Network L.L.C.*, 954 F.3d 970, 975 (7th Cir. 2020).

Further, although the TCPA's IDNC rules originally contemplated a "consent" defense, the FCC removed that exception in 2003. *In re TCPA*, 18 FCC Rcd. 14014 at 14086, ¶ 124 (2003). The FCC reiterated this point in 2005 in the context of auto insurance telemarketing:

> Once the consumer makes a company specific do-not-call request, whether to the company or third party, the company and its third party telemarketer may not call the consumer again on behalf of that company to make a telephone solicitation *regardless of whether the consumer continues to do business with the company*.

*In re TCPA*, 20 FCC Rcd. 13664, 13668 ¶ 7 (2005) (emphasis added).

### B. Facts

#### 1. Allstate's Internal Do-Not-Call Policy Permits Calls to Numbers on its IDNC List.

Allstate's internal do-not-call policy permits Allstate employees, insurance agents, and their vendors (including so-called "non-contracted" vendors with whom Allstate has not directly contracted) to telemarket on Allstate's behalf to persons who have requested not to receive telemarketing calls, but who are believed to have provided consent to receive calls or made an inquiry at Allstate. ASOF 56, Allstate Ex. C-8. In relevant part, Allstate's IDNC policy states:

> Do not initiate a telephone call to phone numbers on the Allstate Do Not Call list for the purpose of encouraging the purchase of products or services, <u>unless</u> a consumer or customer on the Allstate Do Not Call list has made an inquiry about a product or service as evidenced by an express written invitation or consent to call the person and phone number.
>
> It is permissible to <u>reply to an inquiry</u> by returning a phone call to the consumer or customer within three (3) months of the initial inquiry date, however the number should be scrubbed at least monthly following the initial inquiry to identify a possible new Do Not Call request…

*Id.* (emphasis added). Allstate requires that this policy be provided and adhered to by anyone

making outbound telemarketing calls on Allstate's behalf.[1] The upshot of this policy is that "if [a caller on behalf of Allstate has] express written invitation or consent to call you don't need to scrub against [Allstate's IDNC] scrubbing tool."[2]

### 2. Allstate's Procedures Guarantee an Incomplete Do Not Call List.

Allstate maintains an internal do-not-call list, but it is materially incomplete, cumbersome to use, and unavailable to its agents' telemarketers. For example, Allstate treats telemarketer differently depending on whether the telemarketer contracts with Allstate directly (so-called "contracted" telemarketers), or through an Allstate agent (so-called "non-contracted" telemarketers). Whereas Allstate grants "contracted" telemarketers access to scrub telephone numbers against Allstate's IDNC list,[3] and provides a means for them to coordinate the do-not-call requests they receive by and between such vendors and Allstate,[4] Allstate denies such access to "non-contracted" vendors—despite that it knows they generate business for it through their telemarketing efforts. And while Allstate's agents can ostensibly add do-not-call requests to Allstate's IDNC list on a one-by-one basis, Allstate's policy doesn't give agents the means to add a batch of more than a few phone numbers at once,[5] making it difficult or impossible for an agent to add the large number of records in a non-contracted vendor's IDNC list to Allstate's master list. Also, Allstate's system doesn't allow agents to add numbers to its IDNC list without also including the consumer's name and address[6]—making it difficult in situations where the call recipient doesn't provide this information, as is often the case.

---

[1]     PAMF 4, Pl. Ex. C, 2d Lim Dep. at 48:2-49:8; Pl. Ex. Q, Rafford Dep. at 16:14-17:5, 38:24-42:7.
[2]     ASOF ¶ 57, at Def. Ex. C-12 at ALL000213; ASOF ¶ 57, at Def. Ex. C-13 at ALL000554, *also* PAMF 6 Pl. Ex. B, 1st Lim Dep. at 44:3-8; Pl. Ex. C, 2d Lim Dep. at 96:3-7; Pl. Ex. D, Basit Dep. at 18:14-19.
[3]     PAMF 8, [Pl.] Ex. B, 1st Lim Dep. at 57:24-59:11, 103:19-104:7.
[4]     PAMF 9, [Pl.] Ex. B, 1st Lim Dep. at 58:4-13; [Pl.] Ex. Q, Rafford Dep. at 52:12-53:6.
[5]     PAMF 14, [Pl.] Ex. B, 1st Lim Dep. at 47:23-50:3.
[6]     PAMF 15, [Pl.] Ex. B, 1st Lim Dep. at 47:23-50:3; 50:23-51:20.

And although Allstate's *process* for adding phone numbers to its IDNC list requires inputting names and addresses along with telephone numbers, its IDNC *policy* does not mention this requirement.[7] Nor does it require or suggest that non-contracted telemarketers gather names or addresses. This highlights a disconnect: If non-contracted telemarketers were to try to coordinate their IDNC lists with Allstate's, they would not have sufficient information to do so. In fact, Allstate's IDNC policy *does not include any instructions at all* as to how non-contracted telemarketers are supposed to gather or process IDNC requests; instead, it vaguely states that they should process the Do Not Call request via the so-called "██████████."[8]

The natural result of Allstate's above policies and practices is that its IDNC list is incomplete because it doesn't allow for meaningful coordination of do-not-call requests or IDNC lists with its non-contracted telemarketers. Allstate doesn't know how bad the deficiency is because it never bothered to find out: Despite having the contractual right and ability to do so, it has *never* tracked or investigated whether its agents or their non-contracted telemarketers were scrubbing or adding numbers to Allstate's IDNC list *at all*.[9]

The effect of Allstate's head-in-the-sand approach to the completeness of its IDNC list snaps into focus when one reviews the IDNC list of non-contracted telemarketer Transfer Kings: Allstate's IDNC list is missing more than <u>118,000</u> phone numbers, and Transfer Kings' IDNC list is missing roughly <u>1.5 million</u> numbers from Allstate's IDNC list.[10] Such a large gap necessarily results in telemarketing to consumers who, like Plaintiff, previously asked not to be called.

---

[7]     PRASOF 56 (Allstate IDNC policy); PAMF 15Pl. Ex. B, 1st Lim Dep. at 47:23-50:3; 50:23-51:20 (Allstate procedure requiring names and addresses to be added to IDNC list along with phone numbers).

[8]     ASOF 56, Allstate Ex. C-8.

[9]     PAMF 18, Pl. Ex. B, 1st Lim Dep. at 54:17-55:2 (never any scrub audit); PAMF 19, Pl. Ex. B, 1st Lim Dep. at 54:17-55:2; 55:4-8; 65:3-16 (no investigation into DNC scrubbing at all).

[10]    PAMF 75, Summary at ¶¶ 3-6.

5

### 3. Plaintiff's Experience.

Plaintiff is the subscriber for a residential cell number ending in 8888, for which he made multiple do-not-call requests to Allstate in mid-2020 or earlier in relation to an earlier lawsuit he filed against it for similar unwanted telemarketing despite a prior request to stop.[11] Allstate added Plaintiff's number to its internal do-not-call list on July 10, 2020.[12] Plaintiff's phone number is one of those numbers that is on Allstate's list, but is missing from Transfer Kings' IDNC list.[13]

Plaintiff began to receive unsolicited telemarketing calls for Allstate in November 2020.[14] At least seven of these calls were made by non-contracted telemarketer Transfer Kings (or through its dialing vendor, Atlantic), in efforts to sell Allstate goods and services: Calls 3, 5, 6, 7, 9, 10 and 12.[15] Transfer Kings had been engaged to make such calls by multiple Allstate agents, who paid Transfer Kings for "warm lead" transfers of those telemarketing calls, with consumers interested in purchasing Allstate insurance, only.[16]

Consistent with Allstate's policy and practice exempting opt-in leads from any sort of IDNC scrub, Transfer Kings/Atlantic generated these leads by calling lists of phone numbers purchased from third parties, which purportedly included only consumers who had "consented" to receive telemarketing.[17] However, the purported "opt in" for Plaintiff's phone number that

---

[11]    PAMF 21, Pl. Ex. G, Hossfeld Decl. ¶ 2; SMF 22, Pl. Ex. V, at Interrogatory 5; Pl. Ex. C, 2d Lim Dep. at 99:13-101:3.

[12]    PAMF 23, Pl. Ex. F, Voluminous Records Summary at Ex. 2 (Row 1,444,244); Pl. Ex. H, Interrogatory 1 & Request for Admission 7.

[13]    PAMF 75, Pl. Ex. F ¶ 5, Pl. Ex. 3 (Transfer Kings IDNC list, lacking Plaintiff's 8888 number).

[14]    PAMF 25, Pl. Ex. G, Hossfeld Decl. ¶¶ 4-32; Pl. Ex. L (Fleming log of inbound Transfer Kings transfers with Plaintiff's number).

[15]    PAMF 85, at Calls 3, 5, 6, 7, 9, 10 and 12.

[16]    PAMF 25, Pl. Ex. D, Basit Dep. at 9:3-8, 17:20-24; 57:10-13. *See also* Pl. Ex. F, Summary, at Ex. F.5 (showing 19,753 Transfer Kings calls, which were transferred to Allstate agents).

[17]    PAMF 25, Pl. Ex. D, Basit Dep. at 13:18-21, 74:18-24; *see also* Def.'s Ex. G at TCF 0006-13 (supposed "opt in" lead data for Plaintiff's phone number produced by Transfer Kings); PAMF 80, Pl. Ex. D, Basit Dep. at 43:13- 44:18, 92:1-8. (Basit reviewed Allstate's policies, and Transfer Kings and Atlantic's policies were consistent with Allstate's as to the consent exception to IDNC).

Transfer Kings/Atlantic allegedly purchased *looked* real, but was inauthentic; the website where the "opt in" supposedly happened has no record of it, and the Jornaya lead verification vendor for whom a LeadiD is listed in the data likewise returned no matching lead event.[18]

Plaintiff repeatedly asked not to be called during these calls—including on at least six occasions that were audio recorded.[19] And Plaintiff was not the only consumer who complained about Transfer Kings' calls: ████████████████████████████████████

████████████████████████████████████████████████

████████████████████ █████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████[21] It never bothered to try to update or coordinate its IDNC list with Transfer Kings' IDNC list,[22] never told Transfer Kings to stop telemarketing on its behalf unless and until it cleaned up its act, and[23] outright refused to help Transfer Kings come into compliance when its President Ahmed Basit requested such.[24] Because of Allstate's knowing and intentional inaction as to Transfer Kings' TCPA violations, Allstate agents continued to work with Transfer Kings after this lawsuit was filed. Transfer Kings sent Allstate agents 9,544 warm transfers during that time, and Allstate itself issued 4,169 insurance quotes and accepted 136 new customers derived from Transfer Kings'

---

[18]     PAMF 84, Pl. Ex. X, Rutigliano Decl. ¶¶ 4-7; Pl. Ex. Pl. Ex. Y, Wald Decl. ¶¶ 5-15.
[19]     PAMF 88; Pl. Ex. G, Hossfeld Decl. ¶¶ 2-3, 5, 8, 15, 19, 24, 27, 33; Pl. Ex. G.1, Call 1 Tr. at 4:12-13; Pl. Ex. G.2, Call 2 Tr. at 4:23-25; Pl. Ex. G.6, Call 6 Tr. at 12:4-13; Pl. Ex. G.7, Call 9 Tr. at 7:10-14; Pl. Ex. G.8, Call 10 Tr. at 6:9-20; Pl. Ex. G.10, Call 12 Tr. at 9:5-6.
[20]     PRASOF 53.e.vii, Pl. Ex. R, Gilmond Dep. at 42:1-14; Pl. Ex. AA (ALLSTATE0114328); Pl. Ex. BB (ALLSTATE0117404-117409); Pl. Ex. D, Basit Dep. at 52:22-53:5, 76:18-77:6; 78:19-79:1; Pl. Ex. G.10 (call tr.); Def. Ex. B-23 (quote Allstate emailed).
[21]     PAMF 79, Pl. Ex. C, 2d Lim Dep. at 47:17-48:1.
[22]     PAMF 75, Pl. Ex. F, Summary ¶¶ 3-6.
[23]     PRASOF 53; Pl. Ex. D, Basit Dep. at 52:22-24.
[24]     PRASOF 53, Pl. Ex. D, Basit Dep. at 76:18-77:6; 78:19-79:1.

calls in the nine months after having been placed on notice of the violations, before exercising its

control over non-contracted telemarketing vendors and █████████████████████████████

████████████.[25]

Plaintiff was one of the persons Transfer Kings called on Allstate's behalf during the

pendency of this lawsuit while Plaintiff was on Allstate's IDNC list, and Allstate issued Plaintiff a

quote on that call regardless.[26] Allstate offered no apology, didn't tell Gilmond that it should stop

having vendors call phone numbers on Allstate's IDNC list, or fire Transfer Kings or Gilmond,

and instead accepted the benefit of the telemarketing by issuing Plaintiff the quote.[27] Plaintiff has

received at least three other calls (four total) advertising Allstate since filing this action, one

additional call of which resulted in another quote for insurance.[28] The two calls that resulted in

Allstate emailing Plaintiff a quote[29] included one through ███████████████████ it knew

was using Transfer Kings at least four months before Plaintiff was called, due to a ████████

██████████████████████████████████████████████.[30]

In total, Plaintiff has received fourteen Allstate telemarketing calls – violations – to his

residential cell phone, despite being on its IDNC list.[31] Plaintiff hates telemarketing, and sued

---

[25]    PRAMF 53.c, Pl. Exs. O-P (showing Allstate's ability to ban use of Transfer Kings all along);
PRAMF 53.e.vii, Pl. Ex. D, Basit Dep. at 52:22-53:5 (Allstate in contact with Transfer Kings, but never
told it to stop telemarketing); *also* PAMF 78, Pl. Ex. F ¶ 13 (Transfer Kings records showing 9,544 call
transfers to Allstate agents, 4,169 quotes and 136 insurance policies written as a result of Transfer Kings
calls, *after this lawsuit was filed*).
[26]    PAMF 85 at Call 12, Pl. Ex. G, Hossfeld Decl. ¶¶ 30-33; Pl. Ex.G.10 (call tr.); Def. Ex. B-23
(quote materials Allstate emailed Plaintiff during call); Pl. Ex. EE at HOSSFELD000039 (screenshot);
Pl. Ex. F.5, Row 16117 (Transfer Kings/Atlantic transfer data); Pl. Ex. DD at DG0016-17 (email between
Basit and Gilmond, confirming call); PAMF 83, Pl. Ex. AA (ALLSTATE0114328).
[27]    PAMF 85; Pl. Ex. G, Hossfeld Decl. ¶¶ 28-29, 34-35; Pl. Ex.G.9 (call tr.), G.12 (Allstate quote);
Def. Ex. B-11 (screenshot); Pl. Ex. EE (screenshots).
[28]    Calls 11-14 were made after this lawsuit was filed on December 1, 2020. PAMF 85; Pl. Ex. G,
Hossfeld Decl. ¶¶ 28-35; Pl. Ex.G.9-G.12.
[29]    PAMF 85, Pl. Ex. G, Hossfeld Decl. ¶¶ 33, 35; Pl. Exs. G.10, G.11, G.12.
[30]    PAMF 83, Pl. Ex. AA, ALLSTATE0114328.
[31]    PAMF 85 (detailing calls), Pl. Ex. G, Hossfeld Decl. ¶¶ 4-35; Def. Ex. B-1 to B-23; Pl. Ex.G.1-
G.12; Pl. Ex. EE (screenshots); *see also* PAMF 21 (Plaintiff's number is a residential cell phone for which

Allstate to get the calls to stop and secure monetary redress for himself and the class.[32]

## II.    LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering summary judgment motions, "facts must be viewed in the light most favorable to," and all reasonable inferences from that evidence must be drawn in favor of the nonmoving party – but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The movant bears the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III.   ARGUMENT

### A.    Allstate Violated the TCPA as to Plaintiff.

The undisputed facts show that Plaintiff received fourteen telephone calls marketing Allstate goods and services on his residential cell phone[33] between and including November 2020 and September 2021, even though he was on Allstate's IDNC list the entire time. The undisputed facts also show that Allstate's IDNC policy and practice at the time of these calls failed to satisfy the TCPA's minimum standards for internal do-not-call compliance, 47 C.F.R. § 64.1200(d), and that these deficiencies were the proximate cause of the calls Plaintiff received. Finally, the undisputed facts demonstrate that Allstate should be held liable for the calls to

---

he is the subscriber), Pl. Ex. G, Hossfeld Decl. ¶ 2; PAMF 23 (reflecting Plaintiff's number on Allstate's IDNC list), Pl. Ex. F, Voluminous Records Summary at Ex. 2 (Row 1,444,244); Pl. Ex. H, Interrogatory 1 & Request for Admission 7.

[32]    PAMF 24, Pl. Ex. G, Hossfeld Decl. ¶ 3.

[33]    Ex. G, Hossfeld Decl. ¶ 2.

9

Plaintiff that were made on its behalf, pursuant to principles in the Restatement (Third) of Agency. As such, Allstate's motion for summary judgment should be denied.

### 1. Plaintiff Received Fourteen Allstate Telemarketing Calls Within Ten Months.

Plaintiff received fourteen telemarketing calls advertising Allstate goods and services between November 11, 2020, and September 22, 2021, Calls 1-14,[34] all while his personal, residential cell phone number was on Allstate's internal do-not-call list for more than 31 days. Allstate itself issued quotes for insurance on two of those calls, Calls 12 and 14.[35]

### 2. Allstate's IDNC Policy and Practices Were Deficient When Plaintiff Received Allstate's Calls, Rendering the Calls Impermissible.

The TCPA prohibits "any" telemarketing without first instituting proper internal do-not-call procedures—merely drafting a written policy that parrots the regulations is insufficient. 47 C.F.R. § 64.1200(d). Crucially, this requires that the seller – in this case, Allstate – coordinate do-not-call requests across vendors and ensure that persons or entities telemarketing on its behalf *honor* do-not-call requests. *In re TCPA, State Farm Order*, 20 FCC Rcd. 13664, 13668 ¶ 7 (2005); *see also* 47 C.F.R. § 64.1200(d)(3) ("the person or entity on whose behalf the telemarketing call is made will be liable for any failures to honor the do-not-call request."). Allstate imposed its IDNC policies and practices on ████████████████████████████ ████████████████████████.[36] However, those IDNC policies and practices were deficient. First, although, as discussed below, no "consent" exception exists for the TCPA's IDNC rules, Allstate's policy has always permitted calls to be made to phone numbers on

---

[34]     *See* footnotes 26-27, supra; PAMF 85.
[35]     PAMF 85, Call 12 (quote at Def. Ex. B-23), and Call 14 (quote at Pl. Ex. G.12).
[36]     PAMF 4, Pl. Ex. C, 2d Lim Dep. at 48:2-49:8.

Allstate's IDNC list, if the caller believed it had the recipient's consent.[37] Second – and relatedly – Allstate's approved practice for IDNC compliance did not call for scrubbing phone numbers against its IDNC list at all, if the caller believed it had consent.[38]

Additionally, Allstate's procedures for use of its IDNC list are so unreasonably onerous and cumbersome that agents and telemarketers are likely not use them – even if Allstate's policy had properly required such. For example, Allstate doesn't allow non-contracted vendors to scrub against its list or add their own do-not-call lists to its own, and it doesn't allow its own agents to update its IDNC List in large batches to account for the vendors' lists.[39] Additionally, Allstate doesn't bother to track whether its agents use its IDNC scrubbing tool, and there is no evidence that Allstate has *ever* looked into whether anyone was properly using its scrubbing tool at all.[40]

Instead of instituting reasonable policies and procedures to ensure that non-contracted telemarketers were complying with proper IDNC scrubbing, Allstate has taken a "head in the sand" approach to non-contracted telemarketers: It has never done any sort of investigation into whether phone numbers were being scrubbed or properly added to its IDNC list to create a Master IDNC List, and ██████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████.[41]

        **a.**      **The TCPA Does Not Contain an IDNC "Consent" Exception.**

---

[37]     Calls to IDNC list numbers allowed, if there indicia of consent. PAMF 5; Pl. Ex. A; Pl. Ex. C, 2d Lim Dep. at 42:13-24; Pl. Ex. B, 1st Lim Dep. at 44:3-8.

[38]     No IDNC scrub necessary if there is believed to be consent. PAMF 6; Pl. Ex. B, 1st Lim Dep. at 44:3-8; Pl. Ex. C, 2d Lim Dep. at 96:3-7; Pl. Ex. D, Basit Dep. at 18:14-19; *see also* ASOF ¶ 57, at Def. Ex. C-13 at ALL000554 (█████████████████████████████████████████████ ██████████████████████████")

[39]     PAMF 10-12, 13-15, 17; Pl. Ex. B, 1st Lim Dep. at 15:14-16:19, 46:3-23, 47:23-50:3, 52:5-18, 57:24-58:13.

[40]     PAMF 19, Pl. Ex. B, 1st Lim Dep. at 54:17-55:2, 55:4-8.

[41]     PAMF 19, 70-71; Pl. Ex. T, Warner Dep. at 48:18-49:1, 50:2-51:2; Pl. Ex. C, 2d Lim Dep. at 55:24-59:7, 114:19-21; Pl. Ex. B, 1st Lim Dep. at 54:17-55:8, 65:3-22, 82:21-24.

The TCPA requires that "sellers"[42] like Allstate honor requests not to be called for five years – full stop. 47 C.F.R. §§ 64.1200(d)(3), 64.1200(d)(6). Since 2003, the IDNC regulations have contained no exception for opt-in, consent, permission or "existing business relationship" ("EBR"). 47 C.F.R. § 64.1200(d). Before 2003, the IDNC regulations applied to "telephone solicitations," a term of art defined in 47 C.F.R. 64.1200(f)(15) to exclude calls with consent, permission, or an existing business relationship. But the FCC's 2003 regulatory changes replaced "telephone solicitation" with "telemarketing," a term of art defined at 47 C.F.R. § 64.1200(f)(13), which does not include any exceptions at all. The FCC's 2003 Order clarifies:

> … we amend the company-specific do-not-call rules to apply to "any call for telemarketing purposes" to make clear that a company must cease making telemarketing calls to any customer who has made a do-not-call request, regardless of whether they have an EBR with that customer. We also adopt a provision stating that a consumer's do-not-call request terminates the EBR for purposes of telemarketing calls even if the consumer continues to do business with the seller.

*In re TCPA*, 18 FCC Rcd. 14014 at 14086, ¶124 (paragraph breaks supplied). Allstate therefore cannot rest upon a "consent" affirmative defense.[43]

Contrary to the IDNC regulation, Allstate's formal IDNC policy *permits* calls to persons

---

[42] "Seller" is a term of art in the TCPA, defined as "the person or entity on whose behalf a telephone call or message is initiated…." 47 C.F.R. § 64.1200(f)(10).

[43] Aside from the fact that Allstate must concede that the relevant regulations, 47 C.F.R. § 64.1200(d), do not mention existing business relationship or consent at all, several courts have found that no such defenses exist for IDNC violations. *Hand v. Beach Ent. KC, LLC*, 456 F.Supp.3d 1099, 1126 (W.D. Mo. 2020) (rejecting suggestion that entities making calls pursuant to an EBR would be exempt from maintaining internal do-not-call procedures as required by 47 C.F.R. § 64.1200(d)); *Smith v. Truman Rd. Dev., LLC*, 2020 WL 2044730, at *15 (W.D. Mo. Apr. 28, 2020) (denying defense motion for summary judgment on IDNC claims, noting that "Defendants make no argument as to why entities making calls … with prior express invitation or permission would be exempt from maintaining internal do-not-call procedures as required by 47 C.F.R. § 64.1200(d)") (quoting *Allard v. SCI Direct, Inc.*, 2017 WL 2957883, at *6 (M.D. Tenn. July 10, 2017), for "finding there is no consent exception to liability under [] 47 C.F.R. § 64.1200(d), because 'even if [defendant] only initiates telemarketing calls to customers who have given permission to receive such calls, it would still be required to maintain a do-not-call list to permit those customers to opt-out of getting telemarketing calls if they so desire'"); *also Allard*, at *6 ("SCI's argument that it does not need to follow 47 C.F.R. § 64.1200(d) rules if the person being called gave prior express consent is without merit.").

like Plaintiff, PSMF ¶ 2, who were on Allstate's IDNC list but whom caller (and apparently Allstate) believed had "opted in" to be called. Allstate's incorrect "consent exception" also permeates through its TCPA training materials, thus rendering them insufficient, too. ▮



"[46]

And as is natural given that this directive applies to all calls, it appears in Allstate's

"

."[47]

Because Allstate maintains its own IDNC list and retains the ability to do so, one would think Allstate would vet or spot-check the "opt in" data its agents and their third-party vendors use, but it doesn't, instead blindly accepting opt-ins at the word of its agents.[48]

        **b.**      **The TCPA Requires that Do Not Call Requests be Coordinated.**

---

[44]      ASOF 57, at Def. Ex. C-9, at ALL000268.

[45]      ASOF ¶ 57, at Def. Ex. C-10 at ALL000499.

[46]      ASOF ¶ 57, at Def. Ex. C-12 at ALL000213.

[47]      ASOF ¶ 57, at Def. Ex. C-13 at ALL000554.

[48]      PAMF 89, Pl. Ex. B, 1st Lim Dep. at 85:2-14 (unable to "speak to" whether "Allstate agents are allowed to carte blanche believe lead generators and telemarketers that they had consent to make phone calls"). Allstate here relies on inadmissible hearsay to presume that consent existed by virtue of the purchase of third-party "opt-in" data alone—notwithstanding the fact that the alleged "opt in" Transfer Kings produced for Plaintiff's number was fake. PAMF 84, Pl. Ex. X, Rutigliano Decl. ¶¶ 4-7 (Policygenius.com has no record of the purported opt-in); Pl. Ex. Y, Wald Decl. ¶¶ 5-15.

The TCPA requires that sellers like Allstate coordinate their IDNC lists with and among all telemarketers. In 2005, Allstate's competitor State Farm filed a request for clarification with the FCC, asking that it be permitted to share its existing business relationship ("EBR") with its insurance agents. The FCC's answer was "yes," State Farm may do so, but this did not eliminate its obligation to coordinate IDNC requests amongst it and its telemarketers:

> Once the consumer makes a company specific do-not-call request, whether to the company or third party, the company and its third party telemarketer may not call the consumer again on behalf of that company to make a telephone solicitation regardless of whether the consumer continues to do business with the company.

*In re TCPA, State Farm Order*, 20 FCC Rcd. 13664, 13668 ¶ 7 (2005). The Seventh Circuit reached the same conclusion when considering internal do-not-call requirements in the context of both the TCPA and the FTC's Telemarketing Sales Rule, 16 C.F.R. § 310 *et seq.*, which generally mirror one another. The Court found that "order-entry retailers were the sort of agents required to coordinate lists with DISH [because the] order-entry retailers were acting on behalf of DISH for this purpose." *Dish Network LLC*, 954 F.3d at 976.

Allstate's policies and procedures do not ensure proper coordination as required by *Dish Network*. First, it does not afford its agents or their "non-contracted" vendors a meaningful way to add large batches of phone numbers to its IDNC list at once,[49] and prohibits "non-contracted" vendors like Transfer Kings access to its IDNC List.[50] Second, although Allstate's written policy charges its insurance agents with updating Allstate's IDNC list,[51] it provides no ready means for them to update its IDNC List in a way that would accommodate the large batch of numbers that exist in any vendor's IDNC list.[52] Third, Allstate's requirement that phone numbers be

---

[49]     PAMF 17; Pl. Ex. B, 1st Lim Dep. at 52:4-18, 57:24-58:13.
[50]     PAMF 11-12; 1st Lim Dep. at 46:7-23, 57:24-58:13.
[51]     PAMF 14, Pl. Ex. B, 1st Lim Dep. at 47:23-50:3.
[52]     PAMF 15, 17-19, Pl. Ex. B, 1st Lim Dep. at 47:23-50:3, 54:17-55:2, 55:4-8.

accompanied by names and addresses when added to its IDNC list does not appear on its IDNC policy, creating a disconnect that prevents coordinating non-contracted telemarketers' IDNC data with Allstate's.[53]

And when asked *why* Allstate had never done any sort of audit or investigation into how agents use the scrubbing tool, Allstate's senior compliance specialist and internal "subject matter expert" on do-not-call compliance explained that the agents were supposed to use the tool, but that Allstate had no duty to investigate "because Allstate does not require them to place telemarketing calls."[54] Plaintiff submits that whether or not Allstate *requires* anyone to make telemarketing calls does not govern whether Allstate is required to maintain a complete IDNC list, or honor IDNC requests.

Allstate's knowing indifference to the completeness of its IDNC list is highlighted by the fact that although there was direct communication between Allstate's compliance department and Transfer Kings, no one at Allstate ever asked Transfer Kings to scrub its data against Allstate's IDNC list before calling, and no one ever made any suggestions about how Transfer Kings could better comply with Allstate's do-not-call policies—even when Basit asked for help complying.[55]

Given the above, it is not surprising that Allstate's IDNC list is short by at least 118,000 phone numbers because it failed to coordinate with Transfer Kings' IDNC list.[56] And that's just for one vendor.

### 3. Allstate's Improper Policies and Practices were the Proximate Cause of the Illegal Calls to Plaintiff.

Although not a requirement under the TCPA, which prohibits "any" and all telemarketing

---

[53]     PRASOF 56 (Allstate IDNC policy); PSMF 15, Pl. Ex. B, 1st Lim Dep. at 47:23-50:3 (Allstate procedure requiring names and addresses to be added to IDNC list).
[54]     PAMF 18, Pl. Ex. B, 1st Lim Dep. at 54:17-55:2.
[55]     PAMF 72, Pl. Ex. D, Basit Dep. at 21:8-13; 45:11-16, 53:14-20, 78:19-79:1.
[56]     PAMF 75, Pl. Ex. F, Summary, at ¶ 3-6.

calls by or on behalf of a seller absent proper IDNC policies and procedures, 47 C.F.R. §
64.1200(d), Allstate's improper IDNC policy and procedures caused the calls to Plaintiff. In line
with Allstate's IDNC policy, its subvendor Transfer Kings (and Transfer Kings' dialing vendor,
Atlantic) believed that they did not have to scrub Plaintiff's phone number against Allstate's
IDNC list, because they believed Plaintiff had opted in, or consented, to receiving telemarketing
calls.[57] Because "consent" purportedly existed, under Allstate's IDNC policy, Transfer Kings
was not required to scrub Plaintiff's phone number against any do-not-call list.[58] Moreover,
Transfer Kings couldn't have scrubbed its list against Allstate's IDNC List, anyway, because
Allstate denies "non-contracted" telemarketing vendors like Transfer Kings access to its IDNC
list. PSMF 10-11; Pl. Ex. B, 1st Lim Dep. at 46:3-23.

Even worse, pursuant to Allstate's standard practice, for nine months into this litigation,
it did *nothing* to prevent further Allstate telemarketing calls from Transfer Kings/Atlantic to
Plaintiff's phone—despite being in direct contact with Transfer Kings' owner about Plaintiff's
complaint and possessing the absolute right to force its agents to stop using it as a telemarketer
or lead vendor.[59] Indeed, Allstate has never bothered to determine what other agents used
Transfer Kings to generate sales of Allstate insurance policies—business it has happily retained
without showing any interest in returning its ill-gotten profits.[60] And it still hasn't incorporated
Transfer Kings' do-not-call list with its own, or modified its practices to remove the "consent

---

[57]     PAMF 25, Pl. Ex. D, Basit Dep. at 13:18-21, 74:18-24. PAMF 80, Pl. Ex. D. Basit Dep. at 43:13-
16:18, 92:1-7. (Basit reviewed Allstate's policies, and Transfer Kings and Atlantic's policies were
consistent with Allstate's as to the consent exception to IDNC).
[58]     PAMF 5-6; Pl. Ex. A; Pl. Ex. B, 1st Lim Dep. at 44:3-8; Pl. Ex. C, 2d Lim Dep. at 96:3-7; Pl. Ex.
D, Basit Dep. at 18:14-19.
[59]     PAMF 63, 73; Pl. Ex. D, Basit Dep. at 52:22-53:5; Pl. Ex. P.
[60]     PAMF 74; Pl. Ex. D, Basit Dep. at 78:13-15; Pl. Ex. C, 2d Lim Dep. at 60:14-19; *see also* PSMF
78, Pl. Ex. F, Voluminous Records Summary, at ¶ 13 (confirming Transfer Kings/Atlantic sent over 4,169
transfers to Allstate agents that resulted in a quote *since this case was filed*).

exception" that doesn't exist under the TCPA's regulations.[61]

As a result of Allstate's indifference towards TCPA compliance, Plaintiff – and others – have continued to receive unsolicited Allstate telemarketing calls; Plaintiff received four since he filed this lawsuit—two of which, Calls 12 and 14, resulted in quotes Allstate issued to him directly.[62] One of those quotes came through the Gilmond Allstate agency, which Allstate knew was ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████[63]

Because Plaintiff received "more than one telephone call within any 12-month period by or on behalf of" Allstate in violation of the TCPA's prohibition against telemarketing without adequate internal do-not-call rules procedures (as further detailed below), Plaintiff has demonstrated a violation of the TCPA, 47 C.F.R. § 64.1200(d), and has private right of action pursuant to 47 U.S.C. § 227(c)(5). As such, Allstate fails to meet its burden and its summary judgment motion should be denied.

**B.      Allstate Should be Held Liable for the Telemarketing Plaintiff Received.**

The IDNC regulations specify that the regulations must be honored by sellers "on whose behalf such calls are made" such as Allstate, 47 C.F.R. § 64.1200(d)(3), and the TCPA's private right of action explicitly extends to violative calls made "by or on behalf of the same entity," 47 U.S.C. § 227(c)(5). After all, as the FCC found nearly ten years ago,

> [T]he seller is in the best position to monitor and police TCPA compliance by third-party telemarketers. [P]otential seller liability will give the seller appropriate incentives to ensure that their telemarketers comply with our rules. By contrast, allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third

---

[61]     PAMF 75, 79; Pl. Ex. F, Voluminous Records Summary, at ¶¶ 3-5, 6; Pl. Ex. C, 2d Lim Dep. at 47:17-48:1.
[62]     *See* footnotes 26-27, supra; PSMF 85.
[63]     PAMF 83; Pl. Ex. AA (ALLSTATE0114328), Pl. Ex. R, Gilmond Dep. at 12:21-17:22.

parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case."). [*See In re Dish Network, LLC*, 28 FCC Rcd. 6574, 6588 (2013)]

The Court thus looks to the Restatement of Agency when analyzing vicarious liability. *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021). Allstate should be held liable for the calls made on its behalf to Plaintiff, pursuant to the federal common law in the Restatement (3d) of Agency.

### 1.     Actual Authority.

A "person who orders or induces an actor's tortious conduct is subject to liability for harm resulting to a third person when the person 'knows or should know of circumstances that would make the conduct tortious if it were his own.'" Rest. (3d) of Agency § 7.04, *cmt. b*. This concept holds true "even when the relationship between two persons is ***not*** a relationship of agency." Rest. (3d) of Agency § 7.04, *cmt. b* (emphasis added). This concept holds true "even when the relationship between two persons is not a relationship of agency." Rest. (3d) of Agency § 7.04, *cmt. b*. "When a person is subject to liability as a consequence of this rule, it is immaterial whether the relationship between the person and the actor is a relationship of agency" *Id.* (citing Rest. (2d) of Torts § 877, "Directing or Permitting Conduct of Another," which provides liability under substantially identical principles). The TCPA sounds in tort. Black's Law Dictionary defines "tort" as:

> 1. A civil wrong, other than breach of contract, for which a remedy may be obtained, usu. in the form of damages; a breach of a duty that the law imposes on persons who stand in a particular relation to one another …
>
> 2. (pl.)The branch of law dealing with such wrongs.

TORT, Black's Law Dictionary (11th ed. 2019). The TCPA falls squarely within this definition: it's a civil (not criminal) wrong, other than a breach of contract for which a remedy of damages may be obtained, either for negligent or intentional conduct. 47 U.S.C. § 227(c)(5). None of the

above authorities requires that a "tort" arise from the common law. Indeed, the Seventh Circuit held in *Am. States Ins. Co. v. Cap. Assocs. of Jackson Cnty., Inc.* that an "intentional-tort" exclusion in an insurance policy operated to exclude TCPA violations from coverage, 392 F.3d 939, 943 (7th Cir. 2004); and held in *Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458, 462 (7th Cir. 2020), that TCPA violations are akin to "intrusion upon seclusion" intentional tort claims. *Accord Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (TCPA claims closely related to claims for invasions of privacy, intrusion upon seclusion, and nuisance).

Here, Allstate's public-facing IDNC policy – which it required anyone making calls on its behalf to follow – expressly permitted calls to phone numbers that were on the IDNC list, as long as there was evidence of consent.[64] Because Allstate claims that it had "prior express consent" for the calls made on its behalf and because the calls were made pursuant to Allstate's approved procedure of not scrubbing phone numbers if there is believed to be consent, the calls at issue in this case were made within the scope of authorized conduct. Allstate should not be permitted to avoid liability for telemarketers doing what it told them they were *allowed to do*, much less benefit from such as it did. And because Allstate's policy directive resulted in thousands of torts that violated the TCPA, Allstate should be held liable.[65]

### 2. Formal Agency.

A principal-agent relationship exists where a seller has the "right to control" a

---

[64]     PAMF 5, Pl. Ex. A & Pl. Ex. C, 2d Lim Dep. at 42:13-24.

[65]     Allstate may point to authorities that say that express or implied authority is an *element* necessary to a finding of vicarious liability through agency, *e.g. Warciak*, 949 F.3d 354, 357 (7th Cir. 2020) and *Bilek*, 8 F.4th 581, 587 (7th Cir. 2021). However, the Seventh Circuit and the FCC both say that Courts should follow the Restatement when considering liability for calls initiated by a third party, and this rule comes directly from the Restatement. *Id.*; *In re TCPA, Dish Network Petition*, 28 F.C.C.R. 6574, 6582, ¶24 (2013). Rest. (3d) of Agency § 7.04 cmt. b, applies in circumstances where a party specifically authorizes another to commit a tort on its behalf, which is present here. Plaintiff does not believe this argument has been presented in a TCPA case; certainly it has never been considered by any Court in any decision on Westlaw.

19

telemarketer's performance. *United States v. Dish Network, LLC*, 954 F.3d 970, 975 (7th Cir. 2020); Rest. (3d) of Agency § 1.01, cmt. f. *Dish Network* was an IDNC case where the defendant argued – as Allstate does here – that it could not be held vicariously liable for telemarketers' TCPA violations because its contracts with its telemarketers disclaimed agency and prohibited telemarketers from violating the law. *Id*. at 975. The Seventh Circuit rejected that argument, holding that there was an agency relationship *based upon the contract alone*, citing only two clauses of the contract, which (1) required the telemarketers to comply with Dish's rules, and (2) permitted Dish to change the telemarketing rules at any time, gave Dish sufficient control over telemarketing to create an agency relationship and to hold Dish vicariously liable for its telemarketers' calls. *Id*. at 975.[66] Just like in *Dish Network*, Allstate's contracts and policies permitted Allstate to ███████████████████████████."[67] Allstate also made it pellucidly clear that ██████████████████████████████████████ s.[68] If *agents* did not follow Allstate's telemarketing directives its ███████████████████ ████████████████████████ ██████████████████████████████."

      a.    <u>Frequent Agency Standards Revisions.</u> ████████████████ ████████████████████████████████ ████████████████████████ ████████████████████████

---

[66]     The Seventh Circuit also found it relevant to agency that the telemarketers acted directly for Dish, entered consumer information directly into Dish's computer system, did not have their own inventory, and were not resellers of Dish products. 954 F.3d at 975.

[67]     PAMF 4; PRASOF 53.e.i, Def. Ex. C-9 at ALL0000268; Pl. Ex. N.

[68]     PAMF 4; Pl. Ex. C, 2d Lim Dep. at 48:2-49:8; Pl. Ex. Q, Rafford Dep. at 16:14-17:5, 38:24-42:7.

███████████████████████████████████████.[69]

      b.    <u>Frequent DNC Policy Revisions</u>. Allstate is permitted to – and frequently does –

change IDNC policy, which Allstate integrates into its Agency Standards. Allstate has issued

five discrete versions of its IDNC policy in recent years, each of which contained new

directives and requirements.[70] For example, Allstate's September 2020, revisions limited

how long it will honor a do-not-call request from indefinitely to five years. *Compare* PSMF

4, Pl. Ex. A, ALL0000237 at ¶5(b), *with* Pl. Ex. A, ALL0000233 at ¶5(b). Such interim

instructions are the touchstone of an agency relationship. *Toney v. Quality Res., Inc.*, 75 F.

Supp. 3d 727, 742 (N.D. Ill. 2014).

      c.    <u>Termination for Noncompliance</u>. ██████████████████████

███████████████████████████████████████████████████████

█████████████████████████████[71]*See Jackson v. Bank of New York*,

62 F. Supp. 3d 802, 814 (N.D. Ill. 2014) (identifying "the right to terminate the relationship"

as a factor supporting control sufficient for agency).

      d.    <u>Control Over Non-Contracted Telemarketers</u>. ████████████████

█████████████████████████████████████████████████████████

██████████████████████████████ ██████████████████████████

██████████████████████████████████████." *Id*.

      e.    <u>Audit and Investigation Rights</u>. Although Allstate does not regularly exercise

such rights unless/until it receives a lawsuit,[73] Allstate enjoys the contractual right to obtain,

---

[69]    See PSMF 61, Def. Ex. C-9 at ALL0000267; also PRASOF 53.e.i, Pl. Ex. N. (which shows modifications).

[70]    PRASOF 53.e.ii, Pl. Ex. A.

[71]    PRASOF 53.e.iii, Def. Ex. C-9 at ALL0000267.

[72]    SAMF 63, Pl. Ex. O, ALL000036 & Ex. P ALLSTATE0117638 (non-approved vendors).

[73]    PSMF 69, Pl. Ex. B, 1st Lim Dep. at 65:3-22; Pl. Ex. C, 2d Lim Dep. at 114:19-21

audit and investigate its agents and their telemarketers' call and IDNC compliance data, among other things.[74] S*ee Braver v. NorthStar Alarm Servs., LLC*, 2019 WL 3208651, at *7 (W.D. Okla. July 16, 2019) (identifying the power to "assess the agent's performance" as reflecting control).

     f.   <u>Exclusive Agents</u>. Just



.[75]

Allstate's agents act directly for Allstate,

.[76] Allstate agents and their telemarketers are required to use Allstate's name during telemarketing calls. SMF 66, Pl. Ex. A at bullet point 2; Pl. Ex. B, 1st Lim Dep. at 74:5-16. *In re Dish Network*, 28 FCC Rcd. at 6592. In sum, *all* of the specific indicia of control that the Seventh Circuit in *Dish Network* found dispositive as to an agency relationship, and most of the factors the FCC identified in its 2013 *In re Dish Network* order, are present here.

     Although Allstate directly controls their actions through its IDNC policy, non-contracted telemarketers such as Transfer Kings and Atlantic could be considered subagents. This does not change the outcome. "The relationships between a subagent and the appointing agent and between the subagent and the appointing agent's principal are relationships of agency[.]" Rest. (3d) Agency § 3.15. Thus, Allstate's claim that it didn't explicitly "direct" the telemarketing at issue does not absolve it of liability. *See Bilek v. Nat'l Cong. of Emps., Inc.*, 470 F. Supp. 3d 857,

---

[74]    PRASOF 53.e.vi, Pl. Ex. B, 1st Lim Dep. at 65:3-22; Pl. Ex. C, 2d Lim Dep. at 114:19-21; Retention Policy at ALL00042-43.
[75]    PRASOF 53.a, Pl. Ex. Q, Rafford Dep. at 15:11-21.
[76]    PRASOF 53.b, Pl. Ex. R, Gilmond Dep. at 49:9-51:13; Pl. Ex. B, 1st Lim Dep. at 28:16-29:23, 38:21-39:23.

861 (N.D. Ill. 2020) ("Plaintiff does not necessarily need to allege that Defendants had direct control over [the sub-vendor] to establish vicarious liability[;] … an agent may appoint a subagent if the agent has actual or apparent authority from the principal to do so").

Allstate expressly permits its insurance agents authority to "



[79] Allstate controls which third-party vendors its agents use, too.

───────────────────

[77]     PRASOF 53.c, Pl. Ex. Ex. O ALL000036 & Ex. P, ALLSTATE0117638 (non-approved vendors).  Also see Rest. (3d) Agency § 3.15(2) ("An agent may appoint a subagent only if the agent has actual or apparent authority to do so.").

[78]     PRASOF 53.c, Def. Ex. C-8.

[79]     PRASOF 42, Pl. Ex. R, Gilmond Dep. at 42:1-14, Def. Ex. C-20 & C-21 at Agent Agr. § VI.B; PRASOF 53.e.vi; Pl. Ex. S, Retention Policy at ALL00042-43; Pl. Ex. C, 2d Lim Dep. at 27:18-32:10.

[80]     PAMF 83, Pl. Ex. AA (ALLSTATE0114328),

████████████████████████.[81] Consequently, the telemarketing here was made pursuant to the actual authority Allstate imbues in its insurance agents to telemarket or retain third parties to telemarket on its behalf, creating a subagency relationship that establishes vicarious liability for the resulting violations at issue.[82]

In *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 833 (N.D. Ill. 2016), Judge Kennelly denied the TCPA defendants' summary judgment motion, where "[t]he evidence permits the reasonable conclusion that [one defendant] expressly authorized [another] to seek out vendors to generate leads for its timeshare products," which then either directly or through another subvendor "expressly authorized [the caller] to make phone calls." Here, too, Allstate's IDNC policy and practices authorized its insurance agents to retain third parties to telemarket on behalf of Allstate insurance, which Fleming and Gilmond did when they hired Transfer Kings.[83] Transfer Kings and its own call vendor, Atlantic,[84] then placed the calls at issue in line with Allstate's IDNC policy that permitted telemarketing to phone numbers for which the caller believed it had consent.[85] Thus, as in *Aranda*, Transfer Kings and Atlantic are Allstate's

---

[81]    PAMF 83, Pl. Ex. R, Gilmond Dep. at 32:24-33:16; Pl. Ex. DD (DG0016-17); PRASOF 53.e.vii at ALLSTATE0114328 (Gilmond email to Allstate that the lead generator for the Texas Department of Insurance complaint was Transfer Kings).

[82]    Allstate's argument that it cannot be held liable because it didn't know the full extent of Atlantic's involvement as a separate entity is a red herring. Ex. D, Basit Dep. at 78:1-5. A principal doesn't need to know a subagent's identity where, as here, the agents are authorized to appoint whatever subagent they wished as long as those vendors (a) were not on Allstate's non-approved vendor list, and (b) adhered to Allstate's (facially deficient) IDNC policy. Allstate's IDNC policy readily contemplates the use of "external suppliers," Ex. A, and it knew Transfer Kings was using Atlantic to place calls but didn't tell Transfer Kings, to have Atlantic stop. Whether Transfer Kings or Atlantic placed the calls is immaterial to the cause of action, which is based upon Allstate's policies and practices, which both Transfer Kings and Atlantic followed.

[83]    PRASOF 53.c, Def. Ex. C-8 (Allstate IDNC policy), Pl. Ex. O, ALL000036 & Ex. P ALLSTATE0117638 (non-approved vendor notice)

[84]    Allstate knew that Atlantic worked with Transfer Kings by at least spring 2021, before the additional calls Plaintiff received later on. Ex. PAMF 87, Pl. Ex. D, Basit Dep. at 78:1-5.

[85]    PAMF 5, 25; Pl. Ex. A; Pl. Ex. C, 2d Lim Dep. at 42:13-24; PAMF 25, Pl. Ex. D, Basit Dep. at 74:18-24.

subagents, and Allstate is responsible for their TCPA violations on its behalf.

Because Transfer Kings/Atlantic had Allstate's actual authority to call Plaintiff by virtue of a chain of (sub)agent relationships authorized by Allstate's own policies, Allstate should be held vicariously liable for the resulting TCPA violations. As such, its motion should be denied.

### 3.     Apparent Authority

"Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume or which he holds his agent out as possessing—it is such authority as a reasonably prudent man, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess." *Malcak v. Westchester Park Dist.*, 754 F.2d 239, 245 (7th Cir. 1985).

Allstate's internal do-not-call policy mandates that "the name of the person or business on whose behalf the call is being made, the purpose of the call, [and] the products or services that are the subject of the call" be stated during calls.[86] This policy applies to *anyone* making calls to sell Allstate goods and services, including third-party non-contracted vendors like Transfer Kings/Atlantic.[87] Any reasonable person who receives a telephone call where the caller says they're selling Allstate goods and services would believe such, and such belief would be directly traceable to Allstate's policy. This is particularly the case here, where Plaintiff was repeatedly connected during these calls with *bona fide* Allstate insurance agents. Further, in one of these instances, the agent emailed Plaintiff from her Allstate.com email address, and in two other occasions, Allstate *itself* emailed quotes for insurance to Plaintiff during the calls.[88] Allstate *itself* also pulled Plaintiff's credit as a result of the calls, and mailed him letters about it.[89] This

---

[86]     PRASOF 53.e.iv, Def. Ex. C-8, IDNC Policy at ¶ 2.
[87]     PRASOF 53.e.iv, Pl. Ex. B, 1st Lim Dep. at 74:5-16.
[88]     PSMF 40, 57, 60; Pl. Ex. G, Hossfeld Decl. ¶¶ 18, 32, 35; Pl. Exs. G.5 (email), G.11-G.12.
        [89] Def.'s Ex. B-12.

apparent authority is thus directly traceable to the manifestations of the principal, Allstate. Rest. (3d) Agency § 3.03.

The fact Allstate products and services were quoted during calls, also "cloaked" third-party vendors and agents with the appearance that the calls were authorized by Allstate, and thus – regardless of whether there was a formal agency relationship – had the effect of such making Allstate liable.[90] *Brown v. DirecTV, LLC*, 2021 WL 5755044, at *1 (C.D.Cal. Dec. 1, 2021) (entering summary judgment where calls were made by third party, in DirecTV's name).[91]

### 4. Ratification

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Rest. (3d) of Agency § 4.01(1). This may occur through the knowing retention of the benefits of the act, or by "willful ignorance"— i.e., where the principal may not know the material facts, but has "ratified with awareness that such knowledge was lacking." Rest. § 4.01 at cmt. b; *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1075 (9th Cir. 2019). "Ratification may create a relationship of agency when none existed before[,]" Rest. (3d) of Agency § 4.03 cmt. a, and the "benefit" retained need not be monetary. *E.g., Keim v. ADF Midatlantic, LLC*, 2015 WL 11713593, at *8 (S.D. Fla. 2015); *Klein v. Commerce Energy, Inc.*, 256 F. Supp. 3d 563, 588 (W.D. Pa. 2017).

Allstate ratified prior telemarketing calls made by non-contracted telemarketers like

---

[90] PSMF 78; Pl. Ex. F, Summary, at ¶ 13, PSMF 57 Ex.G.10, HOSSFELD000059 at 2; Pl. Ex. G, Hossfeld Decl. ¶¶ 32, 35; Pl. Ex. G.11 & G.12 (quotes)

[91]     Also, "[a] principal's inaction creates apparent authority when it provides a basis for a third party reasonably to believe the principal intentionally acquiesces in the agent's representations or actions." Rest. (3d) Agency § 3.03, cmt. b. Here, four calls Plaintiff received—including the two that resulted in quotes Allstate emailed him directly—occurred *after* Plaintiff filed suit. PAMF 85; Pl. Ex. G, Hossfeld Decl. ¶¶ 33, 35; Pl. Exs. G.10, G.11, G.12. That these calls continue, and Allstate has taken no steps to correct its policy and practices despite the pendency of this action, PAMF 79, Pl. Ex. C, 2d Lim Dep. at 47:17-48:1, certainly provides a reasonable basis for Plaintiff to believe Allstate acquiesced to these and future calls. This alone supports a finding of apparent authority.

Atlantic and Transfer Kings to phone numbers on its IDNC list, through its refusal to change its policy and practice in the roughly eighteen months since such was brought to its attention by this lawsuit, which was filed on December 1, 2020.

Allstate had all relevant facts, and any facts it did not know were the result of knowing ignorance. A few days after this case was filed, two separate investigators, Alan Wroblewski and Mary Beth Warner, were tasked by Allstate's corporate counsel to investigate what happened. Consistent with Allstate's IDNC policy and investigatory practices – ██████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████which was irrelevant to IDNC compliance.

As a result of this lawsuit and its investigation, Allstate – including its in-house and outside legal teams – was on direct notice of the alleged violations here and how its IDNC policy and practice gave rise to such. Instead of shoring up its IDNC policy to remove the offending IDNC consent exception, rushing to engage its DNC list vendor to compile IDNC lists from non-contracted vendors to create a Master IDNC List and amending its policies to make it easier for telemarketers making calls to sell its products and services, Allstate did nothing.

Instead, it consciously elected to allow the *status quo* to continue, and to reap the marketing and monetary benefits of telemarketing that it knew was being performed in violation of the TCPA. Even if Allstate believed that its policies and procedures were compliant, Allstate ratified the challenged policies and practices because the lawsuit brought them to its attention

---

[92] PRASOF 53.e.vi, Pl. Ex. S; PAMF 71, Pl. Ex. T, Warner Dep. at 48:18-49:1, 50:2-51:2 & Pl. Ex. C, 2d Lim Dep. at 114:19-21; PAMF 70, Pl. Ex. B, 1st Lim Dep. at 65:3-22.

and it was thus aware of all material facts. Allstate made a deliberate choice not to change its policies or procedures; if Allstate is wrong about the propriety of those policies and procedures that does not change the choice it made.[93] Rest. (3d) of Agency, § 4.01, cmt. f ("A principal may ratify an act by failing to object to it or to repudiate it… Failure to object may constitute [a manifestation of assent] when the person has notice that others are likely to draw such an inference from silence.").

Allstate (1) has not changed its IDNC policies or practices as a result of this case, (2) knowingly permitted Transfer Kings/Atlantic to continue developing business for it, leading to still more calls to Plaintiff and other class members throughout this action, (3) quoted thousands of consumers for insurance and wrote hundreds of policies, arising directly from telemarketing calls made pursuant to the policies and practices challenged in this lawsuit, both before and after the lawsuit was filed; and (4) still hasn't consolidated Transfer Kings' IDNC list with its own, not to mention other non-contracted telemarketers.[94]

Allstate derives substantial monetary benefit from non-contracted telemarketing.[95] In refusing to change its IDNC policies and procedures when their deficiencies were brought to light by this lawsuit, Allstate manifested its assent to those policies and procedures whether they

---

[93]    Although Allstate's ratification of its IDNC policies and procedures is most relevant to this lawsuit, its ratification of Transfer Kings' calling as complained of in this lawsuit is also evident. Allstate knew that Transfer Kings was sending Allstate telemarketing leads to the Daniel Gilmond Allstate agency in December 2020—the <u>exact same agency</u> through which Plaintiff would go on to receive a quote from Allstate during a telemarketing call on April 7, 2021, months into this lawsuit. PAMF 83; Pl. Ex. AA, ALLSTATE0114328; PAMF 85, Pl. Ex. G, Hossfeld Decl. ¶ 32; Pl. Ex. G.10 (call tr.); Pl. Ex. G.11 (quote). Allstate cannot in good faith deny ratification when it didn't tell Gilmond (or any other agent) to stop using Transfer Kings, didn't tell Transfer Kings to stop telemarketing for it at all, PSMF 73, Basit Dep. at 52:22-24, and allowed Plaintiff to be called months later into this lawsuit by the same Allstate telemarketer.

[94]    PAMF 74, Pl. Ex. D, Basit Dep. at 53:17-19, 78:13-15; PAMF 75 & 78, Pl. Ex. F, Summary ¶¶ 3-6, 13; PAMF 79, Pl. Ex. C, 2d Lim Dep. at 47:17-48:1

[95]    ███████████████████████████████████████████

were ultimately found legal or illegal. And in doing so Allstate knowingly accepted the benefits of telemarketing made pursuant to the challenged policies and procedures to be tune of thousands of insurance quotes and hundreds of new customers for one non-contracted vendor alone. PSMF 78, Pl. Ex. F at ¶ 13.

The fact that Allstate *continues* to argue that "consent" is a valid exception to the prohibition against calling phone numbers on its IDNC list, Allstate SJ Memo, Dkt. 147-1 at 25-26, acts as *further* ratification by Allstate of Transfer Kings and other telemarketers' calling of phone numbers on Allstate's – and likely other telemarketers' – IDNC lists if they believed they had "consent," because a "person may ratify an unauthorized act by taking a position in litigation that is warranted only by consent to be bound by the act." Rest. (3d) of Agency, § 4.01 *cmt h*. Either consent is an IDNC exception or it is not. Either way, Allstate's consistent litigation position that consent is a valid exception and defense to IDNC that renders calls made on its behalf to "Plaintiff and/or the putative class members,"[96] permissible, demonstrates Allstate's "consent to be bound" by that policy, as well as the benefits – and burdens – that accompany it.

### C. Plaintiff Did Not "Consent."

As explained above, whether a consumer "consented" after having asked not to receive telemarketing calls is irrelevant to whether calls must stop after a do not call request, because consent is not available as an exception to the TCPA's prohibition against calling phone numbers that are on an IDNC list. Allstate is aware of the authorities that say this, for example 47 C.F.R. §

---

[96] *See e.g.* Allstate's Original Answer to Second Amended Complaint, Dkt. 44 at 34; Response to Plaintiff's Motion to Strike its Consent Defense, Dkt. 57 at pp. 4-5; Allstate's Answer to Second Amended Complaint, Dkt. 143, at ¶ 26 "Plaintiff's claims are barred to the extent Plaintiff and/or putative class members consented to receive telephone calls as alleged in the Second Amended Complaint," as well as its summary judgment motion at 19, "consent is a defense" and "Hossfeld Consented to Receive the Calls at Issue," arguing that an "individual" should be allowed to change their mind after asking not to receive telemarketing calls.

64.1200(d) and *In re TCPA*, 18 FCC Rcd. 14014 at 14086, ¶124 (2003), but does not cite or attempt to distinguish them.

Instead, Allstate string cites cases concerning how the TCPA is designed to protect consumers, and points to a single instance of alleged consent that happened after Plaintiff had answered Call 11.[97] But as Allstate knows, providing consent during the pendency of a call does not constitute "prior" consent. *Charvat v. Allstate Corp.*, 29 F.Supp.3d 1147, 1150 (N.D.Ill. 2014). Further, Call 11 happened on February 8, 2021—two months *after this lawsuit was filed*, and after Allstate had interviewed Transfer Kings to ask the questions Allstate wished about its telemarketing practices.[98] The reason Plaintiff received Call 11 is that Allstate failed to coordinate its IDNC list – which included Plaintiff's phone number at that time – with Transfer Kings.[99] This failure is evident because Plaintiff's phone number is not on Transfer Kings' IDNC list.[100] Moreover, this was the tenth Allstate telemarketing call Plaintiff had received in that 12-month period; even if Plaintiff's comments constituted "consent," there were ten TCPA violations that happened before then for which Allstate has not pointed to evidence that could possibly constitute "prior express written consent." All of this, notwithstanding that consent is not a defense in any event.  Finally, "prior express written consent" is an affirmative defense, *Blow v. Bijora, Inc.*, 855 F.3d 793, 803 (7th Cir. 2017), and a term of art under the TCPA, with specific elements that Allstate has not even begun to argue are satisfied. 47 C.F.R. § 64.1200(f)(9).

## D.    Hossfeld Suffered Concrete Harm and Is in the TCPA's Zone Of Interest.

Allstate's speculation that Plaintiff wanted Allstate's calls runs contrary to Plaintiff's

---

[97]     ASOF, ¶35; Pl. Ex. B-20.
[98]     PAMF 71, Pl. Ex. T, Warner Dep. at 48:18-49:1, 50:2-51:2; Pl. Ex. D, Basit Dep. at 75:19-77:9; 78:13-15; Pl. Ex. D, Basit Dep. at 53:17-19 (each testifying about Allstate interviews of Transfer Kings).
[99]     PAMF 23 (plaintiff's number was on Allstate IDNC list as of July 2020).
[100]    PAMF ¶ 75, Pl. Ex. F, Summary, at ¶ 5, Ex. 3 (8888 number not on Transfer Kings' IDNC list).

sworn testimony,[101] as well as the facts and circumstances of the calls. While Allstate seeks to

denigrate Plaintiff by labelling him a "professional plaintiff," the evidence is that Plaintiff is a

consumer advocate who "hate[s] telemarketing calls, and want[s] them to stop."[102] It is

undisputed that Plaintiff filed this lawsuit "to make calls stop and to obtain compensation for

[him]self and others[.]" *Id.*

Moreover, the Seventh Circuit values professional plaintiffs. In *Murray v. GMAC Mort.*

*Corp.*, the Court reasoned that "professional plaintiff" is not a "dirty word," because it "implies

experience, if not expertise. …. Repeat litigants may be better able to monitor the conduct of

counsel, who as a practical matter are the class's real champions. 434 F.3d 948, 954 (7th Cir.

2006). So, too, does Plaintiff's experience in past TCPA litigation benefit the proposed class.

Indeed, two of Plaintiff's prior TCPA lawsuits resulted in certified classes, one as part of a

$1,150,000 class settlement, *Hossfeld v. Compass Bank*, 2:16-cv-2017-ACA, Dkt. 100 (final

approval order), and one as part of a litigation class in front of Judge Norgle. *Hossfeld v.*

*Lifewatch, Inc.*, 1:13-cv-9305 (N.D.Ill.), Dkt. 121 (granting class certification), Dkt. 133

(substituting Hossfeld as class representative).[103] Plaintiff's dedication to TCPA compliance is

also demonstrated by his filing of a motion to enjoin Allstate's future illegal calling.

Plaintiff cannot tell what exactly he did that Allstate contends "invited" the calls at issue

because its brief makes a sweeping citation to thirty-two fact statements in support of this

sweeping statement, in violation of L.R. 56.1(g). However, that a consumer participates in calls,

---

[101]    PAMF 88, Pl. Ex. Z, Hossfeld Dep. at 60:10-18 (Plaintiff filed suit "to get [the calls] to stop" and that he "do[es]n't want to talk to" telemarketers).

[102]    PAMF 24, Pl. Ex. G, Hossfeld Decl. ¶ 3.

[103]    The *Lifewatch* class was decertified because: the company went out of business, the FTC obtained an injunction against future calls, *FTC v. Lifewatch*, 176 F.Supp.3d 757, 760 (N.D.Ill. 2016), and Lifewatch paid a $2 million penalty to the FTC in a concurrent action for its robocalls. *See* Dkt. 283 (decertification motion) & Dkt. 284 (order).

agrees to be transferred for more information or to receive a quote, returns a missed call, or doesn't want to use his real name and information during unsolicited calls from unknown third parties, doesn't mean he "invited" telemarketing or tried to "make himself more likely to receive additional calls." After all, calls are required to stop after a request for such, regardless of whether the consumer continues to do business with the seller. *In re TCPA*, 18 FCC Rcd. 14014 at 14086, ¶124. Had Allstate had procedures to properly ensure that Plaintiff's phone number was on a Master IDNC list, the calls would have stopped. Allstate's suggestion that Plaintiff should lose Constitutional standing to sue because of its own failure to keep and share a complete and compliant IDNC list is unsupportable. Indeed, Plaintiff should not have had to – but did - repeatedly ask not to be called during calls he received, at least six (6) occasions of which were audio recorded.[104]

Moreover, telemarketers often place calls anonymously or with fake names,[105] and thus often their identity and the true nature of a seller's involvement is only revealed if the call proceeds far into in the sales process. This is why the IDNC rules require identification of the caller, which as explained below as to Count I, Transfer Kings did not do.

This case is distinguishable from *Garcia*, *Stoops*, and *Leyse* cited in Allstate's brief, where the plaintiffs treated the TCPA like a business opportunity. Unlike the *Garcia* and *Leyse* plaintiffs who maintained multiple cell phones at once to increase the likelihood of TCPA violations, were called on one of those extra phones, and then continued to pay for more prepaid

---

[104]     PAMF 88, Pl. Ex. G, Hossfeld Decl. ¶¶ 2-3, 5, 8, 15, 19, 24, 27, 33; Pl. Ex. G.1, Call 1 Tr. at 4:12-13; Pl. Ex. G.2, Call 2 Tr. at 4:23-25; Pl. Ex. G.6, Call 6 Tr. at 12:4-13; Pl. Ex. G.7, Call 9 Tr. at 7:10-14; Pl. Ex. G.8, Call 10 Tr. at 6:9-20; Pl. Ex. G.10, Call 12 Tr. at 9:5-6.
[105]     For example, Transfer Kings' representatives cryptically referred to it as "TK" when transferring Plaintiff to an agent, so that the agent would know who the call came from but not Plaintiff. Pl.'s Resp. to DSMF 25, 28; Pl. Ex. G.7, Tr. at 4:11-12; Pl. Ex. G.8, Tr. at 4:9.

phone minutes in an effort to drum up statutory damages,[106] Hossfeld received Allstate's calls at

the cell number he has regularly used in daily life for the past seven years.[107] And unlike those

plaintiffs, Hossfeld seeks class action status and has filed a motion to enjoin Allstate's future

illegal calls. *Wesley v. Snap Fin. LLC*, 339 F.R.D. 277, 295 (D. Utah 2021) (similarly

distinguishing *Garcia*). Likewise, this case is wholly unlike *Leyse*, where the plaintiff was a

"paid investigator [who aided] his counsel in the preparation of TCPA lawsuits"[108]—unlike

Hossfeld, who retained counsel for this lawsuit only after he began receiving Allstate's calls, and

who testified that he filed this lawsuit "to make calls stop and to obtain compensation for

[him]self and others[.]"[109] *Hirsch v. USHealth Advisors, LLC*, 337 F.R.D. 118, 126 (N.D. Tex.

2020) (similarly distinguishing *Leyse*).

In short, Allstate's position appears to be that if a consumer like Plaintiff, fed up with

unsolicited telemarketing, takes the affirmative step of trying to figure out who is truly behind a

flurry of telemarketing calls, he is deprived of constitutional standing. "Nothing in the

Constitution, though, requires a plaintiff to be a naïf. Litigation is not college athletics: there is

no 'amateurs only' rule." *Cunningham v. Rapid Response Monitoring Servs.*, 251 F. Supp. 3d

1187, 1195 (M.D. Tenn. 2017). Plaintiff suffered concrete, particularized harm as a result of

Allstate's unwanted calls, and falls squarely within the TCPA's "zone of interest."

### E.    Transfer Kings Never Adequately Identified Itself During Calls, and Allstate Ratified this Conduct.

Summary judgment for Allstate is inappropriate as to Plaintiff's caller identification

---

[106]    *Garcia v. Credit One Bank, N.A.*, 2020 WL 4431679, at *1 (D. Nev. July 31, 2020); *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782, 801 (W.D. Pa. 2016) (over 35 phones).
[107]    PAMF 92; Pl. Ex. V, Interrog. 14; Pl. Ex. Z, Hossfeld Dep. at 19:7-20:4 (Plaintiff switched to the 8888 number in September 2015, to try to avoid the "abundance of telemarketing calls" he was getting on his prior number), 24:24-25:3 (confirming he doesn't personally have any other cell phones)
[108]    *Leyse v. Bank of Am., Nat'l Ass'n*, 2020 WL 1227410, at *4 (D.N.J. Mar. 13, 2020).
[109]    PAMF 24, Pl. Ex. G, Hossfeld Decl. ¶ 3.

claims (Count I) because Allstate ratified telemarketing to Plaintiff that failed to properly identify the caller, Transfer Kings. The TCPA provides that "[a] person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller…" 47 C.F.R. § 64.1200(d)(4). Not one of the Allstate telemarketing calls Plaintiff received identified the caller, despite repeated requests by Plaintiff for this information.[110] In two instances when Plaintiff had proceeded far enough along the call to be transferred, the telemarketing representative informed the transferee, Allstate's agent, that the caller was with "TK"—thus informing the agent that the call came from "Transfer Kings," while leaving Plaintiff in the dark as to the identity of the caller.[111]

And while Allstate's IDNC policy parrots the regulatory language on this point, its actions ratified Transfer Kings' calls that failed to properly identify the caller. Indeed, by at least early December 2020, Allstate ████████████████████████████[112] Allstate and its lawyers had a zoom meeting with Basit, and asked him what happened.[113] And while we do not have testimony on the subject, any reasonable TCPA class action defendant (or counsel) in a case alleging failure to identify would ask about this. After Allstate and its counsel asked the questions they wanted to ask, they refused to answer Transfer Kings' questions or assist it in coming into IDNC compliance,[114] did not direct Transfer Kings to stop telemarketing on its behalf,[115] and did not direct Allstate agents to stop using Transfer Kings until months later. In the meantime, Plaintiff received Call 12 during which Allstate issued an insurance quote – and

---

[110]    PAMF 91; Pl. Ex. G.1, Call 1 Tr. at 3:8; Pl. Ex. G.2, Call 2 Tr. at 5:6; Pl. Ex. G.6, Call 6 Tr. at 6:9-10; Pl. Ex. G.7, Call 9 Tr. at 5:18-25, 6:3-4.
[111]    PRASOF 25, Def. Ex. B-18, Tr. at 4:11-12; PRASOF 28, Def. Ex. B-19, Tr. at 4:9.
[112]    PAMF 83; Pl. Ex. AA (ALLSTATE0114328); Pl. Ex. BB (ALLSTATE0117404-117409).
[113]    PAMF 74, Pl. Ex. D, Basit Dep. at 75:19-77:9
[114]    PAMF 72, Pl. Ex. D, Basit Dep. at 21:8-13; 45:11-16, 53:14-20, 78:19-79:1.
[115]    PAMF 73, Pl. Ex. D, Basit Dep. at 52:22-24,

which similarly did not identify Transfer Kings.[116] Also in the meantime, Transfer Kings had made thousands more phone calls resulting in 9,544 of transfers to Allstate agents, 4,169 during which Allstate issued insurance quotes, which resulted in 136 new policies.[117]

In other words, Allstate continued to accept the benefits of Transfer Kings' challenged conduct failing to identify itself, with full knowledge. This constitutes a ratification of Transfer Kings' prior conduct, Rest. (3d) of Agency § 4.01(1), subjecting Allstate to liability.

## VI.     CONCLUSION

For the foregoing reasons, the Court should deny Allstate's motion for summary judgment.

Dated: June 17, 2022                                  Respectfully submitted,

                                                                ROBERT HOSSFELD, individually and on
                                                                behalf of a class of all persons
                                                                similarly situated

                                                                By: _/s/ Alexander H. Burke_____

Alexander H. Burke
Daniel J. Marovitch
**BURKE LAW OFFICES, LLC**
909 Davis St., Suite 500
Evanston, IL 60201
Telephone: (312) 729-5288
aburke@burkelawllc.com
dmarovitch@burkelawllc.com

*Counsel for Plaintiff*

---

[116]     PAMF 73, Pl. Ex. P; PAMF 83, Pl. Ex. AA (ALLSTATE0114328); PAMF 85, Pl. Ex. G, Hossfeld Decl. ¶ 32; Pl. Ex. G.10 (call tr.); Def. Ex. B-23 (written quote from Allstate).
[117]     PAMF 78, Pl. Ex. F, Voluminous Records Summary, at ¶ 13.

## **CERTIFICATE OF SERVICE**

I hereby certify that, on June 17, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

_/s/ Alexander H. Burke_