## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Robert Hossfeld,                              )
                                              )
                        Plaintiff,            )
                                              )        Case No. 20-cv-7091
                v.                            )
                                              )        Judge Joan B. Gottschall
Allstate Insurance Co.,                       )
                                              )
                        Defendant.            )
                                              )

## <u>MEMORANDUM OPINION AND ORDER</u>

This suit under the Telephone Consumer Protection Act of 1991, Pub. L No. 102-243, 105 Stat. 2394, as amended ("TCPA"), 47 U.S.C. § 227, comes before the court on cross motions for summary judgment filed by plaintiff Robert Hossfeld ("Hossfeld") and defendant Allstate Insurance Co. ("Allstate"). The TCPA and its implementing regulations require telemarketers to maintain an internal do-not-call list. *See* 47 C.F.R. § 64.1200(d) (eff. Oct. 14, 2020 through Feb. 11, 2021). Under the regulations, a telemarketer must within a reasonable time honor a request to be placed on an internal do-not-call list. 47 C.F.R. § 64.1200(d)(3); *see generally Sorsby v. TruGreen L.P.*, 2020 WL 7641288, at *5 (N.D. Ill. Dec. 23, 2020).

It is undisputed that Hossfeld's phone number ending in 8888 appeared on Allstate's internal do-not-call list by no later than July 10, 2020, Allstate's Resp. to SMF ¶¶ 10, 12, ECF No. 256[1], about five months before the calls at issue were placed. As discussed in detail *infra*, two owners of Allstate agencies in Texas hired a company called Transfer Kings. Transfer Kings subcontracted with another company called Atlantic Telemarketing ("Atlantic"), which placed the calls at issue. At summary judgment, the parties focus on three questions: (1) whether consent is a defense to Hossfeld's TCPA internal do-not-call claims; (2) whether, as a factual matter, Hossfeld consented to receive the calls at issue; and (3) whether, under agency law principles, Allstate is vicariously liable for the actions of Transfer Kings and Atlantic. The court

---

1    Appendix A sets forth the abbreviations used in this opinion to cite the briefs and fact statements.

does not reach the first question because Allstate has not come forward with sufficient evidence to establish a consent defense, assuming one is available. Regarding agency law, the undisputed summary judgment evidence establishes that Allstate's agents appointed Transfer Kings, which in turn appointed Atlantic, as subagents, rendering Allstate vicariously liable for their TCPA violations.

## I. <u>Summary Judgment Standard and Local Rule 56.1 Fact Statements</u>

### A. *Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To show that a fact cannot be or is genuinely disputed, a party may cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *see also* Fed. R. Civ. P. 56(c); N.D. Ill. LR 56.1. A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, "facts must be viewed in the light most favorable to," and all reasonable inferences from the evidence must be drawn in favor of, the nonmoving party—but "only if there is a genuine dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quotation omitted).

After "a properly supported motion for summary judgment is made, the adverse party must" go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted). Thus, summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

### B. *LR 56.1 Fact Statements and Responses*

The parties present the summary judgment facts in Local Rule ("LR") 56.1 fact statements and responses. The LR 56.1 fact statements and responses serve as the court's

"roadmap" to the evidence; they "are intended to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994); *accord. Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). Consistent with this purpose, the Seventh Circuit has "routinely upheld the district court's discretion in requiring parties to comply strictly with [L]ocal [R]ule [56.1's] requirements." *Curtis*, 807 F.3d at 259 (citing *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 630 (7th Cir. 2009); *see, e.g., Igasaki v. Ill. Dep't of Fin. & Prof'l Reg.*, 988 F.3d 948, 956–57 (7th Cir. 2021).

The order dated March 8, 2023, describes in detail the purpose and requirements of LR 56.1.[2]  *See* ECF 218 at 2–7.  In brief, each fact statement and statement of additional fact "must consist of concise numbered paragraphs . . . supported by citation to the specific evidentiary material, including the specific page number, that supports it.  The court may disregard any asserted fact that is not supported with such a citation.  N.D. Ill. LR 56.1(d)(1), (2) (eff. Sept. 29, 2023).  A response to a statement of facts consists of a numbered list of paragraphs corresponding to the fact statement.  LR 56.1(e)(1).  "Each paragraph shall set forth the text of the asserted fact (including its citations to the supporting evidentiary material), and then shall set forth the response.  *Id*.  Fact statements "should not contain legal argument."  LR 56.1(d)(4). Furthermore, "If a party contends that its opponent has included objectionable or immaterial evidence or argument in a LR 56.1 submission, the party's argument that the offending material should not be considered should be included in its response or reply brief."  LR 56.1(e)(2). Regarding the content of each responsive paragraph, LR 56.1(e)(2) provides:

> (2) Content. Each response must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact.  If the response admits in part and disputes in part the asserted fact, it must specify which part of the asserted fact is admitted and which part is disputed.  A response may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made. A response may not assert legal arguments except to make an objection, including objections based on admissibility, materiality, or absence of

---

2   In that order, at 13, the court struck the parties' first round of summary judgment briefing and fact statements for failure to comply with LR 56.1's requirements.

> evidentiary support. Motions to strike all or portions of an opposing party's LR 56.1 submission are disfavored. If a party contends that its opponent has included objectionable or immaterial evidence or argument in a LR 56.1 submission, the party's argument that the offending material should not be considered should be included in its response or reply brief. In the event that the objection is overruled, the failure to admit or dispute an asserted fact may constitute a waiver.

LR 56.1(e)(2).

The parties here raise several objections and arguments in their LR 56.1 fact statements and responses. Specifically, they argue that certain facts are immaterial, that certain paragraphs of the fact statements are argumentative, that the evidence on which the opposing party relies is inadmissible hearsay, and that the evidence cited by the opposing party does not support, in whole or in part, the factual proposition for which it is cited. *See, e.g.*, Allstate's Resp. to SMF ¶ 68, Allstate's Resp. to SAF ¶¶ 1, 2 (argumentative); Pl.'s Resp. to SMF ¶ 2 (inadmissible hearsay); Allstate's Resp. to SMF ¶¶ 7, 50, 59, 64, 65, 70, 76, 83; Pl.'s Resp. to SAF ¶¶ 2, 6; Pl.'s Resp. to SMF ¶¶ 47, 77. Allstate's Resp. to SAF ¶¶ 4, 10, 18, 23, 24, 29, 30, 32, 50 (evidence cited by the opposing party does not support the factual proposition).

"Consistent with its ordinary practice, this court will not consider improper arguments in the LR 56.1 statements." *Spiegel v. EngageTel Inc.*, 372 F. Supp. 3d 672, 677 (N.D. Ill. 2019) (Gottschall, J.) (citing *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008); other citation omitted). The court also "disregards legal conclusions" in the parties' LR 56.1 fact statements and responses. *Id.* (citing *Minn. Life Ins. Co. v. Kagan*, 847 F. Supp. 2d 1088, 1093 (N.D. Ill. 2012); other citation omitted). Finally, "[t]o the extent necessary, the court makes relevance and materiality determinations *infra*." *Id.* (citing *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1019 (N.D. Ill. 2018)).

Furthermore, the parties sometimes respond that a paragraph of a fact statement is disputed without citing evidentiary material. LR 56.1(e)(3) provides: "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." The Seventh Circuit has held that district courts may strictly enforce this rule. *E.g.*, *Curtis*, 807 F.3d at 218–19 (citations omitted); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006).

4

Accordingly, the court deems the following paragraphs of the parties' fact statements admitted to the extent they are not supported by the evidence cited: Allstate's Resp. to SMF ¶¶ 7, 37, 50, 51, 59, 64, 65, 68, 70, 74, 76, 83; Pl.'s Resp. to SAF ¶¶ 2, 6; Pl.'s Resp. to SMF ¶¶ 47, 77; Allstate's Resp. to SAF ¶¶ 4, 18, 23, 24, 29, 30, 32, 50.

A final note before reciting the facts. For the most part, the parties rely on identical facts in their cross motions for summary judgment. Except where stated otherwise, the court relies on undisputed facts throughout this opinion. Genuinely disputed facts and competing inferences to be drawn from them will be identified where necessary.

## II.  Background

### A.  The TCPA and Internal Do-Not-Call Regulations

Congress made findings when it enacted the TCPA, including that "Unrestricted telemarketing . . . can be an intrusive invasion of privacy." 105 Stat. 2394, codified as Note to 47 U.S.C. § 227; *see also Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2343 (2020) (opinion of Kavanaugh, J.) (relying on these findings when discussing the history and purpose of the TCPA); *id.* at 2358 (Breyer, J., concurring in part and dissenting in part) (same). "Many consumers," Congress found, were "outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers." 105 Stat. 2394. Congress determined that the Federal Communications Commission (FCC) had a substantial role to play; although "automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call, the Federal Communications Commission should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment of the Constitution." *Id.* (Finding No. 13).

Consistent with its findings, Congress authorized the FCC to issue regulations, among other things, creating what is today commonly known as the national do-not-call registry. *See* 47 U.S.C. § 227(c)(1)(E)(3); *Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 306 (7th Cir.

2017). The TCPA provides a private right to sue for violations of the FCC's implementing regulations in subsection (c)(5) as follows:

> A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may, if otherwise permitted by the laws or rules of court of a State bring in an appropriate court of that State--
>
> (A) an action based on a violation of the regulations prescribed under this subsection to enjoin such violation,
>
> (B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or
>
> (C) both such actions.
>
> It shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection.

47 U.S.C. § 227(c)(5).

The internal do-not-call regulations, 47 C.F.R. § 64.1200(d), provide: "No person or entity shall initiate any artificial or prerecorded-voice telephone call pursuant to [certain exemptions] or any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity." The regulations then list six minimum standards the procedures must meet. The caller must have a written policy, § 64.1200(d)(1); personnel involved must "be informed and trained in the existence and use of the do-not-call list," § 64.1200(d)(2); and the caller "must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted," § 64.1200(d)(4). The regulations further state:

> (3) Recording, disclosure of do-not-call requests. If a person or entity making an artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is

made. Persons or entities making such calls (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed 30 days from the date of such request. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the call is made, the person or entity on whose behalf the call is made will be liable for any failures to honor the do-not-call request. A person or entity making an artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a call is made or an affiliated entity.

* * * *

(5) Affiliated persons or entities. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and (for telemarketing calls) the product being advertised.

(6) Maintenance of do-not-call lists. A person or entity making artificial or prerecorded-voice telephone calls pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes must maintain a record of a consumer's request not to receive further calls. A do-not-call request must be honored for 5 years from the time the request is made.

47 C.F.R. § 64.1200(d)(3), (5)–(6)

## B. *Allstate's Policies and Practices*

The calls at issue here were placed as part of a marketing campaign initiated by two Allstate agents located in Texas, Jason Fleming and Daniel Gilmond. *See* Pl.'s Resp. to SAF ¶¶ 1–2, 5 (undisputed portions of ¶ 5). "Allstate gains new business through telemarketing performed by vendors that its agents engage, and with which Allstate has no direct contractual relationship;" Allstate refers to these vendors as "Non- Contracted Telemarketers." Allstate's Resp. to SMF ¶ 3 (citations omitted). It is undisputed "that Allstate did not 'direct' its insurance agents to make the specific calls to Plaintiff" at issue. Pl.'s Resp. to SMF ¶ 52; *accord. Id.* ¶ 53.

The parties also agree, and the record shows, that Allstate's "Insurance Agents have the autonomy to initiate their own marketing initiatives." *Id.* (disputing legal conclusions Allstate draws from these facts). During the relevant time period, Allstate permitted its agents "to engage Non-Contracted Telemarketers to initiate calls to consumers for the purpose of encouraging the purchase of Allstate products and services, so long as the agent and Non-Contracted

7

Telemarketers compl[ied] with [Allstate']s Agency Standards and incorporated [written] Do Not Call Policy." Allstate's Resp. to SAF ¶ 2 ("relevant time period" is not defined). Although agents were permitted to use non-contracted telemarketers during the relevant time period, Allstate also maintained a list of disapproved telemarketing vendors with which its agents were not permitted to do business. Allstate's Resp. to SAF ¶ 14; *see also* Pl.'s Ex. O (Feb. 2021 list of disapproved vendors).

The parties cite several written contracts and Allstate policy documents. Neither party objects to the authenticity or contents of these documents, but the parties are at issue over their legal consequences. The legal issues will be analyzed in Parts IV and V, *infra*.

Fleming and Gilmond's agency agreements with Allstate state that the agent has "no authority to employ persons on behalf of [Allstate], and no employee of yours will be deemed to be an employee or agent of the company." Allstate's Ex. C-20 § III.A (Fleming); *id.* Ex. C-21 § III.A (Gilmond), *quoted in* Allstate SMF ¶ 62. Both agreements also required Gilmond and Fleming to "comply with all applicable laws," including the TCPA, and both agents separately warranted that they would comply with all applicable laws. Pl.'s Resp. to SMF ¶¶ 60-61 (citations to agreements omitted).

Fleming and Gilmond also agreed to be bound by Allstate's Agency Standards, which is a separate document. Pl.'s Resp. to SMF ¶ 63. The parties agree that the Agency Standards (dated August 2020) "outline 'in detail' Allstate's interpretation of the requirements for complying with the TCPA, though Hossfeld contends that a portion of this policy is legally insufficient." *See* Pl.'s Resp. to SMF ¶ 63. The Agency Standards include the following language:

> Agencies should ensure that an external provider offering services through these channels complies with all components of these corporate policies and applicable state and federal laws and regulations. However, you [the agent] are ultimately responsible for ensuring that telephone calls, texts and emails sent by your agency, or any outside vendor on your behalf, comply with applicable federal and state laws.

Allstate's Ex. C-9 at 12.

8

In addition, Allstate's Agency Standards expressly incorporated a separate, four-page internal do-not-call policy, sometimes referred to as its "IDNC Policy." Allstate's Resp. to SMF ¶ 5. The parties quote most of Allstate's IDNC Policy in their briefing and fact statements. *See* Allstate's SMF ¶ 65; Pl.'s SMF ¶ 6. Excerpts follow:

1. Do not initiate a telephone call to phone numbers on the Allstate Do Not Call list for the purpose of encouraging the purchase of products or services, unless a consumer or customer on the Allstate Do Not Call list has made an inquiry about a product or service as evidenced by an express written invitation or consent to call the person and phone number. The inquiry must be properly documented in the consumer or customer file.

   It is permissible to reply to an inquiry by returning a phone call to the consumer or customer within three (3) months of the initial inquiry date, [sic] however the number should be scrubbed at least monthly following the initial inquiry to identify a possible new Do Not Call request. If calling pursuant to an inquiry, documentation for the consumer or customer inquiry should include the phone number to which calls will be placed, and the date consent was granted. (**Note:** Individual states may have more restrictive requirements in regard to an inquiry about a product or service.)

   An agency should use all available Allstate-provided resources to determine if a consumer or customer number is on the Allstate Do Not Call list.

2. When making a telephone solicitation, provide the called party with the name of the individual making the call, the name of the person or business on whose behalf the call is being made, the purpose of the call, the products or services that are the subject of the call, and a telephone number or address at which the person or business may be contacted. . . .

   \* \* \* \*

4. Discontinue a solicitation if the person being solicited states that he/she is not interested in the solicitation at any time during the telephone call.

5. When a consumer or customer states that he/she does not wish to receive any future telephone calls from Allstate:

   a. Acknowledge the person's Do Not Call request and indicate that Allstate will take steps to comply with it.

   b. Inform the individual that:

      i. It may take up to thirty (30) days before the request can be communicated to other Allstate offices and system records are updated. . . .

      ii. Numbers do not remain on the Allstate Do Not Call list indefinitely unless required by law; Allstate honors Do Not Call requests for the length of time pursuant to federal and state laws and regulations (e.g., five years from the

date the request is made per federal requirements; ten years per some state requirements).

    c. Within one (1) business day from the date of the request, process the Do Not Call request via the approved methods. All information must be accurate and complete.

* * * *

15. Do not block Caller ID.

16. Any person that engages in placing telephone calls must transmit Caller ID information, which includes either the Calling Party Number (CPN) or Automatic Number Identification (ANI), and when available by the telephone carrier, the name of the person, business or entity that engages in placing calls. The telephone number provided must permit individuals to make a Do Not Call request during regular business hours.

Allstate Internal Do Not Call Policy ("Allstate IDNC Policy") at 1–3 (dated Sept. 2020); Pl.'s Ex. A; Def.'s Ex. C-8.

As used in this litigation, "scrubbing" refers to comparing a list of phone numbers with an existing do-not-call list, such as Allstate's internal do-not-call list or the national do-not-call list, and removing prospective numbers that appear on the do-not-call list. Allstate has a separate record retention policy, dated September 2019, that requires agents to retain "[r]ecords pertaining to telephone calls (sales or service, whether placed by [an Allstate] agency or a vendor on [its] behalf, including warm transfers you receive) . . . for a minimum of four years." Allstate's Resp. to SAF ¶ 20 (quoting Records Retention Policy 1 (dated Sept. 2019), Pl.'s Ex. S).

Allstate has two additional policies and practices not reflected in its written IDNC policy. First, "consumers on Allstate's IDNC list can be removed from [the list] by sending Allstate or an Allstate agent a dated, signed letter requesting such." Allstate's Resp. to SAF ¶ 5. There is no evidence that Hossfeld sent Allstate such a letter. Allstate's Resp. to Pl.'s SMF ¶ 68 (undisputed fact).

Second, through its corporate representative, *see* Fed. R. Civ. P. 30(b)(6), Allstate has confirmed that:

Q. Has it always been Allstate's policy that if you have express written invitation or consent to call you don't need to scrub against the scrubbing tool?

* * * *

The Witness: Yes.

Dep. of V. Lim 44:3–8 (June 3, 2021), Pl.'s Ex. B; *see also id.* at 83; Pl.'s Resp. to Allstate's SMF ¶ 68.

### C. Allstate Agents Retain Transfer Kings

Gilmond, an Allstate agent, hired Transfer Kings in August 2020 to place calls on his agency's behalf. Pl.'s Resp. to SAF ¶ 3. Fleming, also an Allstate agent, retained Transfer Kings to place calls on behalf of his agency on or around September 16, 2020. *Id* ¶ 2. Transfer Kings subcontracted with Atlantic Telemarketing, which placed the calls to Hossfeld at issue in this litigation. Pl.'s Resp. to SAF ¶ 5. Transfer Kings' owner, Ahmed Basit, did not tell Gilmond and Fleming about Atlantic when they hired Transfer Kings, though there is evidence that in December 2020 Basit referenced Atlantic's existence in email communications with Allstate (after Hossfeld had received several calls). *See id.* ¶ 6; Allstate's Resp. to SAF ¶ 50 (deemed undisputed because no evidence cited in response).

The parties have not cited any written agreement between Transfer Kings and Gilmond. The record contains a Transfer Kings marketing proposal addressed to Fleming. Def.'s Ex. G (dated Sept. 14, 2020). Under the proposal, Fleming prepaid a fixed price for each "live transfer" of a lead interested in purchasing car insurance. *See id.* at 1. A list of information gathered by Transfer Kings' telemarketer is included, as well as "filters" used to screen leads that would not be transferred. *See id.* The telemarketer gathers information such as the prospect's name, address, number of drivers to be insured, and current insurer. *Id.* To qualify to be transferred, the prospect must be aged 25–65, have no accidents in the past three years, and not currently have insurance with Allstate. *Id.* Under the heading "Lead Quality," the proposal states, "Our agents spend a minimum of 3 minutes on the phone with the prospect before transferring them over to your agents to ensure that the prospect has time and is genuinely interested." *Id.*; *see also id.* (stating that Transfer Kings' agent remains on the line for five

minutes after the transfer occurs); Def.'s Ex. N at 6 (training for telemarketers to remain muted on the line for ten minutes following transfer).

Although there are factual disputes concerning other timeframes, no party disputes that, "by around November 2020 and thereafter when Plaintiff received his calls, Transfer Kings/Atlantic marketed different insurance products." Pl.'s Resp. to SMF ¶ 73. In its training manual for telemarketers, Transfer Kings describes its business model as follows: "We cold call customers and let them know that X insurance company has lowered their rates for home and car insurance by up to whatever % we promote and we would like to provide them with a free comparison quote so they can see how much they can save in comparison to what they're paying with their current insurance provider." Def.'s Ex. N at 3 (no date provided); *see also* Pl.'s Resp. to SMF ¶¶ 74–75; Pl.'s Resp. to SAF ¶ 16. The training manual includes a series of suggested "qualifying" questions the telemarketer should ask the prospect before deciding to which of several insurance providers, such as Farmers, Liberty Mutual, or Allstate, to transfer the call. *See* Def.'s Ex. N at 4. Regarding do-not-call requests, the training manual states, "If a customer tells you they're on the DO NOT CALL LIST apologize and let them know you will put them on our internal DNC list." *Id.* at 7. If a customer reports having previously asked to be placed on the internal do-not-call list, the manual instructs the telemarketer to apologize, hang up, and bring the matter to a manager's attention. *Id.*

Transfer Kings maintained its own internal do-not-call list. *See* Allstate's Resp. to SAF ¶ 36 and exhibits cited there. However, Transfer Kings did not scrub its lists of numbers to be called against Allstate's internal do-not-call list in part because, at the time, non-contracted Allstate vendors did not have access to Allstate's tool for scrubbing lists. Pl.'s Resp. to SMF ¶ 71. Allstate agents, including Fleming and Gilmond had access to Allstate's tool for scrubbing numbers against its internal do-not-call list. *Id.* ¶ 72.

### D. The Calls

Hossfeld's cell phone number ending in 8888 has been on Allstate's internal do-not-call list since July 10, 2020. Allstate's Resp. to SAF ¶ 8. At some point before Hossfeld began

receiving the calls at issue, Transfer Kings or Atlantic purchased a list of prospective insurance customers, *i.e.*, leads, from another company called KP Leads.  Pl.'s Resp. to SMF ¶ 79. KP Leads represented this list to be "100% opt in," meaning that the persons on the list had consented to being called.  *See id*.; Basit's Dep. 81:16-18, 89:13-22*.*  The "lead list contained Hossfeld's number, however, it was paired with the name Michael Bradley."  Pl.'s Resp. to SMF ¶ 80.

Allstate strongly suggests that Hossfeld entered his phone number and pseudonym into a website called policygenius.com ("Policy Genius").  See Basit's Dep 74:4-20 (citing Def's Ex. E).  This data is dated September 25, 2020.  Def.'s Ex. E.  How Hossfeld's number came to be on KP Leads' list is the subject of dispute.  *See generally* Pl.'s Resp. to SMF ¶ 2.  These issues, including the lead list's admissibility, are discussed in Part IV.B.

Judge Harjani supervised discovery.  He limited the scope of relevant discovery to the 12 calls listed in Hossfeld's second amended complaint.  *See* Tr. of Hr'g held Oct. 6, 2021, at 38, Def.'s Ex. Q.  Allstate's list of calls at summary judgment tracks the second amended complaint, but Hossfeld has provided evidence of additional calls he contends are relevant.  Allstate's SMF ¶¶ 3-41; Pl.'s SMF ¶¶ 13-49.  The following chart summarizes the calls at issue in the second amended complaint.

First, a few notes and caveats: Hossfeld did not answer some of these calls, and he sometimes tried to return a call by calling the number shown on his caller id.  The summary judgment record also contains recordings and transcripts of some of the calls.  The court has reviewed the recordings and transcripts.  They appear to be incomplete, as they often start in what is obviously the middle of a conversation.

| Call Number | Date | Time | Length | Caller ID |
|---|---|---|---|---|
| **Allstate's Call #1** | **11/11/2020** | **4:27 p.m.** | **0:19** | **281 724-2161** |
| Hossfeld returned call 11/11/2020 and 11/12/2020. Second call answered, "Thank you for calling Allstate;" called party apologized and characterized call as a "glitch." Def.'s Ex. B-2, Tr. of Hossfeld000052 2:7-14; Def's Ex H ¶18; Def.'s Ex. B-2 (Screenshot of call log). | | | | |

| Allstate's Call #2 | 11/12/2020 | 9:28 a.m. | - | 979 764-0015 |
|---|---|---|---|---|
| Hossfeld called back twice on 11/12/2020, the latter call lasting 3 mins. 2 secs. Def's Ex. B-14; Tr. of Hossfeld000051; Def's Ex H ¶21; Def.'s Ex. B-3 (Screenshot of call log). | | | | |

| Allstate's Call #3; Pl.'s Call #1 | 11/12/2020 | 10:51 a.m. | 9:46 | 512 292-7410 |
|---|---|---|---|---|
| Caller identified themselves, identified Allstate. Hossfeld told caller his name was Michael Johnson, answered questions, and Hossfeld was transferred to Allstate agent. Telemarketer ended with, "We'll call you back, sir." Hossfeld replied, "Okay, thanks. Bye." Def's. Ex. B-16, Tr. of Hossfeld000053. | | | | |

| Allstate's Call #4 | 11/12/2020 | 3:19 p.m. | - | 713 928-6218 |
|---|---|---|---|---|
| Hossfeld called back twice on 11/12/2020 at 3:22 p.m. and 3:23 p.m. Def's Ex H ¶26; Def.'s Ex. B-5 (Screenshot of call log). | | | | |

| Allstate's Call #5; Pl.'s Call #2 | 11/12/2020 | 5:56 p.m. | 9:35 | 254 719-2300 |
|---|---|---|---|---|
| Call transferred to Fleming's agency. Def's Ex H ¶27; Def.'s Ex. B-6 (Screenshot of call log). | | | | |

| Allstate's Call #6; Pl.'s Call #3 | 11/13/2020 | 10:35 a.m. | 21:53 | 281 334-6255 |
|---|---|---|---|---|
| Call transferred to Fleming's agency. Def.'s Ex. B-17, Tr. of Hossfeld000054. | | | | |

| Allstate's Call #7; Pl.'s Call #4 | 11/13/2020 | 11:22 a.m. | 7:04 | 817 596-0033 |
|---|---|---|---|---|
| Transferred to Fleming's agency. Def.'s Ex. H, ¶ 30; Def.'s Ex. B-9 (Screenshot of call log). | | | | |

| Allstate's Call #8; Pl.'s Call #5 | 11/13/2020 | 11:56 a.m. | 1:24 | 817 596-0033 |
|---|---|---|---|---|
| Hossfeld called back once on 11/13/2020. Def.'s Ex. B-8 (Screenshot of call log). | | | | |

| Allstate's Call #9 | 11/20/2020 | 11:56 a.m. | 0:10 | 325 216-5148 |
|---|---|---|---|---|
| Hossfeld called back twelve times after this phone call. Def.'s Ex. B-9. | | | | |

| Allstate's Call #10; Pl.'s Call #6 | 11/23/2020 | 1:44 p.m. | 35:30:00 | 214 765-9742 |
|---|---|---|---|---|

| Caller identified themself, entity they worked with, and provided a callback number. Hossfeld introduced self as Michael Bradley. Told caller he was interested in a quote and agreed to be transferred to an insurance agent. Def's Ex. B-18, Tr. of Hossfeld000055. |
|---|

| Allstate's Call #11; Pl.'s Call #7 | 11/24/2020 | 2:40 p.m. | 7:00 | 214 765-9742 |
|---|---|---|---|---|
| Caller identified themself, entity they worked with, and provided a callback number. Hossfeld gave the name Michael Bradley. Call was transferred to Allstate agent. Hossfeld asked that the agent "send [him] an email real quick in case" they got disconnected. Def's Ex. B-19, Tr. of Hossfeld000056. | | | | |

| Allstate's Call #12; Pl.'s Call #8 | 2/8/2021 | - | 5:30 | 254 749-2314 |
|---|---|---|---|---|
| Telemarketer identified themself, the entity with which they were affiliated ("Allstate"), and provided a callback number. Hossfeld introduced himself as Michael, asked where the caller got the name "Hossfeld." Telemarketer: "I understand you were interested in a quote today?" Hossfeld: "Yeah." Def's Ex. B-20, Tr. of Hossfeld000057. | | | | |

In its briefing, Allstate points out that Hossfeld has filed other TCPA lawsuits and that he has used pseudonyms, including Michael Johnson, in the past. *See, e.g.*, Pl.'s Resp. to SMF ¶¶ 83, 85. Nevertheless, Hossfeld's explanation for his handling of the calls stands undisputed on this record. Hossfeld asked that the calls from Allstate stop seven times. Allstate's Resp. to SAF ¶ 7 (undisputed fact). In paragraph 51 of his fact statement, Hossfeld cites his own deposition testimony and his declaration, both of which subject him to the penalties of perjury (*see* 28 U.S.C. § 1746), in which he states that he feigned interest in an insurance quote and used the false names Michael Johnson and Michael Bradley in an effort to gather enough information about who was calling to get the calls to stop. Pl.'s SMF ¶ 52 (citing Hossfeld Decl. ¶¶ 4–35); *see* Hossfeld Dep. 61:7–18, 74:15–75:15, 82:9–16, 85:15–88:5, 89:12–91:7, 95:4–12, 96:21–97:2, 103:7–12, 108:10–15). Allstate responds that this fact is disputed, but it cites no contradictory evidence. Allstate's Resp. to SMF ¶ 51. Allstate's failure to cite controverting evidence leaves Hossfeld's evidence undisputed. *See* LR 56.1(e)(3); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218–19 (7th Cir. 2015).

Elsewhere in the fact statements, Allstate argues in a single sentence that "Hossfeld's participation in the calls far exceeded that necessary to investigate." Allstate's Resp. to SAF ¶ 11. Allstate does not further develop this argument; it does not explain, for instance, what specifically was unnecessary about Hossfeld's conduct, which, based on the call transcripts and recordings, was consistent with Hossfeld's stated motive. *See id.* This "perfunctory and undeveloped" argument has been waived. *Shipley v. Chi. Bd. of Elec. Comm'rs*, 947 F.3d 1056, 1063 (7th Cir. 2020) (quoting *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016)).

## III. <u>Failure to Identify Claims (Count I) Abandoned</u>

Hossfeld's live second amended complaint, ECF No. 40 ("SAC"), has two counts. Count I asserts failure to identify claims, that is, claims that the callers did not identify who is calling, identify the person on whose behalf the call is being made, and provide a telephone number or address at which the telemarketer can be contacted. *See* 47 C.F.R. § 64.1200(d)(4); SAC ¶¶ 87–93. Hossfeld brings what the parties refer to as internal do-not-call, or IDNC, claims in Count II. That is, he alleges that Allstate "violated the TCPA by not having sufficient internal DNC policies, by not following or honoring the policies that it did have, and/or by not sufficiently ensuring that those making calls on its behalf did the same—including by failing to actually honor do-not-call requests made by" Hossfeld. SAC ¶¶ 94–98.

In his response to Allstate's motion for summary judgment, Hossfeld "abandons his individual failure-to-identify claims raised in Count I. Discovery has shown that, consistent with Allstate's IDNC policy, Transfer Kings/Atlantic's calls generally identified Allstate by name and identified Allstate's products and services." ECF No. 247 at 35 (citation omitted). Since Hossfeld has withdrawn his failure to identify claims, Count I "must be dismissed at summary judgment." *Spiegel v. EngageTel Inc.*, 372 F. Supp. 3d 672, 690 (N.D. Ill. 2019) (Gottschall, J.). The court therefore turns to Count II's internal do-not-call claims.

## IV. <u>Internal Do-Not-Call Claims: Consent-Based Arguments</u>

Allstate advances three arguments in its summary judgment motion. It first contends that the undisputed summary judgment evidence establishes that Hossfeld consented to receiving the

16

calls at issue. *See* Mem. Supp. Allstate MSJ 9, 11–12, ECF No. 239. Second, Allstate maintains that, because Hossfeld consented to receiving the calls at issue, he lacks statutory and Article III standing to sue because, respectively, he has not suffered a concrete injury in fact, and he also falls outside the zone of interests protected by the TCPA. *See id.* at 19–20. Allstate premises its third argument on principles of agency law, contending that it did not directly place the calls at issue and that Hossfeld has not come forward with sufficient evidence to hold it vicariously liable for the calls placed by Transfer Kings and Atlantic at the behest of its agents, Fleming and Gilmond. *See id.* at 12–18.

### A. Governing Legal Principles

To show standing to sue under Article III of the Constitution, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Where standing is at issue, a "plaintiff challenged to produce evidence of injury at the summary-judgment stage must do so." *Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024) (citing *Lujan*, 504 U.S. at 561). In the first of its consent-based arguments Allstate asserts that because Hossfeld allegedly consented to receiving the calls at issue, he has not come forward with enough evidence to show a concrete and particularized injury. *See* Allstate Mem. Supp. MSJ 24–25.

In essence, Allstate argues that Hossfeld's injuries, the calls, are self-inflicted, meaning not traceable to Allstate's conduct. But in *Federal Election Commission v. Cruz*, the Supreme Court declined to "recognize an exception to traceability for injuries that a party purposely incurs." 596 U.S. 289, 296 (2022); *see id.* at 296-98. Rather, a self-inflicted injury can support standing provided that the traceability and redressability requirements are met. *See Cruz*, 594 U.S. at 297–98. That said, the question of whether the plaintiff's injury is self-inflicted is relevant to, but not necessarily dispositive of, the traceability and redressability elements of

standing. *See id.*; *Parvati Corp. v. City of Oak Forest*, 630 F.3d 512, 518 (7th Cir. 2010). The court therefore treats Allstate's standing argument as a traceability and redressability issue.

Allstate also raises a statutory standing challenge. *See Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 196–97 (2017) (discussing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), and explaining that the term "prudential standing," formerly used to describe this doctrine, is misleading). Stated succinctly, the "question [for statutory standing purposes] is whether the statute grants the plaintiff the cause of action that he asserts." *Id.* at 196–97. Courts presume that a statute ordinarily provides a cause of action "only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" Hence the doctrine has earned the moniker "zone of interests" test. *Id.* at 197 (quoting *Lexmark*, 572 U.S. at 127). Generally, the zone of interests analysis begins by asking, using traditional methods of statutory interpretation, "whether the statute arguably protects the sort of interest a would-be plaintiff seeks to advance." *T.M.S. ex rel. T.S. v. Heart of CarDon, LLC*, 43 F.4th 737, 741 (7th Cir. 2022) (quoting *Stockbridge-Munsee Cmty. v. Wisconsin*, 922 F.3d 818, 821 (7th Cir. 2019)). Next, the court must "determine [whether] the interests claimed by the plaintiff are among those statutory interests," but the court does not inquire "whether, in enacting the particular provision, Congress had this specific sort of plaintiff in mind." *Id.* (internal citation omitted) (quoting *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 486 (1992)).

Labeling Hossfeld a "professional TCPA plaintiff," Allstate contends that the TCPA is intended to stop unwanted calls. Allstate's Mem. Supp. MSJ 20 (citation omitted). Hossfeld lies beyond the zone of interests the TCPA protects, continues Allstate, because he invited the calls he received. *See id.* at 20–21. "There can be no invasion of Hossfeld's privacy," Allstate argues, "where, as here, he invites the calls and baits the callers into what he now claims to be TCPA violations." *Id.* at 21.

Finally, the parties devote considerable attention to statutory and regulatory interpretation questions related to Hossfeld's purported consent and invitation to be called. These legal

arguments boil down to whether a defense of consent exists to an internal do-not-call claim under 47 U.S.C. § 227(c)(5) and the internal do-not-call regulations, 47 C.F.R. § 64.1200(d).

Delving into the parties' contentions, Hossfeld emphasizes textual differences between regulations implementing the internal and national do-not-call lists. The national do-not-call registry regulations provide in pertinent part: "Any person or entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating this requirement [to honor the national do not call registry]: if . . . . it has obtained the subscriber's prior express invitation or permission. Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed." 47 C.F.R. § 64.1200(c)(2)(ii); *see, e.g.*, *Ailion v. Healthcare Sols. Team, LLC*, 2023 WL 2333299, at *4 (N.D. Ill. Mar. 2, 2023). The internal do-not-call regulations contain no comparable exception. *See* 47 C.F.R. § 64.1200(d). The potential significance of this difference flows from the general statutory interpretation principle that, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the regulator] acts intentionally and purposely in the disparate inclusion or exclusion." *Bates v. United States*, 522 U.S. 23, 29–30 (1997) (alterations omitted) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

Allstate contends that statutory text supports its position. The portion of the TCPA that creates a private right to sue for violating the internal do-not-call rules provides: "It shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent *telephone solicitations* in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5) (emphasis added). Allstate directs the court to the TCPA's definition of "telephone solicitation" to mean "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message (A) to any person

19

with that person's prior express invitation or permission; (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization." 47 U.S.C. § 227(a)(4).

"Statutory definitions control the meaning of statutory words ... in the usual case." *Burgess v. United States*, 553 U.S. 124, 129 (2008) (quoting *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949); other citation omitted). Applied to the affirmative defense in 47 U.S.C. § 227(c)(5), this principle shows that the defense incorporates the exception for "prior express consent and the other exceptions carved out of the TCPA's definition of 'telephone solicitation.'" It does not necessarily follow, however, that prior express invitation or permission is a defense to every internal do-not-call claim, for the § 227(c)(5)'s affirmative defense does not focus on the particular call so much as whether the defendant has implemented "reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations." 47 U.S.C. § 227(c)(5).

The parties cite cases they claim show that district courts have split over whether consent is a defense to an internal do-not-call claim. *Compare Johansen v. Efinancial LLC*, 2021 WL 7161969, at *10–11 (W.D. Wash. June 11, 2021), *report and recommendation adopted*, 2022 WL 168170 (W.D. Wash. Jan. 18, 2022); *Buja v. Novation Cap.*, *LLC*, 2017 WL 10398957, at *5 (S.D. Fla. Mar. 31, 2017) (dictum), *with Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099, 1125-26 (W.D. Mo. 2020); *Simmons v. Charter Commc'ns, Inc.*, 222 F. Supp. 3d 121, 131 (D. Conn. 2016), aff'd, 686 F. App'x 48 (2d Cir. 2017); *Allard v. SCI Direct, Inc.*, 2017 WL 2957883, at *6 (M.D. Tenn. July 10, 2017).

To resolve the instant motions, the court can, and does, assume for the sake of argument that a prior express consent or invitation defense exists to Hossfeld's internal do-not-call claims. A substantial body of case law applying this defense in other TCPA contexts, such as in junk fax cases and on national do-not-call list claims, exists. *See, e.g.*, *A.D. v. Credit One Bank, N.A.*, 885 F.3d, 1054, 1065 (7th Cir. 2018); *Blow v. Bijora, Inc.*, 855 F.3d 793, 803–05 (7th Cir. 2017);

*see also Craftwood II, Inc. v. Generac Power Sys., Inc.*, 63 F.4th 1121, 1126 (7th Cir. 2023) (discussing defense of express permission to receive advertisements by fax).

**B. Evidence That Hossfeld Consented To or Invited the Calls**

The foregoing standing and statutory arguments hinge on Allstate's factual contention that Hossfeld used the Policy Genius website to opt into receiving insurance quotes, thereby consenting to receiving the calls at issue.[3]  According to an email message Basit sent Allstate personnel, Basit said he had asked Atlantic for documentation substantiating that Hossfeld's 8888 phone number was an opt in lead.  *See* email from Basit at TCF 0021 (Dec. 14, 2020, at 9:59 a.m.), Pl.'s Ex J.  Also according to Basit, Atlantic responded by sending a spreadsheet of leads identified in this record as defendant's Exhibit E.  *See id.*  In the email, Basit told Allstate that Atlantic told him that the spreadsheet came from KP Leads.  *See id.*  The spreadsheet, which is in evidence, reflects that Hossfeld's 8888 phone number; the name Michael Bradley; an email address beginning with "michaelbradley1"; and a Texas mailing address are associated with a lead from Policy Genius and the date September 25, 2020.  Pl.'s Exhibit E at 1, ECF No. 240-2 at 272.  No further information or details are given.  *See id.*

Hossfeld's hearsay objections to the spreadsheet and witness testimony based on it are well taken.  *See* Resp. to SMF ¶ 2.  Hearsay is a statement "the declarant does not make while testifying at the current trial or hearing a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c)(1)–(2) (semicolon omitted).  "To be considered on summary judgment, evidence must be admissible at trial, . . . .  If the evidence is inadmissible hearsay, the courts may not consider it.  And when a document contains multiple layers of hearsay, . . . each layer must be admissible."  *Prude v. Meli*, 76 F.4th 648, 660 (7th Cir. 2023) (ellipses in original) (quoting *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)).

---

3   The record contains no evidence of the content of the policygenius.com website.  The record is therefore insufficient to find that entering information into policygenius.com provides the written consent required by Allstate's IDNC policy.  Allstate's consent defense fails for this independent reason.

Fleming, Allstate's agent, and Basit, Transfer Kings' principal, testified that they believed that someone using Hossfeld's number opted into receiving calls based on the purported KP Leads spreadsheet. *See* Allstate's SMF ¶ 2; Basit's Dep. 74; Fleming's Dep. 57 (testifying that he does not know where Basit got the spreadsheet). This testimony comprises the first layer of hearsay. *See, e.g.*, *Momient v. Nw. Collectors, Inc.*, 666 F. App'x 531, 538 (7th Cir. 2016). At the next layer, Basit allegedly received the spreadsheet from Atlantic, which purportedly told Basit (this is also hearsay) that the spreadsheet came from KP Leads. KP Leads represented (also hearsay) that the spreadsheet established that Hossfeld's phone number resulted from his opting into receiving calls marketing insurance. *See* Basit email (Dec. 14, 2020 at 9:59 a.m.), Pl.'s Ex. J at TCF 21. These multiple layers of hearsay, for which no exception or exemption has been established, render the witness's testimony and the spreadsheet inadmissible. Allstate has not laid an evidentiary predicate tracing the hearsay statements in the spreadsheet to their source, *i.e.*, the data and statements that underly them. *Compare Last Atlantis Cap. LLC v. AGS Specialist Partners*, 262 F. Supp. 3d 641, 764–75 (N.D. Ill. 2017) (sustaining hearsay objections to spreadsheet); *W. Loop Chiropractic & Sports Injury Ctr., Ltd. v. N. Am. Bancard, LLC*, 2018 WL 3738281, at *4 & n.7, 5 (N.D. Ill. Aug. 7, 2018) (sustaining hearsay objection to testimony that called party consented to receive faxes), *with Kuebler v. Nucare Servs. Corp.*, 2016 WL 946950, at *2–3 (N.D. Ill. Mar. 14, 2016) (recognizing that spreadsheet would be hearsay if not produced by a party opponent).

Additionally, to be admissible at summary judgment, "documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) [since recodified as Fed. R. Civ. P. 56(c)] and the affiant must be a person through whom the exhibits could be admitted into evidence." *Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 496 (7th Cir. 2006) (quoting *Scott v. Edinburg*, 346 F.3d 752, 760 n.7 (7th Cir. 2003)). As a matter of evidence, satisfying the requirement of authenticating or identifying an item of evidence means "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Furthermore, an affidavit or declaration at summary judgment "must be

made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Hossfeld cites evidence calling into question the authenticity of the purported lead spreadsheet. *See* Pl.'s Resp. to SMF ¶ 2. A director of the company that operates Policy Genius avers in an uncontested declaration that she personally oversaw a search of its lead database for Hossfeld's 8888 phone number; the email address listed on the purported KP Leads spreadsheet; and the Internet Protocol ("IP") address associated with the lead. Decl. of K. Rutigliano ¶ 4-6, Pl.'s Ex. X. Policy Genius did not identify any record of that phone number in its lead database or any reference to that IP address. *Id.* ¶ 4. Furthermore, Policy Genius has never had any relationship with KP Leads, LLC. *Id.* ¶ 7. In view of this uncontested evidence, the spreadsheet has not been authenticated by someone with personal knowledge and is inadmissible for this reason as well.

The closest Allstate comes to authenticating the spreadsheet is its citation to Basit's email message dated December 14, 2020, stating that the spreadsheet was produced by KP Leads. *See* Pl.'s Ex. J., ECF No. 248-26. This unsworn email message does not show that Basit had personal knowledge of facts necessary to lay a foundation to testify that the spreadsheet is what it purports to be. *See id.* Indeed, Basit's deposition testimony, even viewed in the light most favorable to Allstate, makes clear that Basit did not do anything to confirm the source of the spreadsheet. *See* Basit Dep. 74. *See Last Atlantis Cap.*, 262 F. Supp. 3d at 674-77.

Since the spreadsheet and witnesses' testimony based on it are inadmissible, the following proposition must be deemed undisputed for want of admissible controverting evidence: Hossfeld "has never given written consent to Allstate – or anyone on Allstate's behalf - to call his cell phone for purposes of telemarketing." Allstate's Resp. to SAF ¶ 9 (citing Hossfeld Decl. ¶ 3, Pl.'s Ex. G).

Remaining as the factual basis for Allstate's consent defense are Hossfeld's conduct and oral statements during and in response to the calls. Much of this evidence comes from the call transcripts and recordings themselves. As Allstate points out, Hossfeld prolonged the calls,

apparently feigned interest in insurance quotes, gave false names, and used assumed names. Hossfeld claims that he did so in an effort to gather sufficient information to cause the calls to stop, a claim that is undisputed on this record due to the absence of admissible evidence provided by Allstate. *See generally* Pl.'s Resp. to SMF ¶¶ 3–41, Allstate's Resp. to SAF ¶ 5. Given Hossfeld's undisputed purpose, this conduct prolonged the calls but did not evince Hossfeld's consent to further calls or transform Hossfeld's injury into a self-inflicted one. Rather, the injury to Hossfeld was complete when Allstate placed each call to his phone number, thereby intruding upon his peace and diverting his attention and, as the regulation states, failing to honor his request not to be called by Allstate. *See* 47 C.F.R. § 64.1200(d)(4). As the Seventh Circuit has explained, the TCPA responds to the "pestilence of robocalls, scam calls, and texts pinging our attention away." *Craftwood II, Inc. v. Generac Power Sys., Inc.*, 63 F.4th 1121 (7th Cir. 2023); *see also Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2344–45 (2020) (opinion of Kavanaugh, J.); *Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 305–06 (7th Cir. 2017).

Regarding Hossfeld's requests for a callback number and his provision of a phone number at which some of the telemarketers could reach him if the call disconnected, the consent or invitation required by the TCPA must, as a matter of statute, be express. 47 U.S.C. § 227(a)(4), the express consent requirement means that "the scope of a consumer's consent depends on its context and the purpose for which it is given. Consent for one purpose does not equate to consent for all purposes." *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 737 (N.D. Ill. 2014) (deriving this rule from the FCC's decisions in *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Report and Order, 27 FCC Rcd. 1830, 1840 ¶ 25 (Feb. 15, 2012) and *In re GroupMe, Inc./Skype Comm'n S.A.R.L Petition for Expedited Declaratory Ruling, Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Declaratory Ruling, 29 FCC Rcd. 3442 (Mar. 27, 2014). Even viewed in the light most favorable to Allstate, Hossfeld expressed a limited form of consent to continue the particular call so that Hossfeld could try to get the calls to stop. *See, e.g.,* Pl.'s Resp. to SMF ¶¶ 14, 26, 28.

24

In sum, the factual basis for Allstate's consent-based arguments fails. The court therefore denies summary judgment to Allstate on these issues.

### V. __Allstate's Liability for the Calls__

The TCPA affords a private right to sue to a "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). As discussed in Part I.A, the do-not-call regulations provide, "No person or entity shall initiate any artificial or prerecorded-voice telephone call . . . unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity." 47 C.F.R. § 64.1200(d). The regulation then lists "minimum standards" the procedures must meet, such as having a written internal do-not-call policy, § 64.1200(d)(1); training of its personnel, § 64.1200(d)(2); recording do-not-call requests, § 64.1200(d)(3); identification of the caller or telemarketer, § 64.1200(d)(4); and retaining records of a do-not-call request for five years, § 64.1200(d)(6). "A do-not-call request must be honored for 5 years from the time the request is made." 47 C.F.R. § 64.1200(d)(6).

Hossfeld moves for summary judgment on Allstate's liability for the calls he received beginning in November 2020. He argues that Allstate's internal do-not-call policies and practices violate the TCPA and its regulations in two ways : (1) by permitting calls to be placed to a number on Allstate's internal do-not-call list if Allstate believes that it has received prior express consent or invitation for the call; and (2) by not providing adequately for coordination of Allstate's internal do-not-call list with non-contracted vendors such as Transfer Kings and Atlantic. *See* Pl.'s Br. Supp. MSJ 12–14, ECF No. 229-1. Allstate responds that it cannot be held directly or vicariously liable under either the internal do-not-call regulations or principles of agency law for the calls Hossfeld received. *See* Allstate's Mem. Supp. MSJ 12–24. Each side seek summary judgment under agency law principles, and the parties have exhaustively briefed the issue. *See* Allstate's Mem. Supp. MSJ 12–19, ECF No. 239; Pl.'s Br. Supp. MSJ. 14–24, ECF No. 29-1.

### A. Facial Attack on Internal Do-Not-Call Policy

Allstate's internal do-not-call policy carves out an exception where a consumer or customer on the Allstate do-not-call list has made an inquiry about a product or service as evidenced by an express written invitation or consent to call the person and phone number. "The inquiry must be properly documented in the consumer or customer file." *Id.* (quoting Allstate IDNC Policy at ALL000233, Pl.'s Ex. A). Hossfeld argue that this carve out violates the TCPA.

As explained in Part IV.B, *supra*, the admissible evidence in the summary judgment record does not permit a finding that Hossfeld consented to receiving the calls at issue. Thus, regardless of how the court rules on the question of whether Allstate's IDNC policies' carve out for consent comports with the TCPA, the ruling would not affect Hossfeld's claims. Because Hossfeld lacks a personal stake in the abstract question of whether the consent exception in Allstate's internal do-not-call policy violates the TCPA, the court does not reach this issue.

### B. Vicarious Liability

Allstate maintains that nothing in the text of the internal do-not-call regulations, 47 C.F.R. § 64.1200(d), requires it to coordinate its internal do-not-call lists with non-contracted vendors like Transfer Kings and Atlantic who market the services of multiple insurance companies. *See* Allstate's Mem. Supp. MSJ 9–10, 12. Regardless, the parties agree, as they must, that, at a minimum, the TCPA requires coordination of internal do-not-call lists where an agency relationship exists between the defendant and the third party who places a call. *See, e.g.*, *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021); *United States v. Dish Network L.L.C.*, 954 F.3d 970, 976 (7th Cir. 2020); *Warciak v. Subway Rests., Inc.*, 949 F.3d 354, 356–57 (7th Cir. 2020); *see also Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 937–38 (7th Cir. 2016) (applying agency principles to determine whether defendant was vicariously liable for faxes sent in violation of the TCPA). So, if Atlantic acted as Allstate's agent when Atlantic called Hossfeld, Allstate is liable for Atlantic's failure to honor Hossfeld's do-not-call requests to Allstate. *See, e.g.*, *Bilek*, 8 F.4th at 587–88; *Dish Network*, 954 F.3d at 976.

To succeed on his agency theory, Hossfeld must show "(1) a principal/agent relationship exists, (2) the principal controlled or had the right to control the alleged agent's conduct, and (3) the alleged conduct fell within the scope of the agency." *Id.* at 587 (citing *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 732 (7th Cir. 2014); other citations omitted). An agency relationship can be created through: "(1) express actual authority, (2) implied actual authority, (3) apparent authority." *Bridgeview Healthcare Ctr.*, 816 F.3d at 938 (citing *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 866 (7th Cir. 1998)).

> Express authority exists when a principal expressly authorizes an agent and the agent acts on the principal's behalf and subject to the principal's control. *Clarendon Nat'l Ins. Co. v. Medina*, 645 F.3d 928, 935 (7th Cir. 2011) (citing Restatement (Third) of Agency § 1.01 (2006)). Apparent authority exists when a third-party reasonably relies on the principal's manifestation of authority to an agent. *Am. Soc'y of Mech. Engineers v. Hydrolevel Corp.*, 456 U.S. 556, 565–74, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (referencing the Restatement (Second) of Agency § 8 (1957)); Restatement (Third) of Agency § 2.03 (2006). Statements by an agent are insufficient to create apparent authority. Id.

*Warciak*, 949 F.3d at 357.

Depending on the circumstances, a contract can create an agency relationship, but not all contracts do so. *Id.* at 939. The decision in *Dish Network* provides an illustrative example. There, a seller of satellite television services, Dish, contracted with retailers who marketed its services. *See Dish Network*, 974 F.3d at 757. Like Allstate's contracts with Gilmond and Fleming, Dish's contracts with the retailers included language disclaiming the existence of an agency relationship, but the Seventh Circuit ruled that the disclaimer was not dispositive under the agency law rule that "parties cannot by ukase negate agency if the relation the contract creates is substantively one of agency," *id.* at 975 (citing Restatement (Third) of Agency § 1.02 (2006). The Seventh Circuit held that an agency relationship existed because other contractual language cumulatively gave Dish "complete control" over the rules and procedures the retailers had to follow.[4] *Id.* Two contractual terms compelled this result: (1) a term requiring the retailers

---

4    The Dish Network court did not reach the question of whether or in what circumstances coordination of an internal do-not-call list is required where an agency relationship does not exist. *Id.* at 975.

to comply with Dish's business rules; and (2) a term stating that Dish could change its business rules at any time and for any, or no, reason. *Id.* The Seventh Circuit also found it significant, among other things, that the retailers "acted directly for [Dish], entering orders into Dish's system." *Id.*

Allstate does not seriously dispute that its contractual relationships with Fleming and Gilmond created a principal-agent relationship in law. *See* Allstate Resp. Opp'n MSJ 9–11, ECF No. 255. Similar to the rules that Dish could change at any time, Gilmond and Fleming's contracts include the following language: "the Allstate Agency Standards . . . as they may be amended from time to time, are expressly incorporated in their entirety as part of this Agreement. The Company reserves the right to amend the ... Agency Standards at any time without prior notice to you." Def.'s 's Ex. C-20 ¶ I(C) (Fleming agency agreement); Def.'s Ex. C-20 ¶ I(C) (Gilmond). Allstate does not dispute that, under this language, it "has the right and ability to change – and does change – its "Agency Standards" any time it believes appropriate. Allstate's Resp. to SMF ¶ 52; *see also id.* ¶ 53 (agent may be terminated for failure to follow Agency Standards). In turn, Allstate's Agency Standards include requirements for agents' TCPA compliance (such as limiting the times of day during which agents may place calls, *id.* ¶ 63), expressly incorporate its internal do-not-call policy, and requires its agents and their non-contracted telemarketers to adhere to both policies. *Id.* ¶¶ 4–5 (undisputed during relevant time period).

Allstate's Agency Standards also dictate what an agent must do when retaining a vendor to place calls to sell Allstate products and services: "Agencies should ensure that an external provider offering services through these channels complies with all components of these corporate policies and applicable state and federal laws and regulations. However, you [the agent] are ultimately responsible for ensuring that telephone calls, texts and emails sent by your agency, or any outside vendor on your behalf, comply with applicable federal and state laws." Def.'s Ex. M at 12, ECF No. 248-29 at 12. As further evidence that Allstate authorized its agents to engage outside telemarketing vendors and exercised control over their decisions, Allstate

28

maintains a list of prohibited telemarketing vendors agents are forbidden to use. Allstate's Resp. to SMF ¶ 54. As with the contracts in Dish Network, the foregoing undisputed facts concerning Fleming and Gilmond's contractual relationship with Allstate more than suffice to show that Allstate retains complete control over how an agent conducts telemarketing, which vendors an agent selects, and what telephone solicitation activity is permitted. *See Dish Network*, 954 F.3d at 975. Thus, as Allstate appears to concede, had Gilmond and Fleming placed the calls at issue, Allstate would be vicariously liable under an agency theory.

But Gilmond and Fleming hired Transfer Kings, which subcontracted with Atlantic, and Atlantic placed the calls to Hossfeld. Pl.'s Resp. to SAF ¶ 5. Hossfeld relies on a subagency theory to bridge the vicarious liability gap to Atlantic. Pl.'s Resp. Opp'n MSJ 32–33, ECF No. 247.

"A subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal." *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 832 (N.D. Ill. 2016) (citing Restatement (Third) of Agency § 3.15(1)). An agent must have "actual or apparent authority from the principal" to appoint a subagent. *Id.* (citing Restatement of Agency (Third) § 3.15(2)). A subagency theory has been recognized as a valid basis for imposing vicarious liability in TCPA litigation. *See, e.g.*, *id.* at 353–54; *Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 775–76 (N.D. Ill. 2014).

"An agent has actual authority to create a relationship of subagency when the agent reasonably believes, based on a manifestation from the principal, that the principal consents to the appointment of a subagent." Restatement (Third) of Agency § 3.15 cmt. C. Allstate's internal do-not-call policy recognizes that its agents will appoint telemarketing vendors and requires the agent to ensure that they comply with Allstate's IDNC policy: "you [the agent] are ultimately responsible for ensuring that telephone calls, texts and emails sent by your agency, or any outside vendor on your behalf, comply with applicable federal and state laws." Allstate Ex. C-9 at 12. Under this language (what the Restatement calls a manifestation from Allstate),

Gilmond and Fleming had authority to appoint subagents to place telemarketing calls, but they could not avoid their responsibilities as Allstate agents to comply with Allstate's internal do-not-call policies. Indeed, Allstate has a separate written policy, Def.'s Ex. C-16, entitled "Complying with Allstate's DNC Policy when Using External Vendors (2019-2020)." The undisputed evidence therefore shows, as Allstate agents, Gilmond and Fleming had actual authority to hire Transfer Kings. *See Aranda,* 179 F. Supp. 3d at 352; *Smith*, 30 F. Supp. 3d at 775–76.

Hossfeld must also establish that Transfer Kings and Atlantic were appointed as subagents. *See* Restatement (Third) of Agency § 3.15(1). Allstate contends that Hossfeld has not laid the necessary foundation in the summary judgment record to permit a finding that two layers of subagency (Allstate agents appoint Transfer Kings which appoints Atlantic). *See* Allstate Resp. Opp'n MSJ 9–10 (arguing that Hossfeld "blurs the distinctions between the entities involved").

A similar telemarketing subagency problem arose in *Desai v. ADT Security Systems., Inc.*, 78 F. Supp. 3d 896 (N.D. Ill. 2015), a case involving ADT, which sells home security services. ADT hired the Elephant Group, Inc. ("EG"), to generate leads and engage in contractually limited telemarketing. *See id.* at 899–900. EG subsequently subcontracted with a company referred to as PMG to provide sales leads, and PMG bought leads from a fourth party company called EMI. EMI, in turn, engaged in a robocalling campaign of millions of robocalls offering to sell ADT's services. *See id*. (messages began, "Hello, my name is Jennifer, and I'm with ADT . . . . ). ADT did not learn of the existence of some of the subcontracting relationships until a TCPA lawsuit was filed. *Id.* at 901.

On cross summary judgment motions, the *Desai* court concluded that a subagency relationship existed. *Id.* at 904. Under the contracts, "PMG paid in advance for a specific number of leads and approved the script for EG's calls. PMG could also specify the target markets from which it wanted to receive leads, the content of any messages EMI was supposed to leave, and how EMI should screen callers before transferring them." *Id.* at 904. Together

30

these contractual terms demonstrated sufficient control the principal to show a subagent relationship. *Id.*

The summary judgment evidence in the instant case is similar. Undisputed evidence in the record shows that Fleming and Gilmond paid for a certain number of leads, that they specified the target market (Texas), that they had the right to approve the script used, and that they specified the criteria used to screen (referred to as filters) callers, *e.g.*, age, number of drivers in the family, and no accidents in the past three years. *See* Allstate's Resp. to SAF ¶¶ 2-3; Transfer Kings' Marketing Proposal to Fleming at 1 (dated Sept. 14, 2020), Def.'s Ex. G, ECF 240-2 at 298; Transfer Kings' Presentation, Def.'s Ex. N, ECF No. 240-2 at 374 (page titled "Qualifying Questions"). These undisputed facts demonstrate sufficient control by Gilmond to find a subagency relationship as a matter of law. *See Desai*, 78 F. Supp. 3d at 905; *Bilek v. Nat'l Cong. of Employers, Inc.*, 470 F. Supp. 3d 857, 86 (N.D. Ill. 2020); *Gebka v. Allstate Ins. Co.*, 2021 WL 4951520, at *3 (N.D. Ill. Oct. 25, 2021) (holding that a complaint stated a claim, based on subagency theory, that Allstate was vicariously liable for telemarketing calls placed by an agent's subcontractor). No party argues that Gilmond or Fleming expressly or impliedly prohibited Transfer Kings from appointing a subagent, that any Allstate policy or practice forbade Transfer Kings from subcontracting, or that the practice in the industry was not to permit a vendor such as Transfer Kings from appointing subagents. See Restatement (Third) of Agency § 3.15 cmt. D*; Griffin v. Safeguard Props. Mgmt., LLC*, 2020 WL 6118572, at *6–7 (N.D. Ill. Oct. 16, 2020); *Thakkar v. Ocwen Loan Serv. LLC*, 2019 WL 2161544, at *7 (N.D. Ill. May 17, 2019).

Accordingly, the undisputed material summary judgment evidence establishes that: (1) Gilmond and Fleming were Allstate's agents with actual authority to hire telemarketing vendors and appoint them as subagents; (2) they appointed Transfer Kings as a subagent; and (3) Transfer Kings appointed Atlantic as its subagent. The court therefore grants Hossfeld's motion for summary judgment on Allstate's vicarious liability and denies Allstate's cross motion

on this issue.  The court need not reach the parties' arguments under other agency theories, such as ratification and apparent authority.

### C. Willfulness

In light of the court's resolution of the parties' consent and vicarious liability arguments, no genuine dispute exists that Allstate is liable for failing to honor Hossfeld's do-not-call requests in violation of 47 C.F.R. § 64.1200(d).  Remaining is Allstate's argument that Hossfeld has not come forward with sufficient evidence to warrant summary judgment that Allstate's violations were knowing and willful.  *See* Allstate's Resp. to MSJ 24 (citing no case or statute). The TCPA authorizes a private plaintiff to sue to "recover monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater."  47 U.S.C. § 227(c)(5)(B).  The court may award treble damages if it finds "that the defendant willfully or knowingly violated the regulations."  47 U.S.C § 227(c)(5).

The parties cite no Seventh Circuit case interpreting the phrase "willful and knowing" in 47 U.S.C. § 227(c)(5), and the court has located none.  District courts in the Seventh Circuit "generally have interpreted [willful or knowing] to mean voluntary, intentional, actions, and not to require specific knowledge that the action constitutes a violation of the TCPA."  *Bakov v. Consol. World Travel, Inc.*, 2019 WL 6699188, at *7 (N.D. Ill. Dec. 9, 2019), *amended,* 2021 WL 4026978 (N.D. Ill. Mar. 8, 2021) (citing *Bridgeview Health Care Center Ltd. v. Clark*, 2013 WL 1154206, at *7 (N.D. Ill. March 19, 2013)); *see also Poonja v. Kelly Services, Inc.*, 2021 WL 4459526, at *3 (N.D. Ill. Sept. 29, 2021); *Ashok Arora v. Midland Credit Mgmt., Midland Funding, LLC*, 2021 WL 3737695, at *3 (N.D. Ill. Aug. 23, 2021); *Hossfeld v. Lifewatch, Inc.*, 2021 WL 1422785, at *8 (N.D. Ill. Feb. 5, 2021); *Bakov*, 2019 WL 6699188, at *7–8 (collecting and discussing additional cases).  This court agrees with and adopts this interpretation of the phrase "knowing and willful" in 47 U.S.C. § 227(c)(5).

Citing no case or statute, Allstate raises what amounts to a good faith defense.  *See* Allstate's Resp. Opp'n Summ. J. 23–24.  It submits that it reasonably and in good faith believed that prior express consent or invitation is a defense to a TCPA internal do-not-call claim, that the

list of leads on which Hossfeld's number appeared was represented to be 100% opt in, and that Allstate therefore had a good faith basis for not scrubbing the list against its internal do-not-call list. *See id.* Under the interpretation of § 227(c)(5) the court adopts today, to be knowing and willful the defendant's "act [violating the TCPA must] be intentional or volitional, as opposed to inadvertent;" it does not require a showing "that defendant must have known that the conduct would violate the statute." *Bakov*, 2019 WL 6699188, at *7 (citing *Bridgeview Health Care Ctr. Ltd. v. Clark*, 2013 WL 1154206, at *7 (N.D. Ill. March 19, 2013)). Allstate does not suggest that the calls were non-volitional in this sense, and the summary judgment record does not support such a finding.

On the contrary, the undisputed summary judgment evidence establishes that Fleming and Gilmond intentionally and volitionally hired Transfer Kings to place calls to sell Allstate services and that calls were deliberately placed to Hossfeld's phone number. *See* Allstate's Resp. to SAF ¶¶ 16, 21; Pl.'s Resp. to SMF ¶¶ 43, 44. The court therefore grants Hossfeld's motion for summary judgment on liability and willfulness under 47 U.S.C. § 227(c)(5).

## VI. Conclusion

For the reasons stated, the parties' cross motions for summary judgment are granted in part and denied in part. Specifically, the court rules as follows:

1. The failure to identify claims alleged in Count I of the second amended complaint are dismissed;

2. Allstate's motion for summary judgment on Count II is denied;

3. Hossfeld's motion for summary judgment on Allstate's liability for Count II is granted; and

4. Hossfeld's motion for summary judgment that Allstate's violations were knowing and willful under 47 U.S.C. § 227(c)(5) is granted.

Dated: March 28, 2024                              /s/ Joan B. Gottschall
                                                   United States District Judge

Appendix A

| Short Form | Document Name | Sealed ECF No. | Public ECF No. |
|---|---|---|---|
| Pl.'s MSJ | Plaintiff's Motion for Summary Judgment on Liability and Willfulness | 229 | 236 |
| Pl.'s Br. Supp. MSJ | Brief in Support of Plaintiff's Motion for Summary Judgment on Liability and Willfulness | 229-1 | 238-1 |
| Allstate's Mem. Opp'n To Pl.'s MSJ | Allstate's Opposition to Plaintiff's Renewed Motion for Summary Judgment | | 255 |
| Reply Supp. Pl.'s MSJ | Reply in Support of Plaintiff's Motion for Summary Judgment on Liability and Willfulness | 264 | 265 |
| Pl.'s SMF | Plaintiff's LR 56.1 Statement of Material Facts | 232 | 237 |
| Allstate's Resp. to SMF | Allstate's Response to Plaintiff's LR 56.1 Statement of Material Facts | 256 | |
| Allstate's SAF | Allstate Insurance Company's Statement of Additional Material Facts | | 257 |
| Pl.'s Resp. to SAF | Plaintiff's Response to Allstate's Statement of Additional Material Facts | 266 | 267 |
| Allstate's MSJ | Allstate Insurance Company's Motion for Summary Judgment | | 226 |
| Allstate's Mem. Supp. MSJ | Allstate Insurance Company's Memorandum in Support of its Motion for Summary Judgment | | 239 |
| Pl.'s Opp'n to Allstate's MSJ | Plaintiff's Opposition to Allstate's Motion for Summary Judgment | 247 | 250 |
| Allstate's Reply Supp. MSJ | Allstate Insurance Company's Reply in | | 273 |

34

|  | Support of its Motion for Summary Judgement |  |  |
|---|---|---|---|
| Allstate's SMF | Allstate Insurance Company's Statement of Undisputed Material Facts |  | 240 |
| Pl.'s Resp. to SMF | Plaintiff's Response to Allstate's LR 56.1 Statement of Material Facts | 248 | 251 |
| Pl.'s SAF | Plaintiff's Additional Material Facts that Preclude Summary Judgment for Allstate | 249 | 252 |
| Allstate's Resp. to SAF | Allstate's Response to Plaintiff's Additional Material Facts | 271 | 270 |